# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

(Cite as: 2004 WL 1398024 (D.N.J.))

Page 1

C

Motions, Pleadings and Filings

United States District Court,
D. New Jersey.
Dorothy HEINDEL and Jean Kinmoth Plaintiff,
v.
PFIZER INC., Pharmacia Corp., Monsanto Co.,
G.D. Searle & Co. and Merck & Co.,
Inc., Defendants.
No. Civ.A. 02-3348(SRC).

June 7, 2004.

Donna Siegel Moffa, Trujillo Rodriguez & Richards, LLP, Haddonfield, NJ, for Plaintiff.

Steven A. Karg, Norris, McLaughlin & Marcus, PC, Somerville, NJ, Wilfred P. Coronato, Hughes, Hubbard & Reed LLP, Jersey City, NJ, for Defendants.

OPINION

CHESLER, J.

*1 This matter comes before the Court on the motion of Defendants, Pfizer, Inc., Pharmacia Corporation, the Monsanto Company, Searle & Co., and Merck & Co., Inc. for summary judgment. The Court has opted to adjudicate this motion on the papers, and renders this opinion without oral argument pursuant to Fed.R.Civ.P. 78. For the reasons set forth more fully below, Defendants' motion is granted, and summary judgment entered dismissing Plaintiff's complaint.

I. INTRODUCTION

Plaintiffs in this matter are two consumers who suffer from pain associated with osteoarthritis and other conditions. Both took prescription drugs to treat their conditions and both got relief from the drugs they took. Though neither plaintiff suffered any physical injury from either of the drugs at issue, both now claim that they are entitled to damages for the "economic injuries" they suffered due to Defendants' failure to publicize the results of two clinical studies that revealed possible risks associated with the use of the drugs. Plaintiffs assert claims arising under the consumer fraud statutes of New Jersey or "other states," claims for breach of implied warranty of merchantability, and claims for injunctive/equitable relief requiring Defendants to issue revised advertising statements, marketing materials, and product packaging. [FN1]

> FN1. Plaintiffs have also withdrawn several additional claims, which are therefore not addressed in this opinion.

For the reasons adduced more fully below, the Court finds that Plaintiffs' claims lack merit under the laws of Pennsylvania. Moreover, the Court finds that since the Plaintiffs suffered no injury, there is no theory under which they are entitled to recover, and that Defendants are therefore entitled to summary judgment as to all claims.

II. BACKGROUND

A. Facts

The Defendants in this matter manufactured and marketed two prescription pain medications which belong to a class of medications known as "non-steroidal anti-inflammatory drugs," or "NSAIDs." Pfizer, Inc., Pharmacia Corporation, Monsanto Co., and G.D. Searle & Co (collectively the "Celebrex Defendants") are (or were) the makers of Celebrex, while Vioxx is made by Merck & Co. ("hereinafter "Merck"). Non-steroidal anti-inflammatory drugs reduce pain by blocking the body's production of enzymes called cyclooxygenase, or "COX," of which there are two

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 2

2004 WL 1398024 (D.N.J.), 54 UCC Rep Serv 2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

forms: COX-1 and COX-2. Most traditional NSAIDs, (such as ibuprofen) work by blocking the COX-1 enzyme, which reduces pain but may lead to gastrointestinal perforations and bleeds. Celebrex and Vioxx, it is believed, block the COX-2 enzyme that triggers pain and inflamation while sparing the (COX-1) enzyme that helps maintain normal stomach lining. Both drugs are indicated for, inter alia, treating the signs symptoms of osteoarthritis, and rheumatoid arthritis, management of acute pain in adults, and treatment of primary dysmenorrhea.

Plaintiffs Heindel and Kinmonth both suffer from pain associated with osteoarthritis. Both women, who are citizens of Pennsylvania, were treated by the same rheumatologist, Dr. Lawrence Leventhal, and both were prescribed (and took) traditional NSAIDs. Among other things, Heindel had survived esophageal cancer by having part of her stomach removed (and her stomach thereby raised); and Kinmonth had a history of G.I. complications associated with her ingestion of other drugs used to treat her musculoskeltal aches and pains. These factors put both at risk for serious gastrointestinal side effects, including non-steroidal induced ulcers and ulcer complications because "people that are at risk for developing non-steroidal induced ulcers are: people over the age of 60, individuals with a history of G.I. bleed, [and] individuals with concomitant medical problems." (Deposition of Dr. Lawrence J. Leventhal (hereinafter "Leventhal Dep.) at p. 7-8; 24-26.)

*Plaintiff Heindel*

**\*2** Heindel first took Celebrex in February of 1999 when Dr. Leventhal provided her with samples of the drug. (Deposition of Dorothy Heindel (hereinafter "Heindel Dep.") at 44-46; Leventhal Dep. at 14). Heindel responded favorably to Celebrex, which apparently gave her tremendous relief from her arthritis pain and other symptoms, and she did not experience any adverse side effects. (Heindel Dep. at 44-48) She continued to take Celebrex until July of 1999, when she read an article in a consumer newsletter that questioned the utility and safety of new drugs like Celebrex. (Heindel Dep. at 60-63, 99-100). Dr. Leventhal told

Heindel that Celebrex was the best treatment for her, and advised her to continue using it. (Heindel Dep. at 63-64; Leventhal Dep. at 18- 19). Thereafter she resumed taking Celebrex, and apparently used it until February 2001, when, at Dr. Leventhal's suggestion, she switched to Vioxx. (Heindel Dep. at 76-77; Leventhal Dep. at) Vioxx apparently caused her to experience stomach upset, and after a few months she switched back to Celebrex. (Heindel Dep. at 77; Leventhal Dep. at 55). [FN2] In February of 2002, Dr. Leventhal provided Heindel with another prescription drug, Bextra, to "see if it [was] better than Celebrex." (Heindel Dep. At 80). Finding that it was not, Heindel switched back to Celebrex in November of 2002. (Heindel Dep at 84). Heindel does not claim that she suffered ill effects from or was personally injured by Celebrex. It appears that, at least as of the filing of Defendants' motion for summary judgment, she was still taking Celebrex and planned to continue using it in the future. All of Heindel's treatment took place in Pennsylvania, where Dr. Leventhal is located, where she lives, and where she purchased Celebrex and Vioxx.

> FN2. Heindel and Dr. Leventhal testified that Heindel was prescribed and ingested Vioxx. However, Heindel has not made any claims against Defendant Merck & Co., the manufacturers of Vioxx.

*Plaintiff Kinmonth*

Kinmonth was first prescribed Celebrex in May or June of 1999. (Deposition of Jean Kinmonth (hereinafter "Kinmonth Dep.") at 16-18, 95-96; Leventhal Dep. at 28). Some time in the spring of 2000, she switched to Vioxx, which Dr. Leventhal thought might provide her with a greater degree of relief. (Leventhal Dep. at 33-34). Though Vioxx initially provided Kinmonth with more complete relief from her symptoms than Celebrex had, its efficacy declined over time, and she eventually switched back to Celebrex.

Kinmonth does not claim that she suffered ill effects from or was personally injured by Celebrex or Vioxx. It appears that, at least as of the time of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

Page 3

her deposition, she was still using Celebrex. (It is not clear whether she was still taking Vioxx or had any plans to do so.)All of Kinmonth's treatment took place in Pennsylvania, where Dr. Leventhal is located, where she lives, and where she purchased Celebrex and Vioxx.

B. Plaintiff's Claims

Plaintiffs brought this consumer class action on behalf of the purchasers and users of Celebrex and Vioxx, claiming that they are entitled to recover economic damages they sustained due to Defendants' "unconscionable marketing conduct." Plaintiff's Brief (hereinafter "Pl.'s Br") at 1. They are pursuing claims under the New Jersey Consumer Fraud Act (Count III) and for breach of implied warranty of merchantability (Count I). [FN3]

> FN3. Plaintiff's Complaint also contains claims under the New Jersey Product Liability Act (Count II) and for Medical Monitoring (Count V). *See* Complaint ¶¶ 83-91, 109-117. Plaintiffs agreed, in a consent order dated September 22, 2003, to dismiss their medical monitoring claim and to refrain from seeking certification of their products liability claim. Because they were not physically harmed by ingesting Celebrex and Vioxx and are not seeking damages for physical injury, Plaintiffs agreed, in a consent order signed April 28, 2004, to withdraw their individual products liability claims. Finally, Plaintiffs have acknowledged that their claim for injunctive relief is not a separate cause of action, and that accordingly consideration by the Court of that claim would be appropriate only in the event that Plaintiffs were to prevail on the breach of implied warranty and consumer fraud claims.

*3 Plaintiffs claim that Defendants knew, by 1998, that their "selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them," but nonetheless made a marketing decision to "push these drugs to market on claimed improvements in

gastrointestinal safety while downplaying their cardiovascular dangers." Complaint at ¶¶ 23, 24. Plaintiffs contend that Defendants funded two significant clinical trials to justify their advertising claims and demonstrate that Celebrex and Vioxx had greater gastrointestinal safety than traditional NSAIDs-the Celecoxib Long-Term Arthritis Safety Study ("CLASS") and the Vioxx Gastrointestinal Outcomes Research Study ("VIGOR"). Complaint at ¶ 25.

The CLASS study compared gastrointestinal toxicity in arthritis patients taking Celebrex, ibuprofen, and dicofenac. It included patients with heart problems, who were allowed to take low prophylactic doses of aspirin to reduce the risk of adverse cardiovascular events. The VIGOR study-which compared gastrointestinal toxicity in patients taking VIOXX with those taking naproxen to treat arthritis-excluded patients with heart problems. Complaint at ¶ 26, 27. Plaintiffs claim that Defendants' attention to cardiac factors establishes their "secret acknowledgment of the likelihood cardiovascular events." *Id.* at ¶ 28. Plaintiffs further allege that once the studies were concluded the Defendants tried to divert attention from cardiovascular risks by either not publishing cardiovascular data they had gathered or publishing partial information. (Presumably this allegation refers to publication in medical journals or other media traditionally used for the purpose of disseminating the results of clinical trials; it is not clear from the briefing.)

The results of both studies were submitted to the FDA's Arthritis Drugs Advisory Committee ("the Committee") as part of requests to exempt Celebrex and Vioxx from gastrointestinal safety warning in their package inserts. Plaintiffs state that the Committee did not consider the cardiovascular safety of Celebrex, but they do not discuss whether this would have been a normal consideration given the scope of the exemption sought. They also state that, because patients in the VIGOR study suffered significantly more adverse cardiovascular events than those taking naproxen, the Committee suggested that "Merck add a warning to its package insert advising that Vioxx lacked the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 4

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

cardio-protective properties of traditional NSAIDs." *Id.* at 34. However, it is not clear what Merck's obligation was to warn of a protective quality that Vioxx did not have, as opposed to warning of side effects that may have affirmatively caused.

Thereafter, Defendants "initiated extensive pre-release marketing campaigns" that emphasized Vioxx and Celebrex's efficacy without gastrointestinal side effects. This, Plaintiffs claim, was an attempt to "avoid negative publicity from the VIGOR report and the Committee's decisions. *Id.* at 36. Subsequently, Celebrex and Vioxx were approved by the FDA and released for sale. According to the Plaintiffs, Defendants should have (at this point), used their exponential profits to fund further studies to quantify cardiovascular risks, but instead poured money into advertising campaigns that emphasized the gastrointestinal safety of the drugs. As a "result of" these "misleading advertising campaigns, Celebrex and Vioxx were wildly successful." *Id.* at 42-44.

*4 Persistent concern within the medical community about possible links between COX-2 inhibitors and increased blood clotting (with related incidence of cardiovascular events) eventually led to further research and study. In 2001 independent doctors from the Cleveland Clinic published a meta-analysis of the CLASS and VIGOR trials that concluded that COX-2 inhibitors posed an increased risk of adverse cardiovascular events compared to naproxen. Defendants did not modify their package inserts to reflect the results of the Cleveland Clinic study. Though Plaintiffs contend that the FDA sent both Defendants cautionary letters reflecting its concern about their failure to include warn of cardiovascular side effects in direct-to-consumer advertising, it is far from clear that the FDA's letters addressed this issue. Vioxx and Celebrex have not been taken off the market, and remain popular treatments for osteoarthritis and other types of pain.

Plaintiffs admit that they are not pursuing any claims for physical injury, either for themselves or for the two sub-classes they seek to represent. Rather, their claims are based on the economic injury that Defendants' marketing practices have

allegedly caused them. (Pl.'s Br. at 2). Specifically, they posit that Defendants' "uniform failure to disclose known cardiovascular risks associated with Celebrex and Vioxx caused consumers to pay artificially inflated prices for them." Id. Plaintiffs seek to recover some or all of the purchase price consumers paid for these drugs. Pl.'s Br. at 4-5.

Though this suit arises out of economic injuries allegedly suffered by the Plaintiffs, both Heindel and Kinmonth denied, when deposed, that they had suffered economic harm. Both plaintiffs also testified that they took Celebrex and Vioxx at the suggestion of their physicians, and did not rely on advertising or marketing materials created or distributed by Defendants.

III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if all of the probative materials in the record, viewed in the light most favorable to the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Brooks v. Kyler,* 204 F.3d 102, 105, n. 5 (3d Cir.2000); *Celotex v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it influences the outcome under the applicable law. *Anderson,* 477 U.S. at 248.

The moving party bears the initial burden of demonstrating either (1) that there is no genuine issue of fact and that, as a matter of law, the moving party must prevail, or (2) that the non-moving party has not shown facts relating to an essential element of the issue for which he bears the burden of proof. *Celotex,* 477 U.S. at 331. Once either showing is made, the burden shifts to the non-moving party, who must demonstrate facts which support each element of the for which he bears the burden, and establish the existence of genuine issues of material fact. *Id.* To satisfy this burden, the non-moving

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

party "may not rest on mere allegations or denial of his pleading." Fed.R.Civ.P. 56(e). Rather, he must produce sufficient evidence from which a reasonable jury might find in his favor, and may not simply create some metaphysical doubt as to material facts. *Matsushita Elec. Indus. Co. V Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## IV. CHOICE OF LAW

\*5 The parties disagree as to which state's law this Court should apply in considering Plaintiffs' claims. Plaintiffs claim that, because Defendants have failed to establish specific conflicts between the laws of New Jersey and Pennsylvania, the laws of this forum (New Jersey) should apply. They also contend that the objectives underlying the consumer warranty laws of New Jersey and Pennsylvania are identical, thus requiring the application of New Jersey law to Plaintiff's claims. Turning to the governmental interest analysis, Plaintiffs argue that New Jersey has the greatest interest in having its law govern these claims because (1) the New Jersey legislature has expressed a specific intent to protect the citizens of other states from the deceptive practices of businesses located within its boundaries (even if some aspect of the transaction took place outside New Jersey); (2) many of the corporate decisions and actions that form the basis for Plaintiff's claimsincluding the development, production, and marketing of Celebrex and Vioxx-took place in New Jersey; and (3) because "Defendants have other significant contacts with New Jersey that give this state an express interest in having its laws apply to their conduct." Among the contacts mentioned are Defendants' large corporate presence in the state, the considerable number of people it employs, the tax breaks it receives from New Jersey, and the number of lawsuits (unrelated to this one) filed by Defendants in New Jersey courts.

The Defendants contend, for essentially the same reasons, that Pennsylvania law should apply. They stress that both Plaintiffs live in Pennsylvania; that the conduct alleged occurred in Pennsylvania; and that the alleged financial injuries were suffered in

Pennsylvania. All Defendants argue that the mere fact of a corporate presence (a minimum threshold which some of these defendants do not even meet, since only one of the four Celebrex Defendants has headquarters in New Jersey) does not give New Jersey an interest in the adjudication of these claims which overrides that of the Plaintiffs' home state. Thus, they argue, New Jersey has neither sufficient contacts with this litigation nor the requisite governmental interest in having its laws applied.

Federal courts sitting in diversity must apply the choice of law rules of the forum in which they sit. *Klaxon Co v. Stentor Electrical Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed 1477 (1941); *Erie R.R. Co v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Accordingly, New Jersey's choice of law rules govern this Court's analysis. *Chin v. Chrysler Corp.,* 182 F.R.D. 448, 457 (D.N.J.1998). New Jersey's rule "applies a flexible 'governmental interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." *Gantes v. Kason.* 145 N.J. 478, 484, 679 A.2d 106 (1996).

The initial prong of a government interest analysis entails an inquiry into whether there is an actual conflict between the laws of the respective states, a determination that is made on an issue-by-issue basis. *Gantes,* 145 N.J. at 484, 679 A.2d 106; *see also Veazy v. Doremus,* 103 N.J. 244, 248, 510 A.2d 1187 (1986). Hence, the Court's inquiry addresses potential conflicts between (1) the laws pertaining to implied warranty of merchantability; and (2) the consumer fraud statutes of New Jersey and Pennsylvania.

### A. Whether a Conflict Exists

\*6 In addition to not agreeing on which state's laws should apply, the parties do not agree as to how the Court should go about making such a determination. Plaintiffs, citing *Boyes v Greenwich Boat Works,* 27 F.Supp.2d 543, 547 (D.N.J.1998), contend that "[w]here the parties fail to point out or establish any difference in the laws of the various jurisdictions involved in a particular case, its proper for the court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 6

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

to apply the law of the forum." They then point out that, while Defendants may have identified areas of potential differences between the laws of New Jersey and Pennsylvania, these differences are immaterial because the underlying policies of both laws are the same. This approach assumes that the initial determination as to whether a conflict exists should be based on whether the policies underlying the respective laws differ. However, it is clear that under the governmental interest test a court must *"first* determine whether a conflict exists between the laws of the interested states," *Veazey v. Doremus,* 103 N.J. 244, 510 A.2d 1187 (1986) and, *if* the court finds a conflict, *then* determine "the state with the greatest interest in governing the particular issue." *Veazey,* 103 N.J. at 251, 510 A.2d 1187 (emphasis added). To do this, the court must "identify the governmental policies underlying the law of each state and how these policies are affected by each state's contacts to the litigation and the parties." *Id.* Hence, the Court should turn to an evaluation of the underlying policies only after determining that there indeed exists a conflict between the laws of the two states.

None of the parties have conducted a conflict analysis that follows this model, perhaps because aspects of each state's laws are unsettled as to one or another of the claims presented. Complicating matters is the somewhat novel application of implied warranty and consumer fraud remedies to claims that are predicated only on "economic injury." Nonetheless, the Court finds that the parties have indeed pointed out differences between the laws of New Jersey and Pennsylvania, and thus proceeds with the analysis.

1. Breach of Implied Warranty of Merchantability

Defendants argue that Pennsylvania law conflicts with New Jersey law in that, under Pennsylvania law, a claim for breach of implied warranty of merchantability may not be maintained against a seller of prescription drugs. The implied warranty of merchantability, "as described in the Uniform Commercial Code ("U.C.C.") and adopted by Pennsylvania, is 'a warranty that the goods will pass without objection in the trade and are fit for the

ordinary purposes for which such goods are used." ' *Davenport v. Medtronic, Inc.* 2004 WL 193197 (E.D.Pa.2004); 13 Pa.C.S. § 2314. In order to prevail under Pennsylvania law on a claim for breach of implied warranty, a plaintiff must show that the product was "defective." *Thomas v. Carter-Wallace Inc.,* 27 Pa. D. & C. 4th 146, 149 (C.P. Monroe 1994) (citing *Dambacher by Dambacher v. Mallis,* 336 Pa.Super. 23, 485 A.2d 408 (1984)), *aff'd,* 449 Pa.Super. 711, 673 A.2d 412 (1995)(finding that "a breach of implied warranty of merchantability theory in Pennsylvania states that a merchant is 'only liable for harm caused by a defect in their product.' "); *Altronics of Bethlehem, Inc. v. Repco, Inc.,* 957 F.2d 10012, 1005 (3d Cir.1992) (an implied warranty of merchantability plaintiff must establish, inter alia, 'that the product malfunctioned.') *Grant v. Bridgestone Firestone, Inc.* 2002 WL 372941 (Pa.Com.Pl.). New Jersey's uniform commercial code provides, as pertinent, that "[g]oods to be merchantable must be at least such as ... are fit for the ordinary purposes for which such goods are used." The exact showing required to establish a breach of implied warranty of merchantability claim is somewhat more amorphous in New Jersey, and the New Jersey courts have used various terms to describe it. *See Yost v. General Motors Corp.,* 651 F.Supp. 656, 658 (D.N.J.1986) ("[d]amage is a necessary element of ... breach of warranty" claims); *Hollinger v. Shoppers Paradise of New Jersey, Inc.,* 134 N.J.Super. 328, 332, 340 A.2d 687 (Law Div.1975), ("[l]iability is established if the evidence shows that the product was not reasonably fit for the ordinary purposes for which it was sold and [the] defect proximately caused injury to the ultimate consumer."). *See also Kaspirowitz v. Schering Plough Corp.,* 70 N.J.Super. 397, 403-04, 175 A.2d 658 (App.Div.1961) (finding that, where a prescription dandruff shampoo caused the plaintiff to have an adverse reaction "we are not dealing with a Defective product on the sale of which a claim of breach of an implied warranty of merchantability must necessarily rest."); *Adams v. Peter Tramontin Motor Sales, Inc.,* 42 N.J.Super. 313, 325, 126 A.2d 358 (App.Div.1956) (finding that product at issue "met the test of merchantability," where "[i]t was reasonably suitable for ordinary use ... [and]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1398024 (D.N.J.), 54 UCC Rep Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

possessed no remarkable defect."). [FN4]

> FN4. While Pennsylvania's requirement of a manifest defect or malfunction is slightly different than New Jersey's more amorphous standard, which refers variously to "injury" and "defect," this Court finds that there is no actual conflict between the laws of the two states.

**\*7 (a) Whether a Claim for Breach of Implied Warranty can be Maintained Against a Manufacturer of Prescription Drugs**

Defendants contend- and Plaintiff's concedePennsylvania law bars claims for breach of implied warranty against a manufacturer of prescription drugs. Defendants rely on *Makropidis v. Merrell-Dow Pharmaceuticals, Inc.,* 361 Pa.Super. 589, 593, 523 A.2d 374 (1987) (and its progeny), which holds that

> the very nature of prescription drugs themselves precludes the imposition of a warrant of fitness for "ordinary purposes," as each individual for whom they are prescribed is a unique organism who must be examined by a physician who is aware of the nature of the patient's condition as well as the medical history of the patient.

The reasoning in *Makripodis,* which involved a claim against a pharmacist, has subsequently been applied to bar breach of implied warranty claims against pharmaceutical manufacturers and makers of medical devices. *See Luke v. Am. Home Prods. Corp.,* 1998 WL 1781624 at \*6 (Pa.Com.Pl.1998); *Murray v. Synthes (U.S.A.), Inc.,* 1999 WL 672937 at \* 9 (E.D.Pa.1999). *See also Hahn v. Richter,* 543 Pa. 558, 673 A.2d 888, 891 (Pa.1996) (holding that "where the adequacy of warnings associated with prescription drugs is at issue, the failure of the manufacturer to exercise reasonable care to warn of dangers, i.e., the manufacturer's negligence, is the only recognized basis of liability.")

It is uncontested that New Jersey law contemplates no such limitation on breach of implied warranty claims against prescription drug manufacturers. Accordingly, the Court finds that there is an actual

conflict between the laws of New Jersey and Pennsylvania as they pertain to this issue, and proceeds to the next step of the analysis.

**2. Consumer Fraud Claims**

Plaintiffs assert (on behalf of the payer sub-class) a claim arising under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1(c) and "other states' consumer protection statutes." Compl. ¶¶ 93-100. Defendants argue that the Plaintiff's consumer fraud claims should be governed by Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-2 *et seq.*

The UTPCPL provides, as pertinent, that

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act [73 P.S. § 201-3], may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars, and may provide such additional relief as it deems necessary or proper

The NJCFA provides, as pertinent, that

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ... or with the subsequent performance of such person as aforesaid, whether or not any person has been damaged thereby, is declared to be an unlawful practice.

**\*8** N.J.S.A. 56:8-2.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d

2004 WL 1398024 (D.N.J.), 54 UCC Rep Serv.2d 586

(Cite as: 2004 WL 1398024 (D.N.J.))

Page 8

As Defendants point out, the private remedy provisions of both statutes require a plaintiff to have suffered an ascertainable loss. *See Weinberg v Sprint Corp.*, 173 N.J. 233, 801 A.2d 281 (2002) (holding that, in order "to have standing under the Act a private party must plead a claim of ascertainable loss that is capable of surviving a motion for summary judgment."); *Weinberg v Sun Co., Inc.*, 565 Pa. 612, 618, 777 A.2d 442 (2001) ("[t]he statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result of* the defendant's prohibited action.")(emphasis in original).

However, the New Jersey and Pennsylvania laws differ in several important respects. First, reliance is an element of claims arising under the UTPCPL, but not the NJCFA. The Pennsylvania Supreme Court "has held expressly that successful prosecution of a private cause of action under the UTPCPL is dependant upon pleading and proof by the plaintiff that he or she suffered an ascertainable loss 'as a result of the defendant's prohibited conduct. The Court has interpreted this language to mean that a plaintiff must establish his specific reliance on some conduct or representation by the defendant that caused him to incur the loss in question." *Sexton v. PNC Bank*, 792 A.2d 602, 607 (2002) (citation omitted). The New Jersey statute, on the other hand, "requires only a causal nexus between the 'method, act, or practice declared unlawful' and the consumer's 'ascertainable loss.' The [New Jersey] Supreme Court has taken pains to point out that this element is significantly distinct from the requirement of reliance in a common law fraud claim. A defendant who violates the Act because of an unlawful 'method, act, or practice' that results from an omission of a material fact with the 'intent that others rely upon such concealment, suppression, or omission,'... is liable for [such] representations whether 'any person has in fact been misled, deceived, or damaged thereby.' ' *Varacallo v Mass Mutual Life Insurance Co.* 332 N.J.Super. 31, 48, 752 A.2d 807 (2000) (*internal citations omitted*).

Second, the New Jersey and Pennsylvania laws have different damages and attorney's fees

provisions. In "New Jersey the assessment of treble damages and attorney's fees is mandatory when a violation of the Consumer Fraud Act has been proved." *Huffmaster v. Robinson*, 221 N.J.Super. 315, 320, 534 A.2d 435 (Law Div.1986) (*citing Skeer v EMK Motors, Inc.*, 187 N.J.Super. 465, 455 (App.Div.1982). In Pennsylvania those assessments are discretionary. *See Pennsylvania Unfair Competition and Practice Act*, 73 Pa.Cons.Stat. § 201-9.2.

Finally, under Pennsylvania law, the learned intermediary doctrine may bar Plaintiff's UTPCPL claims for reasons similar to those discussed above in relation to the implied warranty claims. Pennsylvania courts that have addressed this issue in the context of claims brought against a maker of prescription drugs have ruled that, "[t]here can be no cause of action based on Defendants' alleged omission because Defendants had no duty to disclose any information directly to Plaintiff. Further, to permit a cause of action under the UTPCPL in this case would effectively make a drug manufacturer the absolute guarantor of the anticipated results and effects of a prescription drug." *Luke v. American Home Products Corp.*, 1998 WL 1781624, * 8 (Pa.Com.Pl.1998) Because New Jersey Courts have not articulated such a doctrinal obstacle to recovery under the state's consumer fraud act, the laws of the states are in conflict in this respect as well.

**\*9** Based on the foregoing, the Court is satisfied that there is an actual conflict between the UTPCPL and the NJCFA. Accordingly, the Court proceeds to the next stage of the analysis.

B. Underlying Governmental Policies and their Relationship to the Parties' Contacts

I.

Having determined that there is an actual conflict between the laws of Pennsylvania and New Jersey, the "next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *D'Agostino v.*

© 2005 Thomson/West No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

*Johnson & Johnson, Inc.,* 133 N.J. 516, 523, 628 A.2d 305 (1993) *(citing Veazy,* 103 N.J. 244, 510 A.2d 1187 (1986) (citations omitted)). With respect to both implied warranties of merchantability and consumer fraud statutes, New Jersey and Pennsylvania have similar (and in some respects identical) policy objectives. In both states, the implied warranty of merchantability is "designed to protect the buyer of goods from bearing the burden of loss where merchandise, though not violating a promise expressly guaranteed, does not conform to the normal commercial standards or meet the buyer's particular purpose, a condition upon which he had the right to rely." *Vlases v. Montgomery Ward & Co.* 377 F.2d 846, 849 (3d Cir.1967) (applying Pennsylvania law). Moreover, the enforcement of implied warranties of merchantability is intended to address potential imbalances in the bargaining position of and knowledge possessed by respective parties to a transaction, and reduce the risk that in the absence of an express warranty the party in the greater bargaining position will be able to sell a substandard product with impunity.

Likewise, the consumer fraud statutes of both states are premised on similar legislative goals. The UTPCPL's " 'underlying foundation is fraud prevention," ' *Weinberg v. Sun Company, Inc.,* 565 Pa. 612, 618, 777 A.2d 442 (2001), and in passing it the legislature intended to protect consumers against unfair or deceptive business practices, *see Pirozzi v. Penske Olds-Cadillac-GMC, Inc.,* 413 Pa.Super. 308, 605 A.2d 373, (1992) *appeal denied,* 532 Pa. 665, 616 A.2d 985, and place the seller and consumer on more equal terms, *see Com. by Packel v. Ziomek,* 145 Pa.Cmwlth. 675, 352 A.2d 235 (1976). The New Jersey statute was conceived to protect the consumer against imposition and loss as a result of fraud and fraudulent practices by sellers of goods and services. *See Scibeck v. Longette* 339 N.J.Super. 72, 770 A.2d 1242 (App.Div.2001). Its three main purposes are generally described as (1) compensating the victim for his or her actual loss; (2) punishing the wrongdoer through the award of treble damages; and (3) attracting competent counsel to counteract the "community scourge" of fraud by providing an

incentive for an attorney to take a case involving a minor loss to the individual. *See Lettenmaier v. Lube Connection, Inc.* 162 N.J. 134, 741 A.2d 591 (1999).

II.

The next stage of the choice of law inquiry examines the relationship of each state's contacts to the policies underlying the respective laws. "If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply." *D'Agostino.* 133 N.J. at 523, 628 A.2d 305 *(citing Veazy,* 103 N.J. 244, 510 A.2d 1187 (1986) (citations omitted)).

*10 The parties' contacts are as follows. Plaintiffs Heindel and Kinmonth live in Pennsylvania, are residents of Pennsylvania, and were treated by their physicians in Pennsylvania. They were prescribed-and purchased-Celebrex and Vioxx in Pennsylvania. To the extent that they saw advertising about Celebrex or Vioxx, or read any package inserts, warnings, or informational newsletters, they appear to have done so in Pennsylvania. (*See* Merck's 56.1 Statement at ¶¶ 16-26; Celebrex Def's 56.1 Statement at ¶¶ 7-54). Moreover, their physicians were based in, and worked from offices or hospitals in Pennsylvania.

With respect to the Defendants, Plaintiffs contend that Merck's pharmaceutical business is conducted through its divisional headquarters located in New Jersey. (Pl.'s 56.1 Statement at ¶ 12). Furthermore, they claim that a vast majority of Merck's corporate functions, including those related to Vioxx, are located in New Jersey; that Merck provided the source information for the VIGOR trial from its New Jersey offices; that New Jersey residents participated in the VIGOR study; and that Merck conducted various public relations functions from its New Jersey headquarters. (Id.). However, the record establishes that Merck employees stationed in Pennsylvania had responsibility for much of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp.2d

2004 WL 1398024 (D.N.J.), 54 UCC Rep Serv.2d 586

(Cite as: 2004 WL 1398024 (D.N.J.))

Page 10

interaction with the FDA regarding Vioxx. Declaration of Wilfred Coronato ("Coronato Dec .") at Exh. B, ¶ 10. The department of Merck Research Laboratories responsible for collecting adverse events and reporting them to the FDA is also located in Pennsylvania, as is the headquarters of Merck's United States Human Health Division, which markets Vioxx in the U.S (Id. at ¶¶ 11, 12, 510 A.2d 1187). The head of the U.S. Human Health Division had his primary office in Pennsylvania during the time period relevant to this lawsuit, and his subordinate directly responsible for marketing Vioxx was also in Pennsylvania (Id. at ¶ ¶ 13, 510 A.2d 1187). The groups within the U.S Human Health division in charge of training its U.S.-based professional representatives, and which have responsibility for advertising Vioxx in the U.S., are based in Pennsylvania. (Id at ¶¶ 14, 15, 510 A.2d 1187). Finally, the committee at Merck Research Laboratories that is responsible for the drafting and editing of the Product Circular (containing warnings, precautions, and other information concerning adverse effects and contraindications) is comprised of employees located in both Pennsylvania and New Jersey. (Id at ¶ 9, 510 A.2d 1187)

With respect to the Celebrex Defendants, Plaintiffs contend that Pfizer conducts corporate functions (such as those related to the development, distribution, manufacture, research, and sale of Celebrex) in New Jersey; that Pfizer broadcast and published Celebrex ads in New Jersey; and that Pfizer sent "Dear Doctor" letters to New Jersey physicians downplaying the cardiovascular risks of Celebrex. They also contend that Pharmacia maintains headquarters in New Jersey and hired a marketing consultant with a New Jersey based office to handle the global promotion of Celebrex. However, the record establishes that both Plaintiffs started taking Celebrex in 1999, when the drug was manufactured and marketed by corporate predecessors of Pfizer that were neither incorporated nor headquartered in New Jersey. (Celebrex Defendant's Brief in Support of it's Motion for Summary Judgment (hereinafter "Celebrex Def's Br.) at 17). Celebrex was developed by Searle, a Delaware Corporation with

its principal place of business in Illinois. (Compl. at ¶ 10). In June of 1998 Searle, then a subsidiary of the Missouri-based Monsanto, submitted the marketing application for Celebrex to the FDA, which granted its approval in December of 1998 (Celebrex Def's Br. at 17) Celebrex was co-promoted from the time of FDA marketing approval by Searle and Pfizer, a Delaware corporation with its principal place of business in New York, pursuant to a co-promotion agreement between Pfizer and Searle. (Id.) In March of 2000, Searle's parent corporation, Monsanto, merged with Pharmacia & Upjohn to form Pharmacia. According to Defendants, promotional activities were coordinated out of Pharmacia's headquarters in New Jersey and Pfizer's headquarters in New York for some period of time after the March 2000 merger, but the Searle regulatory personnel responsible for Celebrex remained in Illinois. (Id.) In April of 2003, Pfizer acquired Pharmacia, and Celebrex promotional activities are apparently now coordinated out of Pfizer's headquarters in New York. Celebrex is, and was at all relevant times, manufactured in Puerto Rico (Id.) Hence, only one of the four Celebrex Defendants (Pharmacia) has headquarters in New Jersey.

*11 Finally, Plaintiffs list a number of ancillary contacts that both companies have with the state of New Jersey, such as the length of their corporate presences, the number of people they employ, the tax breaks and businesses incentives they enjoy, and their availment of the courts of this jurisdiction over the course of a year.

In short, it appears that Defendants' contacts with New Jersey can be summarized as (1) the presence of Merck's principal place of business in the state (though the division that markets and advertises Vioxx is headquartered in Pennsylvania); and (2) the presence of Pharmacia's principal place of business in the state between March of 2003 and April of 2003 (though many marketing, advertising, and regulatory functions appear to have been conducted elsewhere) [FN5]

> FN5. For the purposes of this discussion, factors such as the number of people

© 2005 Thomson/West. No Claim to Orig. U S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

Page 11

employed in New Jersey by the Defendants are not relevant, just as Defendants' filing of unrelated lawsuits in the District of New Jersey bears no relation to the inquiry at hand.

III.

At the outset, it bears noting that the parties have engaged in assiduous parsing of particular marketing and advertising functions and where they took place. While some corporate and marketing functions clearly took place in New Jersey, it appears that just as many others took place in other states. Generally, courts weighing the competing interests of the state where a corporation is domiciled against those of the consumer's home state do not engage in a microanalysis of specific marketing and promotional practices and their relative significance. This is not to say that courts do not consider where marketing or advertising originated, especially where (as here) the underlying allegations are based on fraud or misrepresentation, as to which advertising and marketing are of course relevant. However, examining in depth which individual functions or phases in the marketing and advertising process are more significant than others would constitute a lengthy and ultimately unproductive digression. With respect to Merck, the marketing and promotional activities that occurred in Pennsylvania appear to outweigh or at the very least equal in significance those that took place in New Jersey. The case for considering the marketing and promotional activities of the Celebrex Defendants is even less compelling, as it appears that there was only a brief period during which these activities took place in New Jersey, and that at all other times marketing and promotion primarily took place elsewhere. In short, this Court finds that the performance of various marketing and promotional activities in New Jersey is not a compelling interest as it pertains to either the warranty claim or the consumer fraud claim.

Hence, as is often the case in conflicts analysis, the determination of which state's law bears the more compelling relationship to the underlying policies

turns on the relative interests of the corporation's home state and the consumer's home state. The facts of this case and the nature of the Plaintiff's claim present what have been called "often difficult issues with respect to conduct regulating laws [which] include, but are by no means limited to ... the scope and impact of the learned intermediary doctrine, and the rules governing disclosure in the advertising of ethical pharmaceuticals." *In re Rezulin Products Liability Litigation,* 210 F.R.D. 61, 70 (S.D.N.Y.2002) To be certain, New Jersey has a interest in governing the conduct of its corporate citizens and encouraging truthful marketing and advertising of products. However, with respect to both the warranty and consumer fraud claims, Pennsylvania has a competing interest in ensuring that its own citizens "are compensated for their injuries, that the standards its [sic] sets for product sales within its borders are complied with, and that the rules it establishes to govern physician and pharmacist are upheld." *Id.* at 70-71. These interests are not outweighed by New Jersey's interest in regulating the conduct of its pharmaceutical companies.

*12 The "particular configuration of the state interests to be balanced, and the relative weight of those interests as dictated by the relevant contacts with the parties" require that "the deterrence interest of New Jersey as the domicile and locus of the defendant manufacturer must yield in this case to the compensation interest" of Pennsylvania. *See Gantes v. Kason Corp.,* 145 N.J. 478, 496-97, 679 A.2d 106 (1996). Here, the only real contacts that Defendants had with New Jersey--the state with the deterrent interest are somewhat attenuated. Moreover, since Celebrex and Vioxx were marketed, advertised, distributed, prescribed, and purchased in Pennsylvania, that state has both a deterrent interest in *and* a compensation interest.

Other factors require this outcome. First, while a number of New Jersey courts have chosen to apply the NJCFA over the consumer protection law of another state, finding that New Jersey law "should be construed liberally in favor of protecting consumers," *Levin v. Lewis,* 179 N.J.Super. 193, 200, 431 A.2d 157 (App.Div 1981) and its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 12

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

mandatory treble damages and fee provisions provide a heightened level of protection, it is important to distinguish the particular transactions at issue in those cases from the one involved here. Obviously, this case does not involve the sale of a boat, a car, or a house. *See Boyes v. Greenwich Boat Work, Inc.*, 27 F.Supp.2d 543 (D.N.J.1998); *Huffmaster v. Robinson*, 221 N.J.Super. 315, 534 A.2d 435 (Law Div.1986); *Gennari v. Weichert*, 148 N.J. 582, 691 A.2d 350 (N.J.1997). The "transaction" at issue here is Plaintiffs' ingestion of prescription medicines that were prescribed, purchased, paid for, and allegedly damaged the Plaintiffs in their home state. None of these things could have occurred without the involvement of a physician.

In *Incollingo v. Ewing*, 444 Pa. 263, 282 A.2d 206 (1971), the Pennsylvania Supreme Court adopted the learned intermediary doctrine, which, among other things, circumscribes the liability of prescription drug manufacturers. Though originally the basis for eliminating the imposition of strict products liability against drug manufacturers, the rule has evolved to apply to other causes of action, including implied warranty and consumer fraud. The learned intermediary doctrine clearly reflects the determination by the Pennsylvania courts to preserve the primacy of the physician's role in making treatment decisions for Pennsylvania patients-including the making of informed choices about prescription drugs. [FN6] In light of this, the most important aspects of the transaction underlying this lawsuit are the decisions of the physician and the relationship between doctor and patient, all of which occurred in Pennsylvania.

> FN6. In fact, the Pennsylvania courts have even declined to abrogate the learned intermediary doctrine in cases involving direct to consumer marketing, holding that despite these practices the decision to take a particular drug is still dependant on the judgment of a physician. *See Lennon v. Wyeth-Ayerst Laboratories, Inc.*, 2001 WL 755944 (Pa.Super.2001); *Albertson v. Wyeth Inc.*, 2003 WL 21544488 (Pa.Com.Pl.).

New Jersey's consumer protection statue arguably offers greater protection to the consumer. However, the plaintiffs in this matter are not residents of New Jersey, and given the competing interests of Pennsylvania, New Jersey does not have a "compelling reason ... to extend to such non-domiciliary plaintiffs the benefit of [its] decisional law." *Deemer v. Silk City Textile Mach. Co.*, 193 N.J.Super. 643, 475 A.2d 648 (App.Div.1984). Consequently, the laws of Pennsylvania must govern.

## V. DISCUSSION

**\*13** Having determined that Pennsylvania law governs both the breach of implied warranty and consumer fraud claims, the Court turns to the merits of those claims. The Court will first address whether Plaintiffs' "fraud on the market" theory is viable, and then whether the learned intermediary doctrine precludes the breach of implied warranty and consumer fraud claims.

### A. *Plaintiffs' "Fraud on the Market" Theory*

As a preliminary matter, the Court turns to Plaintiffs' problematic assertion that their claims "challenge Defendants' intentional failure to disclose the known cardiovascular risks of Celebrex and Vioxx to consumers and seek to recover some or all of the purchase price consumers paid for these drugs." Complaint at ¶¶ 2, 35-36, 44, 51, 59, 63-67. Their claim for economic damages caused by the payment of allegedly inflated prices for Defendants' products is based upon a vaguely articulated "fraud on the market" rationale. Because the "fraud on the market" theory is untenable as to both remaining claims, the Court will briefly address this issue at the outset.

### 1. Implied Warranty of Merchantability

Clearly, neither Plaintiff was personally injured by Celebrex or Vioxx. They do not claim to have suffered any bodily harm and, accordingly, have withdrawn their product liability and medical monitoring claims. This presents an issue which is at the core of this case, namely, if there is no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

(Cite as: 2004 WL 1398024 (D.N.J.))

"defect" at issue, and the drugs themselves caused no harm, how were Heindel and Kinmonth injured? Their apparent explanation is that, given the potential cardiovascular side effects, they simply paid too much for the drugs. By asserting economic loss, Plaintiffs "seek to move the suit out of the tort domain and into that of contract," because, allegedly, the drugs were not as they were "described and thus [were] not merchantable, a warranty theory." *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017 (7th Cir.2002).

First, this 'shift' into the realm of contract is problematic because "if tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly means excess compensation." *Id* at 1017. Moreover, breach of implied warranty claims are not intended to address hypothetical economic loss; they are meant to compensate a buyer who has not gotten the benefit of her bargain because the product in question does not meet generally accepted standards or disappoints consumer expectations. These plaintiffs would be hard pressed to claim that they did not get what they paid for. Indeed, the record unequivocally establishes that Celebrex and Vioxx were effective treatments for Heindel and Kinmonth's arthritis pain, and that both benefitted significantly from its use. Kinmonth testified that she found Vioxx more effective than other, non-narcotic medicines that she had used in the past, and that the relief it gave her from arthritis pain allowed her to function better and do things that had been made difficult by her condition, such as preparing food and lifting things. (Coronato Decl. at Exh. D, (hereinafter Kinmonth Dep.) p. 64-70.) Kinmonth also testified that Celebrex gave her relief from her symptoms, and she reported to her doctor that she liked its results. Kinmonth Dep. at p. 119; Leventhal Dep. at p. 39-40. Likewise, Heindel "liked" the results she got from Celebrex, found it more effective than several other non-narcotic drugs she had tried, and even told her doctor that it was "as close to a panacea as is likely to be found." (Heindel Dep. at 46-48; Leventhal Dep. at 15-16.) Both plaintiffs continued to use Vioxx and Celebrex after the complaint was filed in this lawsuit, and were taking it as of the time they

were deposed.

*14 Despite the irrefutable evidence that Plaintiffs got the effective arthritis remedy that they bargained for, they seek to recover "some or all of the purchase price" paid for Celebrex and Vioxx. Complaint at ¶¶ 2, 35-36. Clearly, the Plaintiffs would not be entitled to recover *all* of the purchase price of the drugs; this would amount to a claim for restitution, to which they are obviously not entitled. As the court in *In re Rezulin Products Liability Litigation*, 210 F.R.D. 61, 68 (S.D.N.Y.2002) (a case that, like this one, involved claims for purely economic losses alleged by otherwise unharmed consumers of a prescription drug) found:

> In order to obtain restitution for the purchase price of [the drug], plaintiffs and class members would be obliged, at least in many jurisdictions, to prove some kind of harm. In other words, although theories presumably could differ, they would have to establish that ... that the defendants' retention of the price they paid for the drug would be unjust, that the value of the drug given its allegedly concealed defects was less than the purchase price, or some other variation that would warrant the transfer of money from the defendants to them. Plaintiffs contention that everyone who took Rezulin sustained an ascertainable loss presumes that Rezulin was worthless. But that is not a defensible position. Even Plaintiff's experts acknowledge that Rezulin was enormously beneficial to many patients. Those patients *got their money's worth* and suffered no economic injury.

*In re Rezulin Products Liability Litigation*, 210 F.R.D. 61, 68 (S.D.N.Y.2002) (emphasis supplied)

This Court agrees with the above conclusions. Finding no other theory under which they would be entitled to reimbursement for some or all of the purchase price of the arthritis medicine whose benefits they clearly enjoyed, Plaintiffs attempt to explain away this deficiency with their "price inflation" or "fraud on the market" theory. In this context, though, such a theory is patently absurd. It depends on the totally implausible predicate that, had some adverse information about side effects

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                    Page 14

2004 WL 1398024 (D N J ), 54 UCC Rep Serv 2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

derived from the VIGOR and CLASS studies been more widely disseminated, the Plaintiffs would have paid *less* for Celebrex and Vioxx. However, (at the risk of stating the obvious) there is no prescription drug "market," at least as that term is understood in the securities context. There, a "perfect market" or "efficient market" is assumed, and adverse information is expected to be quickly absorbed by the market, thus causing the price of the stock or commodity at issue to fluctuate. But the only "market" for a prescription drug is the potential group of patients who will be prescribed it by their physician, and if the side effects of the drug make it overly risky to ingest, the doctor will either not prescribe it or the patients will decide not to take it. The suggestion that consumers might be inclined to take a drug with certain side affects if they could pay less for it, or that drugs with certain side effects should cost less, defies both reality and common sense. It is also out of place in this lawsuit, where it is clear that neither plaintiff suffered any adverse effects. In short, the decision to take a particular drug is a medical one, not one based on an comparative analysis of risk versus price.

## 2. Consumer Fraud

**\*15** For the same reasons, the fraud on the market theory is flawed with respect to Plaintiffs' consumer fraud claims. Moreover, in *Weinberg v Sun Co*, 565 Pa. 612, 777 A.2d 442 (2001) the Pennsylvania Supreme Court explicitly rejected an attempt by a class of consumers to employ the fraud on the market theory in a case arising under the UTPCPL. The plaintiffs in *Weinberg* were consumers of high octane gasoline who claimed that "the [defendants'] false marketing campaign increased the demand for Ultra(R) gasoline, raising the price for all consumers." The Court found that

[t]here is no authority which would permit a private plaintiff to pursue an advertiser because an advertisement might deceive members of the audience and might influence a purchasing decision when the plaintiff himself was neither deceived nor influenced ... Nothing in the legislative history suggest that the legislature ever intended the statutory language directed against consumer fraud to do away with the traditional

common law elements of reliance and causation. The statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result* of the defendant's prohibited action.

*Id* at 617-18, 777 A.2d 442 (emphasis in original).

Clearly, Plaintiffs cannot use the fraud on the market theory to circumvent the reliance element of the UTPCPL. The suggestion that Defendants' failure to advertise potential side of effects of Celebrex and Vioxx boosted sales and caused price inflation is an attempt to do just that, and as such must fail. [FN7]

> FN7. Plaintiffs' claims would be similarly precluded under New Jersey law. In *Kaufman v i-Stat Corp*, 165 N.J. 94, 754 A.2d 1188 (2000), the New Jersey Supreme Court rejected the use of the "fraud on the market" or "price inflation" theory to establish the causal nexus between the defendant's alleged misrepresentations and their loss. While *i-Stat* considered the fraud on the market and price inflation theories only in the context of traditional common law fraud, where pleading and proving the element of reliance remains a part of plaintiff's burden, at least one other New Jersey court has concluded, relying on *i-Stat'* s reasoning, that those theories "have no place as a part of the proofs required of plaintiffs in the CFA [New Jersey Consumer Fraud Act] context either." *New Jersey Citizen Action v Schering Plough Corp*, 367 N.J.Super. 8, 14-16, 842 A.2d 174 (App.Div.2003). Allowing plaintiffs to rely on those theories, the court held in *New Jersey Citizen Action*, would "virtually eliminate the requirement that there be a connection between the misdeed complained of and the loss suffered. Adopting plaintiff's theory ... would therefore fundamentally alter the concept of causation in the CFA context ... [and] the relationship between the alleged misstatement and the ascertainable loss

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 15

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv 2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

suffered would become so attenuated that it would effectively disappear."

B. *Learned Intermediary Doctrine*

1. Implied Warranty of Merchantability

In *Makripodis v. Merrell-Dow Pharmaceuticals, Inc.*, 361 Pa.Super. 589, 523 A.2d 374 (1987), the Superior Court of Pennsylvania addressed the question of whether a retail druggist who filled a prescription "with the proper and unadulterated drug prescribed," was "liable to the patient purchaser for breach of an implied warranty of merchantability if the drug caused harmful side effects." *Id.* at 592, 523 A.2d 374. The court found that he was not, and that

As heretofore observed, [prescription] drugs are not available to the general public and but may be obtained only upon the prescription of a licensed physician. This restriction upon the availability of such drugs has been imposed because of the inherently dangerous properties of such drugs. Prescription drugs may pose a threat to the safety of certain identifiable segments of the public, or may be dangerous when used in conjunction with other drugs or substances, or may be harmful if taken by persons suffering from certain diseases or conditions.

*Id.* at 594, 523 A.2d 374 (emphasis supplied).

The court's holding in *Makripodis* was based on Pennsylvania's adoption of the learned intermediary doctrine. That rule, articulated by the Supreme Court in *Incollingo v. Ewing*, 244 Pa. 263, 288 (1971), was formulated "with reference to comment k [of the Restatement (Second) of Torts § 402A] and the policies expressed therein." *Coyle v. Richardson-Merrell. Inc.*, 526 Pa. 208, 213, 584 A.2d 1383 (1991). [FN8] It addresses the nature of a drug manufacturer's duty to warn of potentially dangerous side effects and provides that when a drug "is available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." *Baldino v. Castagna*, 505 Pa 239, 244, 478 A.2d 807 (1984). This is so "because

it is the duty of the prescribing physician to be fully aware of the (1) the characteristics of the drug he is prescribing, (2) the amount of the drug which can be safely administered, and (3) the different medications the patient is taking. It is also the duty of the prescribing physician to advise the patient of any dangers or side effects associated with the use of the drug as well as how and when to take the drug." *Makripodis*, 361 Pa.Super. at 596, 523 A.2d 374.

FN8. Comment k addresses whether a manufacturer of products that are inherently unsafe, but accompanied by proper warnings (such as prescription drugs) should be held strictly liable for the "unfortunate consequences attending the use of otherwise useful and desirable products which are attended with a known but apparently reasonable risk," and concludes that "such a manufacturer is liable only if he fails to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous." Though comment k specifically addresses the imposition on drug-makers of strict liability, (as opposed to liability for negligence) the learned intermediary doctrine arises from its broader point regarding the adequacy and intended recipients of drug warnings.

*16 Moreover, warnings are directed to the physician rather than the patient-consumer because "[i]t is for the prescribing physician to use his own independent medical judgment, taking into account the data supplied to him from the drug manufacturer, other medical literature, and any other source available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug." *Leibowitz v. Ortho Pharmaceutical Corp.*, 224 Pa.Super. 418, 431, 307 A.2d 449 (Pa.Super.1973). Hence, the "learned intermediary" stands between nearly every prescription drug manufacturer and the patient-consumer. For this reason, its application has been expanded to claims sounding in causes of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 16

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

action other than negligence. Recognizing this, the *Makripodis* court held

> that the very nature of prescription drugs themselves precludes the imposition of a warranty of fitness for "ordinary purposes," as each individual for whom they are prescribed is a unique organism who must be examined by a physician who is aware of the nature of the patient's condition as well as the medical history of the patient

*Makripodis,* 361 Pa.Super. at 594, 523 A.2d 374. *Makripodis,* which involved a pharmacist, has subsequently been applied to claims against a manufacturer of prescription drugs, *see Lennon v. Wyeth-Ayerst Laboratories, Inc.,* 2001 WL 755944 (Pa.Super.2001); *Luke v. American Home Products Corp.,* 1998 WL 1781624 (Pa.Com.Pl.1998); and the makers of prescription medical devices, *see Rosci v. Acromed, Inc.,* 447 Pa.Super. 403, 422-424, 669 A.2d 959 (Pa.Super.1995).

From the foregoing it is clear that manufacturers have duty to warn doctors of potentially dangerous side effects, and can be held liable for their failure to exercise reasonable care in doing so. While Plaintiffs here contend that Defendants "downplayed" or "failed to disclose" known cardiovascular risks posed by Celebrex and Vioxx, they do not (and, indeed, can not) couch their argument as one arising from a negligent failure to warn. Even if they were to do so, the argument would still fail. It is clear, under Pennsylvania law, that "the information supplied by the drug manufacturer is only *one* source a physician must consult, and he is expected to make an independent medical judgment in determining whether a given drug is appropriate for a particular patient." *Brecher v. Cutler,* 396 Pa.Super. 211, 218-20, 578 A.2d 481 (Pa.Super 1990) (emphasis supplied). Neither is a prescription drug manufacturer's failure to warn actionable "where the prescribing physician did not rely on the package insert, has full information from other sources, and made his own independent medical judgment to prescribe it." *Leibowitz,* 224 Pa.Super. at 432 n. 3, 307 A.2d 449; *Stottlemire v. Cawood.* 213 F.Supp. 897 (D.C.D.C.1963).

The information that Plaintiffs claim the Defendants downplayed (or did not readily disclose) was contained in the results of published, presumably peer reviewed studies. The record before this Court establishes that Dr. Leventhal, the Plaintiffs' treating physician, first learned of Celebrex through medical meetings and literature even before its approval by the FDA, and that he had stayed abreast of the scientific literature analyzing the potential risks posed by COX-2's. It further establishes that Merck released the results of the VIGOR study, comparing patients taking Vioxx to those taking a traditional NSAID, on March 23, 2000. Dr. Leventhal testified that he read the VIGOR study when it was published in the New England Journal of Medicine in November of 2000. Dr. Leventhal also testified that he read an article in the Journal of the American Medical Association in August of 2000 which purported to analyze the combined results of different studies of Celebrex and Vioxx. He asserted that the study referred to in the JAMA article was "extremely flawed," and "used a control group from a completely different study which is not considered scientifically sound." Based on the available information and data analyzing the risk of cardiovascular events associated with COX-2 inhibitors, Dr. Leventhal "did not feel that there was evidence ... that convinced [him] that there was an increased risk of myocardial infarction or thrombal embolic phenomenon with the COX-2's" and therefore saw no reason to stop prescribing Celebrex or Vioxx to his patients. Dr. Leventhal did not rely on advertising to physicians or to the public when he determined that Celebrex and Vioxx were appropriate treatments for Heindel and Kinmonth, but he did consider sources such as the FDA approved package insert, the Physician's Desk Reference, and his own clinical experiences.

*17 In short, it is clear that Dr. Leventhal (1) based his decision to prescribe Celebrex and Vioxx on information from a variety of sources and (2) that he certainly did not rely exclusively on information provided by the Defendants. For these reasons, as well as those discussed at length above, Defendants are entitled to summary judgment on Plaintiffs' implied warranty claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 17

2004 WL 1398024 (D.N.J.), 54 UCC Rep Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

2. Claims arising under the Unfair Trade Practices and Consumer Protection Law

For reasons similar to those adduced above, Defendants are entitled to summary judgment on Plaintiffs' consumer fraud claims. The Court turns briefly to the particular application of the learned intermediary doctrine to claims arising under the UTPCPL.

Plaintiffs claim that the Defendants knew of cardiovascular risks posed by Celebrex and Vioxx, but spent "millions of dollars on direct-to-consumer advertising that portrayed these drugs as safer than other available treatments while uniformly omitting to disclose any risk of cardiovascular harm." Pl.'s Opp. Br. at 1; Complaint at ¶¶ 2, 21-24, 36, 42-44, 51, 67. This "deceptive marketing scheme" caused their alleged economic injury and, they claim, violated the UTPCPL. [FN9] Defendants claim that Plaintiffs' UTPCPL claim is barred by the learned intermediary doctrine. For several reasons, the Court finds that Plaintiffs' claims are indeed barred by the learned intermediary doctrine.

> FN9. Plaintiffs brought their consumer fraud claim as one arising under the New Jersey Consumer Fraud Act and the consumer protection statutes of "other states." Though their pleadings and briefing focus on the New Jersey Consumer Fraud Act, they contend that the Pennsylvania law would require the same outcome.

First, since the manufacturer of prescription drugs need only direct information and warnings to prescribing physicians, there "can be no cause of action based on Defendants' alleged omissions because [they] had no duty to disclose any information to the plaintiff[s]." *Albertson v. Wyeth, Inc.* 2003 WL 21544488 at * 12 (Pa.Com.Pl.2003); *Luke v. American Home Products.* 1998 WL 1781624 at *8 (Pa.Com.Pl.1998). Second, "to permit a cause of action under the under the UTPCPL in this case would effectively make a drug manufacturer the absolute guarantor of the anticipated results and effects of a prescription

drug. Pennsylvania law, however, recognizes that some prescription drugs by their nature can never be made safe." *See Makripodis,* 361 Pa.Super. 589, 523 A.2d 374; *Luke,* 1998 WL 1781624 at *8.

Third, both the learned intermediary doctrine and the record before the Court establish that the Plaintiffs did not rely on any representations (or misrepresentations) by Defendants, and reliance is, of course, a necessary element of a UTPCPL claim. First, Heindel and Kinmonth both testified that they took Celebrex and Vioxx based on the advice of their treating physician. Kinmonth testified that she did not read information about Vioxx or material provided with Vioxx prior to taking it, and that she relied her on her physician's advice regarding whether or not to take it. Heindel's testimony also reveals that she relied on her doctor's professional advice, rather than information supplied by Defendants, regarding Celebrex. She claimed not to have read any print advertisements for Celebrex, and though she said she had seen Celebrex television commercials, she asserted that she was not influenced by them. However, even if Heindel and Kinmonth had offered evidence indicating that they had relied in some way on Defendants' misrepresentations, it would ultimately be of no consequence. The learned intermediary breaks the chain in terms of reliance, since the patient cannot obtain prescription drugs without the physician no matter what they believe about them.

*18 Finally, the economic loss doctrine further mandates the entry of summary judgment dismissing Plaintiffs' consumer fraud claims. Pennsylvania has adopted the economic loss doctrine, [FN10] as well as its mirror image, the "gist of the action doctrine," in order to "place a check on limitless liability for manufacturers and establish clear boundaries between tort and contract law." *Werwinski v. Ford Motor Co.* 286 F.3d 661, 680 (3d Cir.2002). The parties have spilled a great deal of ink debating whether, under the UPTCPL, there is an "intentional tort" exception that would allow the plaintiffs to recover in tort for purely economic losses. Defendants contend that there is not, relying on the Third Circuit's decision, in *Werwinski,* to "reject[ ] ... an intentional fraud

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 18

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

exception" to the economic loss doctrine. Relying on *O'Keefe v. Mercedes-Benz USA, LLC,* 214 F.R.D. 266 (E.D.Pa.2003) (in addition to some Pennsylvania cases decided both before and after *Werwinski* ), Plaintiffs argue that the economic loss doctrine has not been extended to cover intentional torts.

> FN10. New Jersey also recognizes the economic loss doctrine, although New Jersey courts have not addressed its application in a context similar to the one presented here. However, in *Alloway v. General Marine Indus.,* 149 N.J. 620, 627-630, 695 A.2d 264 (1997), the New Jersey Supreme Court found that contract remedies are better suited than tort law to resolve claims for economic loss, whether the sale at issue was characterized as a consumer purchase or a commercial transaction. It's decision rested on a finding that purchasers who fall victim to fraud or unconscionable conduct will have "substantial rights to recover for common law fraud and for violation of various state and federal statues such as the New Jersey Consumer Fraud Act." *Boyes v. Greenwich Boat Works, Inc.,* 27 F.Supp.2d 543, 550 (D.N.J.1998). "In sum," the Court concluded in *Alloway,* judicial decisions and statutory encasements, including the U.C.C., protect consumers from overreaching. Against this background, a tort cause of action for economic loss duplicating the one provided by the U.C.C. is superfluous and counterproductive." *Alloway,* 149 N.J. at 641, 695 A.2d 264.

The Supreme Court of Pennsylvania has not decided this question, and the lower Pennsylvania appellate courts are not in agreement on the matter. However, the job of this Court is greatly simplified by the Third Circuit's exhaustive treatment of this issue in *Werwinski,* in which the Court upheld a district court's prediction as to how the Pennsylvania Supreme Court would rule on this question. In doing so, the Court of Appeals explained that

The district court applied the economic loss doctrine to the fraudulent concealment claims after recognizing the willingness of Pennsylvania courts to restrict intentional tort claims that overlap with contract claims. In the absence of any pertinent case law on the subject, the district court aptly predicted that the Supreme Court of Pennsylvania would apply the economic loss doctrine to intentional fraud cases by drawing an analogy from Pennsylvania's acceptance of the "gist of the action" doctrine. Such a conclusion is congruent with our past recognition that Pennsylvania state courts have exhibited a "lack of hospitality to tort liability for purely economic loss."

*Werwinski,* 286 F.3d at 680.

Moreover, the court held, "even if we were torn between two competing yet sensible interpretations of Pennsylvania law ... we should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of Pennsylvania decides differently." *Id* (citations omitted). Consequently, the court held that there is no intentional fraud exception to the economic loss doctrine, whether the claim is one for common law fraud or arises under the UTPCPL.

This Court is bound by the Third Circuit's prediction of Pennsylvania law. *Itzkoff v. F & L Realty of New Jersey Corp.,* 890 F.Supp. 351, 356 (D.N.J.1995). The decision of the district judge who decided *O'Keefe,* who clearly agreed with neither the Third Circuit's prediction nor the rationale upon which it rested, is not binding on this Court, and, since the Court of Appeals has predicted how the Pennsylvania Supreme Court will rule, the lower (Pennsylvania) courts' decisions are also irrelevant for the purposes of this discussion. In short, this Court holds, pursuant to *Werwinski,* that economic loss doctrine bars Plaintiffs' UTPCPL claim seeking recovery for their purely economic damages.

*C. Remaining Claims*

**\*19** Plaintiffs' claims for injunctive and equitable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d                                                        Page 19

2004 WL 1398024 (D.N.J.), 54 UCC Rep Serv 2d 586

**(Cite as: 2004 WL 1398024 (D.N.J.))**

relief do not constitute separate causes of action.
Accordingly, consideration by the Court of those
claims would only be appropriate in the event that
Plaintiffs had prevailed on their warranty and
consumer fraud claims. Since they have not, the
Court need not discuss the issue further.

VI. CONCLUSION

For the foregoing reasons, Defendants are entitled
to summary judgment dismissing Plaintiffs' claims.
An appropriate order will issue.

2004 WL 1398024 (D.N.J.), 54 UCC Rep Serv 2d
586

**Motions, Pleadings and Filings (Back to top)**

• 3:02CV03348   (Docket)
                        (Jul. 10, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.2d

Page 1

2002 WL 31641641 (D.Del.), RICO Bus.Disp.Guide 10,390

(Cite as: 2002 WL 31641641 (D.Del.))

**H**

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
Thomas MURPHY, Plaintiff,
v.
BANCROFT CONSTRUCTION COMPANY,
Defendant.
**No. Civ.A. 02-453-SLR.**

Nov. 15, 2002.

Herbert G. Feuerhake, Wilmington, Delaware, for
Plaintiff.

William W. Bowser, and Adria B. Martinelli, of
Young, Conaway, Stargatt & Taylor, LLP,
Wilmington, Delaware, for Defendant.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Thomas Murphy was hired by
defendant Bancroft Construction Company on
January 31, 2000, as a Construction Manager. In
November 2000, he was promoted to Project
Manager of the Capital School District ("CSD")
Project. The CSD project was a multi-million dollar
construction project related to the design and
construction of a number of schools in the Dover,
Delaware area. During the CSD project, plaintiff
became discontent with his employment with
defendant. As a result of this, plaintiff became
depressed and removed himself from the workplace.
Ultimately, plaintiff was terminated from
employment by defendant on April 11, 2002.

Plaintiff filed this action on May 24, 2002, alleging

four counts: (1) violation of the covenant of good
faith and fair dealing; (2) intentional interference
with a business relationship; (3) retaliation in
violation of 19 Del. C. § 2365; and (4) racketeering
under 18 U.S.C. § 1962 ("RICO"). This court has
jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332,
and 18 U.S.C. § 1964(c). Presently before the court
is defendant's motion for judgment on the pleadings
pursuant to Fed.R.Civ.P. 12(c) on plaintiff's tortious
interference and racketeering counts and defendant's
motion for sanctions and order granting its motion
for judgment on the pleadings. (D.I.12, 16)

II. STANDARD OF REVIEW

In evaluating a Rule 12(c) motion, " 'the court must
view the pleadings in the light most favorable to,
and draw all inferences in favor of, the nonmoving
party." ' *Revis v. Slocomb Indus.,* Inc., 765 F.Supp.
1212, 1213 (D.Del.1991) (quoting *Madonna v.
United States,* 878 F.2d 62, 65 (2d Cir.1989)) The
court may grant the motion "only if no relief could
be granted under any set of facts that could be
proved " *Turbe v. Government of the Virgin Islands,*
938 F.2d 427, 428 (3d Cir.1991) (citation omitted).
If a complaint "contains even the most basic of
allegations that, when read with great liberality,
could justify plaintiff's claim[s] for relief, motions
for judgment on the pleadings should be denied."
*Cardio-Medical Assocs., Ltd. v. Crozer-Chester
Med. Ctr ,* 536 F.Supp. 1065, 1072 (E.D.Pa.1982);
accord *Southmark Prime Plus, L.P. v Falzone,* 776
F.Supp. 888, 891 (D.Del.1991). The court need not,
however, adopt conclusory allegations or statements
of law. *See In re General Motors Class E Stock
Buyout Sec. Litig.,* 694 F.Supp. 1119, 1125
(D.Del.1988).

III. DISCUSSION

A. Intentional Interference with Business
Relationship

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp.2d                                                                                    Page 2

2002 WL 31641641 (D.Del.), RICO Bus.Disp.Guide 10,390

**(Cite as: 2002 WL 31641641 (D.Del.))**

In count two of his complaint, plaintiff alleges that in the fall of 2001, he began exploring employment options with the Capital School District after being approached by its representatives. (D.I. 1 at 7) When defendant found out about this, plaintiff states that Stephen Mockbee, the president of Bancroft, offered him $10,000 to stay until May 2002. (*Id*) Furthermore, plaintiff alleges that in the fall of 2001 and in early 2002, defendant wrongfully influenced the School District Board so that they would not hire plaintiff. (*Id.* at 9) As a result of defendant's actions, plaintiff contends that he was denied a business opportunity and suffered emotional anguish. (*Id*)

*2 Defendant contends that Delaware does not recognize a cause of action for tortious interference with contractual relations where the employment is "at-will." (D.I. 13 at 5) Given the fact that Delaware does not permit an action for interference with existing at-will employment, it would not permit an action for interference with prospective at-will employment. (*Id.* at 6) In support of its argument, defendant cites *Leblanc v. Janette H. Redrow & Janette H. Redrow,* 2001 Del.Super. LEXIS 138 (April 19, 2001). Defendant's argument is unavailing for two reasons.

First, as defendant points out, *Leblanc* was a case involving a third party defendant's alleged interference with a plaintiff's employment with her employer. The court in *Leblanc* held that because the plaintiff's employment arrangement with her employer was "at-will," the defendant could not tortiously interfere with her employment arrangement with her employer. *Id.* at *5. However, this case is not about a third party's interference with an employee's relationship with her employer but, rather, it is about an employer's alleged interference with an employee's prospective employment with a third party. As the Delaware state courts have recognized, the tort of interference with an existing contract and of interference with probable future contractual relationships are closely related but not identical. *De Bonaventura v. Nationwide Mut. Ins. Co*, 419 A.2d 942, 947 (Del. Ch.1980). Furthermore, at least one court in Delaware has allowed a claim for interference with

an at-will contract to survive a motion for dismissal. *Gagliardi v. Trifoods Int'l,* 683 A.2d 1049, 1051 (Del. Ch.1996). While the court in *Gagliardi* stated that "such a claim would be a difficult one to sustain ... [it was] not persuaded at this stage that there is no possibility that such liability can be found." *Id.*

Second, plaintiff appears to dispute the fact that an employment arrangement between himself and CSD would necessarily be an "at-will" arrangement. (D.I. 20 at 9) Neither plaintiff's or defendant's briefs address the nature of plaintiff's potential employment with CSD. If plaintiff cannot point to any support for this contention by the close of discovery, defendant may be entitled to summary judgment. However, at this early stage in the proceedings, the court must accept as true all of the facts alleged in the complaint, and draw all reasonable inferences in the plaintiff's favor. As such, defendant's motion to dismiss count two of the complaint is denied.

B. Racketeering Under 18 U.S.C. § 1962

In count four of his complaint, plaintiff alleges that defendant's actions constitute a violation under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962 ("RICO"). (D.I. 1 at 10) However, plaintiff not only fails to cite to the proper code section, but also fails to point to what section defendant allegedly violates. Furthermore, plaintiff fails to plead facts sufficient to establish a RICO claim under any section. *See Maio v. Aetna Inc*, 221 F.3d 472 (3d Cir.2000). In response to defendant's motion, plaintiff admits that his initial pleading was insufficient to state a RICO claim but argues that this deficiency will be remedied in an amended complaint. (D.I. 20 at 4) Plaintiff then proceeds to "sketch out just what the ultimate allegations are likely to be." (*Id* at 5) Despite plaintiff's arguments, the court concludes that his RICO claim must be dismissed.

*3 Although the precise requirement for establishing a civil RICO cause of action depends on which subsection of the statute a plaintiff invokes, the following are the essential elements of

© 2005 Thomson/West No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 3

2002 WL 31641641 (D.Del.), RICO Bus.Disp.Guide 10,390

**(Cite as: 2002 WL 31641641 (D.Del.))**

any civil RICO action: (1) the existence of a RICO enterprise; (2) the existence of a pattern of racketeering activity; (3) a nexus between the defendant, the pattern of racketeering activity or the RICO enterprise; and (4) resulting injury to plaintiff, in his business or property. *Klapper v Commonwealth Realty Trust,* 657 F.Supp. 948, 953 (D.Del.1987). While plaintiff argues that he will be able to make out the first three elements in an amended complaint, the court need not address these contentions since the failure to point to a cognizable injury to plaintiff's business or property is ultimately fatal to his RICO claim.

In his brief, plaintiff asserts that he has been "injured in his capacity to work" as a result of defendant's alleged wrongful acts and the "resultant damages" include the results of his induced depression (e.g., the constructive discharge) as well as "general damage to his business and property." (D.I. 20 at 7-8) Plaintiff admits that this argument is "somewhat novel" and cites to no cases, nor has the court found any cases, that would support such an argument.

It is well settled law that in any RICO case, injuries to business or property are not actionable unless they result in tangible financial loss to the plaintiff. *Maio,* 221 F.3d at 483. In his pleadings and brief, plaintiff does not point to any tangible financial loss and the court declines to extend the already expansive scope of RICO to encompass the injuries complained of by plaintiff in this case. As such, plaintiff cannot allege an injury cognizable under 18 U.S.C. § 1962 and, therefore, lacks standing to bring the claim. Therefore, count four of plaintiff's complaint shall be dismissed with prejudice.

C. Sanctions

Defendant also moves for sanctions against plaintiff under Delaware Local Rule 1.3. (D.I.16) Defendant seeks attorney's fees and costs incurred by defendant in preparing its motion for judgment on the pleadings. In support of its argument, defendant cites Delaware Local Rule 7.1.2(a)(2) which states that an answering brief should be filed no later than 10 days after service and filing of the

opening brief. Defendant argues that it filed its opening brief on September 10, 2002, thus plaintiff's answering brief was due September 24, 2002. Therefore, plaintiff's failure to file his answering brief by September 24, 2002, was a "[f]ailure to comply with the Rules of this Court relating to motions" and sanctionable under Local Rule 1.3(b). Defendant's argument fails for two reasons.

First, defendant fails to cite the entire sentence in Local Rule 1.3(b) that it relies on. In its entirety, the sentence states "[f]ailure to comply with the Rules of this Court relating to motions may result in the determination of the motion against the offending party." Thus, according to Local Rule 1.3(b), the penalty for an untimely filed brief is the possibility of a ruling against the offending party, not sanctions including attorney's fees and costs.

*4 Second, those in glass houses should not throw stones. Defendant did not file its reply brief timely, therefore "[f]ail[ing] to comply with the Rules of this Court relating to motions." [FN1]

> FN1. Local Rule 7.1.2(a)(3) states that "the reply brief ... shall be served and filed no later than 5 days after service and filing of the answer brief." Plaintiff served his answering brief on October 23, 2002, giving defendant until October 30, 2002 to file its reply pursuant to Local Rule 7.1.2(a)(3). The reply brief was not filed until November 8, 2002.

Given the fact that neither party was prejudiced by either party's failure to observe the Local Rules, the court shall deny defendant's motion for sanctions.

IV. CONCLUSION

For the reasons stated, defendant's motion for judgment on the pleadings (D.I.12) is granted in part and denied in part and defendant's motion for sanctions and order granting judgment on the pleadings (D.I.16) is granted in part and denied in part. An appropriate order shall issue.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 4

2002 WL 31641641 (D.Del.), RICO Bus.Disp.Guide 10,390

**(Cite as: 2002 WL 31641641 (D.Del.))**

ORDER

At Wilmington this 15th day of November, 2002, having reviewed papers submitted in connection therewith, for the reasons stated;

IT IS ORDERED that:

1. Defendant's motions for judgment on the pleadings (D.I.12, 16) are granted with respect to count four of plaintiff's complaint (D.I.1) and count four is dismissed with prejudice.

2. Defendant's motions for judgment on the pleadings (D I 12, 16) are denied with respect to count two of plaintiff's complaint (D.I. 1).

3. Defendant's motion for sanctions (D I 16) is denied.

2002 WL 31641641 (D.Del.), RICO Bus.Disp.Guide 10,390

**Motions, Pleadings and Filings (Back to top)**

• 1:02CV00453 (Docket)
(May. 24, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3



Slip Copy                                                                                    Page 1

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

C

**Motions, Pleadings and Filings**

United States District Court,
E.D. Pennsylvania.
Walter B. GILMOUR, et al.
v.
Barry O. BOHMUELLER, et al.
**No. Civ.A. 04-2535.**

Jan. 27, 2005.

Gary P. Lightman, Lightman Manochi &
Christensen, Philadelphia, PA, for Plaintiffs.

Kathleen M. Carson, Swartz Cambell and
Detweiler, Walter J. Timby, Iii, Margolis Edelstein,
Carol L. Press, Heather E. Rennie, Eckert,
Seamans, Cherin & Mellott, Llc, Gregory T. Parks,
J Gordon Cooney, Morgan, Lewis & Bockius Llp,
Jana Michelle Landon, Philadelphia, PA, for
Defendants.

*MEMORANDUM*

PADOVA, J.

*1 Presently before the Court in this action are
Motions to Dismiss the Amended Complaint filed
by    Defendants    Barry    O.    Bohmueller
("Bohmueller"), Stephen A. Strope ("Strope"), The
Patriot Group, Inc. ("Patriot"), American Investors
Life Insurance Company ("AILIC"), and Oxford
Life Insurance Company ("Oxford"), (Doc Nos. 25,
26, 29, 31, 33 and 37). For the reasons that follow,
the Motions are granted in part and denied in part.

1 BACKGROUND

This action is brought by Walter B. Gilmour, Sr.
and Suzanne Gilmour, husband and wife, who
allege a total of fifteen counts against six individual

and corporate Defendants for their participation in a
fraudulent scheme involving investments in living
trusts and annuities. The Gilmours seek injunctive
relief and damages for fraudulent and negligent
misrepresentation, professional negligence, civil
conspiracy, breach of contract, breach of fiduciary
duty, violations of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"), 18 U.S.C. §
1961, *et seq.*, violations of federal and state securities
laws, violations of state consumer protection laws,
tortious interference with contractual relations and
prospective economic advantage, and unjust
enrichment.

The Gilmours allege the following facts in the
Complaint and Amended Complaint (collectively
the "Amended Complaint"). [FN1] Defendants
operate a "fraudulent Living Trust and Annuities
Scheme" in which they target elderly persons who
own their own homes and have a certain income.
(Am.Compl.¶ 2.) Defendants use non-attorney
sales representatives to sell inappropriate revocable
living trusts and annuities to those individuals by
making false, deceptive and misleading statements
and representations. (*Id.* ¶¶ 2, 38.) Strope, who is
an employee of Patriot, also acts as an agent for
Bohmueller, an attorney, and AILIC, Oxford and
New Life Corporation of America ("New Life")
(collectively the "Annuity Companies"), who
market and sell annuities. (*Id.* ¶¶ 15-16, 28, 34.)
As agent for Bohmueller, Strope promotes, markets,
and sells living trusts to elderly investors. (*Id.* ¶ 8.)
As agent for the Annuity Companies, Strope
markets and sells annuities to those same
consumers. (*Id.* ¶ 34.) Both Bohmueller and the
Annuity Companies use non-attorneys such as
Strope to advise consumers regarding estate
planning, exaggerate the benefits of living trusts
over wills; induce consumers to purchase and sign
legal documents; review provisions of legal
documents with consumers; engage in the
unauthorized practice of the law; hold themselves
out as attorneys with Bohmuellers' law office; and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 2

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

mislead consumers to believe they are qualified to provide legal advice. (*Id.* ¶ 41.)

> FN1. The Amended Complaint in this action added a claim for violation of the RICO statute to the allegations of the Complaint.

The Amended Complaint alleges that Defendants defrauded the Gilmours of their retirement income through the sale of annuities and use of living trusts. The Gilmours, who are residents of Pennsylvania, accumulated approximately $2.8 million in savings over the years. (*Id.* ¶ 67.) They invested their savings in a portfolio comprised primarily of tax exempt bonds and blue chip stocks, and lived off of the interest from these investments. (*Id.* ¶ 68.) On March 22, 2001, however, Strope knocked on the Gilmour's door intending to persuade them to liquidate their securities and invest the $2.8 million in a Bohmueller revocable living trust and annuities issued by the Annuity Companies. (*Id.* ¶ ¶ 70, 72, 81.)

*2 In order to induce the Gilmours to purchase a Bohmueller living trust, Strope misrepresented the advantages of living trusts over wills and probate. (*Id.* ¶ 73.) Among other things, Strope falsely claimed that living trusts avoid probate, save taxes, save attorneys fees, assure privacy after death, permit quicker distribution of assets, avoid court challenges, or are required to avoid guardianship. (*Id.* ¶ 74.) At the same time, in order to induce the Gilmours to purchase annuities from the Annuity Companies, Strope falsely claimed that those annuities and future annuity payments would be inheritance tax free, that there would be no capital gains on the sales of any securities to fund certain annuity purchases, that in order to create three annuities which the Gilmours desired they would also have to create a fourth annuity, and that this fourth annuity would be inheritance tax free. (*Id.* ¶ 75.)

The Gilmours believed Strope's false representations. (*Id.* ¶ 76.) After Strope had completed his sales pitch, the Gilmours gave him a check for $1,895.00 made out to the Bohmueller

Law Offices to purchase a Bohmueller living trust. (*Id.* ¶ 77.) Strope also induced the Gilmours to transfer $858,000 of their savings to New Life for a charitable gift annuity. (*Id.* at ¶ 80.) A short time later, Strope met with the Gilmours again and this time persuaded them to reinvest the approximately $2 million remaining in life savings in AILIC and Oxford annuities. (*Id.* at ¶ ¶ 102-103.)

The annuities the Gilmours received from the Annuity Companies in return for their investments were less valuable than the assets the Gilmours had transferred to them. (*Id.* at ¶ ¶ 109, 112.) As a result, the Defendants received higher commissions and other benefits from the Gilmours than they would otherwise have received for the asset transfers and sales of the deferred annuities. (*Id.*) As a further result of Defendants' conduct, Plaintiffs were induced to transfer their life savings of $2.8 million into the investments recommended by Strope and were damaged by adverse income and tax consequences of those transfers, as well as accounting, estate planning and legal fees and costs they incurred as a result of the transfers. (*Id.* ¶ ¶ 112-113.)

**II. LEGAL STANDARD**

The Moving Defendants seek the dismissal of all Counts of the Amended Complaint with the exception of Count VII pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) or for a more definite statement pursuant to Rules 8(a)(2) and 12(e). [FN2] When determining a Motion to Dismiss pursuant to Rule 12(b)(6), the court may look only to the facts alleged in the complaint and its attachments. *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). The court must accept as true all well pleaded facts in the complaint and view them in the light most favorable to the plaintiff. *See Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Holder v. City of Allentown,* 987 F.2d 188, 194 (3d Cir.1993). A Rule 12(b)(6) motion will be granted when a Plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                           Page 3

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

FN2. Count VII of the Amended Complaint asserts a claim for professional negligence against Bohmueller only. Bohmueller has not moved to dismiss Count VII, and none of the other Moving Defendants separately address Count VII in their Motions to Dismiss. Accordingly, the Court concludes that none of the Moving Defendants seek dismissal of Count VII.

*3 Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This rule "requires plaintiffs to plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. Corp v. Southmost Corp.*, 742 F.2d 786, 791 (3d Cir.1984). There is no formula for pleading fraud with particularity: "[a]llegations of 'date, place, or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.*

A. *Fraudulent and Negligent Misrepresentation-Counts I & II*

AILIC and Oxford seek the dismissal of Counts I and II of the Amended Complaint which allege causes of action based on fraudulent and negligent misrepresentation for statements made by Strope on behalf of the other Defendants. Moving Defendants argue that the Amended Complaint does not aver the purportedly fraudulent statements made by them or on their behalf with the particularity required by Rule 9(b).

To establish a cause of action for fraudulent misrepresentation under Pennsylvania law, a plaintiff must plead:

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to

whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Manning v. Temple Univ.*, No. Civ. A. 03-4012, 2004 WL 3019230, at *10 (E.D.Pa. Dec.30, 2004) (citing *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (Pa.1994)). To successfully establish a cause of action for negligent misrepresentation under Pennsylvania law, a plaintiff must plead: "(1) a misrepresentation of material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in an injury to the party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561 (Pa.1999) (citing *Gibbs*, 647 A.2d at 890)). Allegations of fraud must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Bristol Tp. v. Independence Blue Cross*. No. Civ. A. 01-4323, 2001 WL 1231708, at *5 (E.D.Pa. Oct.11, 2001) (citing *Seville Indus.*, 742 F.2d at 791.) However, in applying Rule 9(b) pleading requirements, "courts should be 'sensitive' to the fact that application of the Rule prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.' " *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir.1992) (citing *Christidis v. First Pa. Mortgage Trust*. 717 F.2d 96, 99 (3d Cir.1983)).

*4 Pennsylvania has adopted the Restatement (Second) of Agency regarding the liability of a principal for the tortious misrepresentations of his agents. *Bolus v. United Penn Bank*, 363 Pa.Super. 247, 525 A.2d 1215, 1223 (Pa.Super.Ct.1987). Under the Restatement (Second) of Agency, "[a] principal is subject to liability for loss caused to another by the other's reliance upon a tortious representation of a servant or other agent if the representation is: (a) authorized; (b) apparently authorized; or (c) within the power of the agent to make for the principal." Restatement (Second) Agency § 257 (1958).

The Amended Complaint alleges fraudulent and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 4

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

negligent misrepresentation claims against AILIC and Oxford for statements made by their agent, Strope, when he promoted, marketed and sold annuities to Plaintiffs on their behalf. (Am.Compl ¶ ¶ 1, 117, 118.) Among other things, the Amended Complaint states that the representations made by Strope on behalf of Moving Defendants were false for the following reasons:

(a) the estate plan of the Gilmours prior to [D]efendants' involvement was not inadequate;

(b) the estate plan and investments in the "tax free" or "tax deductible" or "tax deferred" annuities of [New Life] and AILIC devised and recommended by [D]efendants for the Gilmours was not better than their existing estate plan, and was not in the Gilmours' best interests, and did not result in tax savings and benefits which the [D]efendants represented to the Gilmours, and did not result in the Gilmours being able to pass those assets, let alone pass those assets with significant tax savings and benefits, to their beneficiaries upon the deaths of the Gilmours;

(c) the annuities and investments [D]efendants sold to the Gilmours were not as represented, and the living trust created by [D]efendants for the Gilmours do not result in the tax savings and benefits to the gilmours or the shielding or reduction of [P]laintiffs' assets from further taxation;

(d) The Gilmours did not need to give any money away to New Life or to purchase any New Life annuities in order to create or effectuate the other trusts they desired as part of their estate plan;

(e) the annuities that the Gilmours were induced to purchase from New Life, AILIC, and Oxford were not inheritance tax free and income tax free, as Strope had represented; ...

(f) The Gilmours did not have the right to rescind the investment whenever they wanted, let alone during three days as required by Pennsylvania's consumer protection laws; and

(h) the living trust created for the Gilmours, and the "tax free" or "tax deductible" or "tax deferred" annuities which [D]efendants induced the Gilmours to purchase, were not tailored to the needs of the Gilmours and do not shield their income and assets from further taxes, but to the contrary, the trust agreements were "canned" or

form documents, and the estate plan left the Gilmours in much worse shape than they would have been in had the Gilmours never engaged in business with any of the [D]efendants.

*5 (*Id.* ¶ 118, 525 A.2d 1215.) The Amended Complaint further alleges that these representations "were known by [D]efendants to be false, or were made recklessly and in disregard of their truth or falsity, and were made by [D]efendants to induce [P]laintiffs to trust [D]efendants and to turn over their assets and estate to [D]efendants, in order that [D]efendants could reap substantial fees...." (*Id.* ¶ 119, 525 A.2d 1215.) In addition, the Amended Complaint alleges that Plaintiffs justifiably relied on these misrepresentations, acted upon them to their detriment, and lost their entire $2.8 million in life savings. (*Id.* ¶¶ 120-122.)

The Amended Complaint states that Strope was at all relevant times "acting in concert with or for and/or as an actual or apparent sales agent or representative or 'emissary' or 'Charitable Advisor' for [D]efendants ... AILIC ... and Oxford." (*Id.* ¶ 82, 525 A.2d 1215.) In addition, the Amended Complaint alleges that Strope "was acting in the course and scope of his agency, and with authority from [D]efendants...." (*Id.* ¶ 105, 525 A.2d 1215.) The Amended Complaint thus states a cause of action against AILIC and Ocford for the fraudulent and negligent misrepresentations made on their behalf by Strope with the particularity required by Rule 9(b). *See Bolus,* 525 A.2d at 1223.

Plaintiffs also contend that their claim for fraudulent and negligent misrepresentation involves allegations that Defendants committed fraud when, after notification by a consumer agency that a fraudulent living trusts scheme existed, they continued to issue annuities in connection with that scheme. (10/28/04 NT at 56.) The Amended Complaint, however, contains no facts which would establish that Defendants were involved in some larger fraudulent living trusts scheme, much less that Defendants knowingly or negligently misrepresented a material fact in connection with that larger scheme with the intent of inducing Plaintiffs to rely on it. *See Bortz,* 729 A.2d at 560. Accordingly, AILIC and Oxford's Motions to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 5

2005 WL 241181 (E.D.Pa ), RICO Bus Disp Guide 10,825

(Cite as: 2005 WL 241181 (E.D.Pa.))

Dismiss Count I of the Amended Complaint are granted with respect to any claim for fraud based on their notification by a consumer agency that a larger living-trust scheme existed. AILIC's and Oxford's Motions to Dismiss Counts I and II of the Amended Complaint are denied in all other respects.

C. *Civil RICO: Count III*

The Moving Defendants seek the dismissal of Count III of the Amended Complaint which alleges a cause of action for civil RICO violations pursuant to 18 U.S.C. § 1962(c). [FN3] The Moving Defendants argue that the Amended Complaint fails to state a valid RICO claim because it does not allege a pattern of racketeering activities and instances of mail and wire fraud with the specificity required by Rule 9(b). [FN4]

> FN3. Section 1962(c) states as follows: "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

> FN4. Moving Defendants also argue that the RICO claim should be dismissed pursuant to 18 U.S.C. § 1964(c), which provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). It is the Court's understanding that Defendants have withdrawn such arguments in response to Plaintiffs' voluntary dismissal of their claims for violations of state and federal securities law claims. *See infra*, at 19.

In order to state a claim pursuant to Section 1962(c) a plaintiff must allege the following:
(1) the existence of an enterprise affecting

interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity that must include the allegation of at least two racketeering acts.

*6 *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165 (3d Cir.1989) (citations omitted). Where the alleged racketeering activities consist of fraud, a plaintiff must also meet the particularity pleading requirements of Rule 9. *Rose v. Bartle,* 871 F.2d 331 (3d Cir.1989). To meet this standard, the complaint must "specify the nature of the predicate acts to a degree that will allow the defendants to comprehend the specific acts to which they are required to answer." *Id*

The elements of the predicate act of mail fraud, in violation of 18 U.S.C. § 1341, are: "(1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme charged with the specific intent to defraud; and (3) the use of the United States mails in furtherance of the fraudulent scheme." *United States v. Hannigan,* 27 F.3d 890, 892 (3d Cir.1994) (footnote omitted) (citing *United States v. Burks,* 867 F.2d 795, 797 (3d Cir.1989)). The wire fraud statute, 18 U.S.C. § 1343, is virtually identical to the mail fraud statute, except that it concerns "communications transmitted by wire." *United States v. Frey,* 42 F.3d 795, 797 (3d Cir.1994); *see also* 18 U.S.C. §§ 1341, 1343. Accordingly, " 'the cases construing the mail fraud statute are applicable to the wire fraud statute as well.' " *Id.,* 42 F.3d at 797 n. 2 (quoting *United States v. Tarnpol,* 561 F.2d 466, 475 (3d Cir.1977)). The mail and wire fraud scheme "need not be fraudulent on its face but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension. Proof of specific intent is required ... which may be found from a material misstatement of fact made with reckless disregard for the truth." *United States v. Coyle,* 63 F.3d 1239, 1243 (3d Cir.1995) (citations omitted). Use of the mails and wires does not have to be an essential part

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 6

2005 WL 241181 (E.D Pa.), RICO Bus.Disp Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

of the fraudulent scheme. Rather, "it is sufficient if the mailings are incident to an essential part of the scheme or a step in [the] plot." *Id.* at 1244 (citation omitted). It is also not necessary that the mailings and usage of the wires themselves be fraudulent: "[t]he mailings themselves need not contain any misrepresentations: 'innocent mailings--ones that contain no false information--may supply the mailing element." ' *Philadelphia Reserve Supply Co v Norwalk & Assoc., Inc.* 864 F.Supp. 1456, 1470 (E.D Pa 1994) (quoting *Schmuck v United States*. 489 U.S. 705, 109 S.Ct. 1443, 103 L Ed.2d 734 (1989)). Moreover, liability for mail and wire fraud does not require personal use or prior knowledge of the mailing or wire content:

   [T]he defendants need not have been the actual individuals who used the mails and wires, nor need they have known of the specific communications; it is sufficient under the mail and wire fraud statutes that the use of the mails and wires by others occurred in the ordinary course of business related to the fraudulent scheme, or was foreseeable as part of the furtherance of the fraudulent scheme.

*7 *Id.* at 1471 (citing *United States v Bentz,* 21 F.3d 37, 40-41 (3d Cir 1994)).

The Moving Defendants claim that the Amended Complaint fails to allege specific predicate acts of mail and wire fraud with the specificity required by Rule 9(b). The Moving Defendants further argue that the Amended Complaint does not allege a pattern of racketeering activities, and does not identify any use of the mails or wires by the Defendants. The Amended Complaint states:

   The mail and wire communications by which each [D]efendant perpetuated [the] scheme included, but were not limited to, those identified with particularity as aforesaid in the Complaint, and in particular:

   a. letters from [D]efendants to the [P]laintiffs;

   b. letters from [D]efendants to [P]laintiffs' tax advisers and accountants;

   c. mailings from defendants to other defendants;

   d. interstate telephone communications among [D]efendants; *and*

   e. interstate telephone communications between [D]efendants and [P]laintiffs.

... Defendant's acts constitute a pattern of racketeering activity because they were related in purpose ... and have continued unabated since their first communications with the [P]laintiffs.
(Am. Compl. ¶¶ 251, 252, emphasis in original.) The Court finds that the Amended Complaint does not plead with particularity the date, place or time of the alleged misrepresentations. *See McHale,* 2002 WL at *3 Nor has the Amended Complaint, by some other means, injected the necessary "precision and some measure of substantiation into their allegations of fraud." *Id.* The Amended Complaint merely states that certain types of mail and wire communications were made by "Defendants," and does not in any way identify those communications, their dates, senders, or recipients. Similarly, the Amended Complaint fails to identify the content of the mail and wire communications *See Rolo v City Investing Co Liquidating Trust,* 155 F.3d at 658 (3d Cir.1998) (RICO allegations should contain "precise content of each particular mailing") These deficiencies are not cured by the general statement that the "mail and wire communications by which each [D]efendant perpetuated [the] scheme included ... those identified with particularity as aforesaid in the [Amended] Complaint." (Am.Compl.¶ 251.) The Amended Complaint further fails to allege how those communications relate to the alleged RICO violations. Plaintiffs allegations are, therefore, too vague to satisfy the RICO pleading requirements. *See Allen Neurosurgical Assocs., Inc. v. Lehigh Valley Health Network,* Civ. A. No. 99-4653, 2001 WL 41143, at *3 (E.D.Pa. Jan.18, 2001) (RICO claims dismissed for failure to plead date, place, or time of alleged misrepresentations, defendant who made each misrepresentation, and contents of misrepresentations). Accordingly, the Moving Defendants' Motions to Dismiss Count III of the Amended Complaint are granted. [FN5]

         FN5. Plaintiffs may, however, file a second amended complaint correcting the deficiencies of their RICO claim

D. *Civil Conspiracy· Count IV*

*8 AILIC and Oxford also seek the dismissal of

Slip Copy

2005 WL 241181 (E.D.Pa.), RICO Bus Disp Guide 10,825

(Cite as: 2005 WL 241181 (E.D.Pa.))

Page 7

Count IV of the Amended Complaint which alleges a cause of action for civil conspiracy. They argue that the Amended Complaint fails to state essential elements for a valid claim for civil conspiracy because it does not set forth with the required particularity the allegedly false statements made by Defendants in furtherance of the conspiracy. In order to state a claim for conspiracy under Pennsylvania law, a plaintiff must allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage ." *McKeeman v Corestates Bank. N A.*, 751 A.2d 655, 660 (Pa.Super.Ct.2000) (citations omitted). To satisfy this pleading standard:

> [a] complaint alleging civil conspiracy must allege facts showing the existence of all the elements, and if the plaintiff is unable to allege facts that are direct evidence of the combination and its intent, [plaintiff] must allege facts that, if proved, will support an inference of the combination and its intent

*Brown v Blaine*, 833 A.2d 1166, 1173 n. 16 (Pa.Commw.Ct.2003) (citing *Baker v. Rangos*, 229 Pa.Super. 333, 324 A.2d 498, 506 (Pa.Super.Ct.1974)).

The Amended Complaint alleges that the Defendants conspired with each other to deprive Plaintiffs of their life savings through fraudulent misrepresentations. (Am.Compl.¶ 135.) As discussed, *supra,* the Amended Complaint satisfies Rule 9(b) pleading standards with regard to Plaintiffs' fraudulent and negligent misrepresentation claims. Accordingly, the inquiry must focus on whether the Amended Complaint states all remaining elements necessary to state a valid claim for civil conspiracy.

The Amended Complaint asserts that the Defendants conspired and acted in concert on their intent to defraud Plaintiffs of their life savings. (*Id* ¶ 136, 324 A.2d 498.) The Amended Complaint also alleges that the fraudulent misrepresentations made by Strope on behalf of himself and all other Defendants were overt acts made in furtherance of

the conspiracy, as was the Moving Defendants' illegal agreement to set up the living trust arrangement and reinvest Plaintiffs' savings in annuities. (*Id.* ¶ 137, 140, 142.) The Amended Complaint further states that Defendants intended, through their conspiracy, to "reap substantial commissions, fees and other benefits from the creation of the living trusts for [Plaintiffs], and from the sales or transfers of [Plaintiffs'] assets, and [Plaintiffs'] purchases of 'tax-free' or 'tax deductible' or 'tax deferred' annuities." (*Id* ¶ 92, 324 A.2d 498 .) The Amended Complaint also alleges that:

> one or more of the Annuity Company Defendants and one or more of the Attorney Defendants and one or more of the Sales Agents shared in the commissions or other payments paid by [Plaintiffs] in connection with the living trusts, and/or from commissions or other payments which ... the other Annuity Company Defendants paid to the non-attorney defendants.

*9 (*Id.* ¶ 97, 324 A.2d 498.) The Amended Complaint also asserts that, as a result of Defendants' conspiratorial scheme, Plaintiffs suffered damages in the amount of $2.8 million, the live savings they were induced to transfer to Defendants, as well as adverse tax consequences and professional fees incurred as a result of Defendants' fraudulent scheme. (*Id* ¶¶ 143-44.) While the Amended Complaint does not identify a specific date, time or place where a conspiratorial meeting was held by Defendants, these allegations, if proved, would suffice to establish a claim of civil conspiracy See *McKeeman*, 751 A.2d at 660. Accordingly, AILIC's and Oxford's Motions to Dismiss Count IV of the Amended Complaint are denied

E. *Violations of Securities Laws: Counts V & VI*

Counts V and VI of the Amended Complaint allege causes of action for violations of federal and state securities laws. Plaintiffs voluntarily withdrew these counts against all Defendants at the Hearing held on October 28, 2004. (*See* 10/28/04 N.T. at 29). Accordingly, by agreement of the parties, Counts V and VI of the Amended Complaint are dismissed.

F. *Breach of Contract Count VIII*

© 2005 Thomson/West. No Claim to Orig U.S. Govt. Works

Slip Copy

2005 WL 241181 (E.D Pa.), RICO Bus Disp Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

Page 8

AILIC, Oxford, Strope and Patriot seek the dismissal of Count VIII of the Amended Complaint which alleges a cause of action for breach of contract They argue that the Amended Complaint fails to adequately allege the existence of a contract between themselves Plaintiffs. Under Pennsylvania law, a claim for breach of contract must allege the following three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Omicron Systems, Inc v Weiner*, 860 A.2d 554, 564 (Pa Super.Ct.2004) (citation omitted). An enforceable contract exists where the parties reached a mutual agreement, exchanged consideration, and set forth the terms of their bargain with sufficient clarity. *See Biddle v Johnsonbaugh*, 444 Pa Super. 450, 664 A 2d 159, 163 (Pa.Super.Ct.1995) (citation omitted).

The Amended Complaint alleges that:
> Plaintiffs entered into an agreement with [D]efendants whereby [D]efendants were specifically instructed by [P]laintiffs to provide estate planning to [P]laintiffs that would result in (1) tax and estate benefits to [Plaintiffs]; and (2) inheritance tax free and income tax free investments to [Plaintiffs] ... and (3) a living trust that would enable the [Plaintiffs'] assets to avoid probate after their death ... Defendants breached their agreement with [P]laintiffs by failing to deliver the contracted upon services .. As a direct and proximate result of [D]efendants' breaches of contract .. [P]laintiffs have sustained damages in the amount of $2.8 million.

(Am.Compl ¶¶ 193-196.) The Amended Complaint fails to state the specific identify of the party or parties who entered into the contract, or contracts, with Plaintiffs. The Amended Complaint further fails to state the consideration for any such contract and the essential terms of any such agreement For example, while the Amended Complaint broadly outlines some of the Defendants' responsibilities, there is no information which would suggest Plaintiffs' duties under the agreement. The allegations contained in the Amended Complaint are, therefore, insufficient to establish a cause of action for breach of contract against any of the Defendants. Accordingly,

Defendants AILIC, Oxford, Strope and Patriot's Motions to Dismiss Count VIII of the Amended Complaint are granted.

*G. Breach of Fiduciary Duty · Count IX*

**\*10** AILIC and Oxford also seek the dismissal of Count IX of the Amended Complaint which alleges a cause of action for breach of fiduciary duty. They argue that the Amended Complaint fails to state a claim for breach of fiduciary duty because there is no factual basis from which to infer that they owed a fiduciary duty to Plaintiffs. Under Pennsylvania law, fiduciary relationships exist "where by virtue of the respective strength and weakness of the parties, one has a power to take advantage of or exercise undue influence over the other." *eToll, Inc v. Elias/Savion Advertising, Inc*, 811 A.2d 10, 22 (Pa.Super.Ct 2002). Accordingly, "the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on the one side or 'weakness, dependence, or trust, justifiably reposed' on the other side." *Id.* at 23 (emphasis in original) (citing *Basile v H & R Block*, 777 A.2d 95, 101 (Pa Super.Ct.2001)). A fiduciary duty may attach " 'whenever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest." ' *Basile*. 777 A.2d at 102 (quoting *Brooks v. Conston*. 356 Pa. 69, 51 A 2d 684, 688 (Pa.1947)). Indeed, "those who purport to give advice in business may engender confidential relations if others, by virtue of their own weakness or inability, the advisor's pretense or expertise, or a combination of both, invest such a level of trust that they seek no other counsel." *Basile*, 777 A.2d at 102 (citations omitted). In Pennsylvania, a claim for breach of fiduciary duty must allege that: "(1) the defendant acted negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) the plaintiff suffered injury; and (3) the agent's failure to act solely for the plaintiff's benefit was a real factor in bringing about plaintiff's injuries." *Schmidt. Long & Assoc v Aetna U.S Healthcare, Inc*, Civ. A. No. 00-3683, 2001 WL 856946, at \*9

© 2005 Thomson/West. No Claim to Orig. U.S Govt. Works.

Slip Copy                                                    Page 9

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

(E.D.Pa. July 26, 2001) (citation omitted).

Here, the Amended Complaint states that:
Defendants owed a duty, imposed by common law, to [Plaintiffs] to represent them and their interests in a fair and honest manner, and to invest their finances in conservative, low-risk investments that would be tax-free and safe, and that would maximize the tax and estate savings and benefits to the [P]laintiffs ... Defendants breached the fiduciary duties which they owed to [P]laintiffs.

(Am.Compl.¶¶    199,    200.)    The    Amended Complaint further alleges that Strope, acting on behalf of AILIC and Oxford, held himself out as an expert on tax and estate planning. (Id. ¶¶ 117.) As a result of Strope's representations, Plaintiffs posed justifiable trust in him and in AILIC and Oxford. ( Id. ¶ 103); see Basile, 777 A.2d at 101-02. The Amended Complaint asserts that AILIC and Oxford breached their fiduciary duty when they, through their agent Strope, knowingly or recklessly misrepresented the benefits and drawbacks of living trusts annuities. (Am.Compl.¶ 118, 119.) The Amended Complaint alleges that Defendants made these false representations:
*11 to induce [P]laintiffs to trust [D]efendants and to turn over their assets and estate to [D]efendants, in order that [D]efendants could reap susbstantial fees from the sales and liquidation of [P]laintiffs' assets, and the purchase of the 'tax free' or 'tax deductible' or 'tax deferred' annuities ... and the creation of the living trusts.

(Id. ¶ 119.) The Amended Complaint further asserts that Defendants' actions resulted in an estate plan and investments for Plaintiffs which were not in Plaintiffs' best interest, and that the direct and proximate cause of Defendants' actions was a loss to Plaintiffs in the amount of $2.8 million, as well as professional fees and costs. (Id. ¶¶ 118, 122.) These allegations are sufficient to establish a claim for breach of fiduciary duty against AILIC and Oxford in connection with tax and estate planning activities. Accordingly, AILIC and Oxford's Motions to Dismiss Count IX of the Amended Complaint are denied.

H. *Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law  Count X*

AILIC, Oxford and Bohmueller further seek the dismissal of Count X of the Amended Complaint which alleges a cause of action for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL"), 73 Pa. Stat. Ann. § 201-1,    *et    seq,*    based    on    fraudulent misrepresentations as well as aiding and abetting in the unauthorized practice of law. [FN6] AILIC, Oxford and Bohmueller argue that the Amended Complaint fails to plead the instances of alleged fraud under the UTPCPL with the particularity required by Federal Rule of Civil Procedure 9(b). They further argue that the Amended Complaint fails to demonstrate a sufficient factual basis from which to infer that they were obligated to provide estate planning services to Plaintiffs. In addition, AILIC, Oxford and Bohmueller submit that Plaintiffs' UTPCPL claims for aiding and abetting the unauthorized practice of law must fail because Pennsylvania has not yet adopted a cause of action for aiding and abetting in the unauthorized practice of law.

> FN6 Under Section 9.2 of the UTPCPL, "[a]ny person who purchases ... goods or services primarily for personal ... purposes and thereby suffers any ascertainable loss of money... as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages." 73 Pa. Stat Ann. § 201-9.2. Section 3 of the UTPCPL declares as unlawful unfair methods of competition, including acts or practices "causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with ... another" and "any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. Stat. Ann. §§ 201-2(iii) and (xxi), 201-3.

The Pennsylvania Supreme Court has held that the purpose of the UTPCPL is to "place on more equal terms seller and consumer" and "to ensure the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 10

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp Guide 10,825

(Cite as: 2005 WL 241181 (E.D.Pa.))

fairness of market transactions." *Commonwealth by Creamer v Monumental Properties, Inc.,* 459 Pa. 450, 329 A.2d 812, 816 (Pa.1974). The UTPCPL is to be interpreted liberally so as to effectuate its purpose. *Keller v. Vclkswagen of America, Inc.,* 733 A.2d 642, 646 (Pa.Super.Ct.1999). To establish a valid cause of action under the UTPCPL for unfair or deceptive acts or practices, a plaintiff must plead those acts or practices with the same specificity as common law fraud. *Grant v Kingswood Apts.,* No. Civ. A. 01-1523, 2001 WL 1876343, at * 3 (E.D.Pa Oct 15, 2001). Accordingly, in order to assert a cause of action pursuant to the UTPCPL, a plaintiff must allege the following essential elements of fraud: "(1) material misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damages to the party defrauded as a proximate result." *Heller v Shaw Indus.,* Civ. A. No. 95-7657, 1997 WL 535163, at *20 (E.D.Pa. Aug 18, 1997) (citing *Prime Meats, Inc. v Yochim,* 422 Pa.Super. 460, 619 A.2d 769, 773 (Pa Super.Ct 1993)).

*12 The Amended Complaint asserts a cause of action pursuant to the UTPCPL against Moving Defendants with respect to the estate, asset and tax planning services provided to Plaintiffs, the sale of annuities by Oxford and AILIC, and the sale of living trusts by Bohmueller. (Am.Compl.¶¶ 203, 204.) Plaintiffs obtained these services for the primarily personal use of increasing their retirement income. (*Id* ¶¶ 74, 75.) The Amended Complaint asserts that Moving Defendants fraudulently gained access to Plaintiffs' assets and violated the UTPCPL by (1) misrepresenting their expertise in estate and tax planning and investments, as well as their relationships with each other; (2) using false and misleading information to persuade Plaintiffs to use Bohmueller as their attorney and to utilize the services of the other Defendants; (3) "causing a likelihood of confusion or misunderstanding as to affiliation, connection, or association with each other;" and (4) engaging in "fraudulent conduct which created the likelihood of confusion or misunderstanding." (*Id* ¶¶ 205-208.) The Amended Complaint also alleges that the representations made by Defendants "were known

by [D]efendants to be false, or were made recklessly in disregard of their truth or falsity, and were made by [D]efendants to induce [P]laintiffs to trust them and turn their entire estate over to them." (*Id.* ¶ 110, 619 A.2d 769.) Finally, the Amended Complaint alleges that these actions induced Plaintiffs to justifiably rely on Defendants' misrepresentations, and that Plaintiffs sustained damages in the amount of $2.8 million. (*Id.* ¶¶ 211-213.) These allegations are sufficient to state valid claims under the UTPCPL with respect to the estate, asset and tax planning services, the sale of annuities by AILIC and Oxford, and the sale of living trusts by Bohmueller. *See Heller v. Shaw Indus.,* 1997 WL 535163 at *20.

The Amended Complaint also alleges a cause of action against AILIC, Oxford and Bohmueller for aiding and abetting Strope in the unauthorized practice of law in violation of the UTPCPL and 42 Pa Stat. Ann. § 2524. [FN7] (*Id* ¶¶ 209-210.) Plaintiffs do not dispute that Pennsylvania has not yet adopted a cause of action for aiding and abetting liability, and that the Pennsylvania Supreme Court has not yet spoken on the issue. *See Clayton v. McCullough,* 448 Pa.Super. 126, 670 A.2d 710, 713 (Pa Super.Ct.1996). "When presented with a novel issue of law, or where applicable state precedent is ambiguous, absent or incomplete, [the federal court] must determine or predict how the highest state court would rule." *Rolick v Colins Pine Co.,* 925 F.2d 661, 664 (3d Cir.1991) *cert denied,* 507 U.S. 973, 113 S Ct. 1417, 122 L.Ed.2d 787 (1993). The parties have submitted no authority to support the proposition that the Pennsylvania Supreme Court would recognize a claim for aiding and abetting the unauthorized practice of law. Accordingly, the Court cannot conclude that the Pennsylvania Supreme Court would recognize such a claim. AILIC's, Oxford's and Bohmueller's Motion to Dismiss Count X of the Amended Complaint are, therefore, granted as to the claim for aiding and abetting the unauthorized practice of law, and denied in all other respects.

> FN7. Under 42 Pa. Stat. Ann. § 2524 it is unlawful for any person to "hold[ ] himself out to the public as being entitled to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Page 11

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

(Cite as: 2005 WL 241181 (E.D.Pa.))

practice law ... without being an attorney at Law." 42 Pa. Stat. Ann. § 2524.

### I. Tortious Interference with Contractual Relations- Count XI

*13 All Moving Defendants have moved to dismiss Count XI of the Amended Complaint which alleges a cause of action for tortious interference with contractual relations. Moving Defendants argue that the Amended Complaint does not allege that they wrongfully prevented a third party from performing a contract with Plaintiffs, and thus fails to state essential elements of a claim for tortious interference with contractual relations. Pennsylvania has adopted the cause of action for intentional interference with contractual relations as defined in the Restatement (Second) of Torts § 766:

> One who intentionally and improperly interferes with the performance of a contract ... between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979); see also Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 482 Pa. 416, 393 A.2d 1175, 1183 (Pa.1978); Daniel Adams Assoc., Inc. v. Rimbach Publ'g, Inc., 360 Pa.Super. 72, 519 A.2d 997, 1000 (Pa.Super.Ct.1987). Accordingly, the elements of a cause of action for interference with contractual relations are:

> (1) the existence of a contractual ... relation between the complainant and the third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation ...; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

Strickland v. Univ. of Scranton, 700 A.2d 979, 985 (Pa.Super.Ct.1997) (citations omitted).

The Amended Complaint states that "Defendants tortiously interfered with [P]laintiffs' contractual relations with third parties, including without limitation, with the contractual relations existing by virtue of [P]laintiffs' purchase of securities comprising their existing investment portfolios." (Am.Compl.¶ 217) The Amended Complaint, however, alleges no facts which would support an inference that any specific third party was prevented from performing its contractual obligations owed to Plaintiffs as a result of Defendants' conduct. Accordingly, Moving Defendants' Motions to Dismiss Count XI of the Amended Complaint are granted.

### J. Tortious Interference with Prospective Economic Advantage Count XII

Moving Defendants also seek the dismissal of Count XII of the Amended Complaint which alleges a cause of action for tortious interference with prospective economic advantage. They argue that the Amended Complaint does not identify any prospective contracts or business relationships that Plaintiffs were prevented from entering into, and thus fails to state essential elements for a valid claim for tortious interference with prospective contractual relations. Under Pennsylvania law, to state a claim for tortious interference with prospective economic advantage a plaintiff must allege:

*14 (1) the existence of a potential contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to prevent the prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the defendant's conduct; and (5) a reasonable likelihood that the relationship would have occurred but for the interference of the defendant.

SmithKline Beecham Corp. v. Apotex Corp., Civ. A. No. 99-4304, 2004 WL 2222388, at *14 (E.D.Pa. Sept.29, 2004) (citing Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir.1998). A prospective contract is "something less than a contractual right, something more than a mere hope; it exists if there is a reasonable probability that a contract will arise from the parties' current dealings." Alvord-Polk, 37 F.3d 996, 1015 (3d Cir.1994) Conclusory speculation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

Page 12

that plaintiffs might have entered into a business or contractual relationship with unspecified third parties is insufficient to state a claim for tortious interference. *Alvord-Polk,* 37 F.3d at 1015.

The Amended Complaint states that "Defendants tortiously interfered with [P]laintiffs' prospective economic advantage, including without limitation, with the prospective economic advantage by reason of [P]laintiffs' purchase of securities comprising their pre-existing investment portfolios, and the earnings therefrom, and [Plaintiff's] ability to use their assets as they saw fit." (Am.Compl.¶ 223). The Amended Complaint, however, contains no facts which would support an inference that specific prospective contracts existed into which either third parties or Plaintiffs were prevented from entering. Moreover, the Amended Complaint does not allege that Moving Defendants acted purposefully to harm Plaintiffs and prevent a prospective relation from occurring, or that Moving Defendants were not privileged or justified in their actions. *See Gordon,* 489 A.2d at 1370. The Amended Complaint's bald assertion that Defendants interfered with Plaintiffs' prospective economic advantage is insufficient to state a claim under Pennsylvania law. *See Alvord-Polk,* 37 F.3d at 1015. Accordingly, Moving Defendants' Motions to Dismiss Count XII of the Amended Complaint are granted.

K. *Unjust Enrichment/ Quantum Meruit and Accounting Counts XIII, XIV*

AILIC and Oxford have also moved to dismiss Counts XII and XIV of the Amended Complaint which allege causes of action for unjust enrichment/ *quantum meruit* and for an accounting. They argue that the Amended Complaint fails to plead how the Defendants were unjustly enriched. AILIC further argues that, because the annuities are an express contract, the purchase of these annuities cannot form the basis of a *quantum meruit* recovery.

In order to plead a claim for unjust enrichment/ *quantum meruit* under Pennsylvania law a complaint must allege the following:

**\*15** benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and

acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.... Where unjust enrichment is found, the law implies a contract ... which requires that the defendant pay to plaintiff the value of the benefit conferred. In short, the defendant makes restitution to the plaintiff in *quantum meruit.*
*Schenck v K E David, Ltd.* 446 Pa.Super. 94, 666 A.2d 327, 328-29 (Pa.Super.Ct.1995). However, "where an express contract governs the relationship of the parties, a party's recovery is limited to the measure provided by the express contract; and where the contract fixes the value of the services involved, there can be no recovery under a *quantum meruit* theory." *Constar, Inc. v Nat'l Distribution Centers, Inc.,* 101 F.Supp.2d 319, 324 (E.D.Pa.2000) (citing *Hershey Foods Corp v Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3d Cir.1987)) (internal quotations omitted).

Here, the Amended Complaint alleges that "Defendants were unjustly enriched by [P]laintiffs in the amount of \$2.8 million.... Also, or in the alternative, [P]laintiffs are entitled to a *quantum meruit* recovery against [D]efendants in the amount of \$2 .8 million." (Am.Compl.¶¶ 229, 230.) The Amended Complaint further alleges that Plaintiffs transferred \$2.8 million to Defendants as a result of the fraudulent misrepresentations made by Strope on behalf of himself and all other Defendants (*Id.* ¶¶ 81, 92.) The Amended Complaint, further states that Plaintiffs were damaged in the amount of \$2.8 million in addition to professional fees and costs incurred by Plaintiffs in pursuing this action to recover their assets (*Id.* ¶¶ 112, 114.) The Amended Complaint does not allege the existence of a written agreement or express contract which governs the relationship between Plaintiffs and Moving Defendants or fixes the value of the services involved. However, the Amended Complaint relies on the purchase of annuities from AILIC and Oxford. AILIC has submitted a copy of the two annuity policies issued to the Gilmours together with its Motion to Dismiss. While a court must accept the well-pleaded allegations of the complaint as true and may not rely on matters

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 13

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

outside the complaint in deciding a motion to dismiss, the court may consider documents explicitly relied on in the complaint in its analysis. *See GSC Partners CDO Fund v Washington,* 368 F.3d 228, 236 (3d Cir.2004) Accordingly, the Court can take into account the annuity policy Plaintiffs and AILIC entered into in ruling on AILIC's Motion to Dismiss. This policy is an express contract which governs the relationship between the parties, and thus prevents Plaintiffs from being able to recover against AILIC on a *quantum meruit* theory. Oxford, on the other hand, did not provide the Court with documentation of an annuity policy which governs the relationship between Plaintiffs and Oxford. In the absence of such policy, the Court can not conclude that such policy in fact existed, much less that it governed the relationship between the parties or fixed the value of the services involved. Under these circumstances and the facts as pled in the Amended Complaint, it would be inequitable to allow Defendants to retain the money given to them by Plaintiffs. *See Schenck,* 666 A.2d at 328. Accordingly, AILIC's Motion to Dismiss Count XIII is granted, while Oxford's Motions to Dismiss Count XIII is denied.

**\*16** AILIC and Oxford further seek the dismissal of Count XIV of the Amended Complaint which alleges a cause of action for an accounting. They argue that the Amended Complaint does not state sufficient facts to support a claim that they were obligated to provide legal, tax or estate planning services to Plaintiffs, and that an accounting would, therefore, be inappropriate. Plaintiffs seek an accounting from Defendants:

(a) Itemizing and describing in detail each and every security and other asset turned over by [P]laintiffs to [D]efendants; and
(b) Itemizing and detailing the liquidation of each such assets, including date sold or disposed, manner of disposition, transferee, amount received (both gross and net of any commissions paid or earned);
(c) Itemizing and detailing each and every payment earned or received by each [D]efendant ... in connection with (i) the liquidation of $2.8 million of [P]laintiffs' existing investment portfolios, and (ii) the purchase of [Defendants']

"tax free" annuities; and (iii) the establishment of the living trust.
(Am.Compl.¶ 232.) Pennsylvania Rule of Civil Procedure 1021 permits parties to seek relief "of several different types, including an accounting." Pa.R.Civ.P. 1021(a). Accordingly, AILIC and Oxford's Motions to Dismiss Count XIV are denied.

*L. Professional Negligence: Count XV*

AILIC and Oxford further seek the dismissal of Count XV of the Amended Complaint which alleges a cause of action for professional negligence against all Defendants. They argue that the Amended Complaint contains no factual basis from which to infer that they had contracted to provide Plaintiffs with professional services. Under Pennsylvania law, clients may bring tort actions against professionals for their failure to provide the client with professional services consistent with those expected by the profession. *Gorski v Smith,* 812 A.2d 683, 693-94 (Pa.Super.Ct.2002). Professional negligence actions, however, can be maintained only against persons licensed in Pennsylvania or another state as: (1) health care providers as defined in 40 P.S. § 1303.503; (2) accountants; (3) architects; (4) chiropractors; (5) dentists; (6) engineers or land surveyors; (7) nurses; (8) optometrists; (9) pharmacists; (10) physical therapists; (11) psychologists; (12) veterinarians; or (13) attorneys. Pa.R.Civ.P. 1042.1.

Here, the Amended Complaint alleges that moving Defendants are not registered to do business in Pennsylvania, and use sales representatives such as Strope to market and sell annuities. (Am.Compl.¶ ¶ 8, 12, 37.) The Amended Complaint further alleges that Moving Defendants:

undertook to provide estate and asset and tax planning advice to [P]laintiffs ... As professionals providing estate and asset and tax planning advice for [P]laintiffs, the [D]efendants owed a common law duty to [P]laintiffs to provide such professional advice to [P]laintiffs with the necessary skill, confidence, prudence and diligence, as other similarly situation estate and asset planning professionals in the community.
**\*17** (Am.Compl.¶¶ 234, 235.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 14

2005 WL 241181 (E D Pa ), RICO Bus Disp Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

The Amended Complaint does not allege that any of the Defendants except for Bohmueller are licensed professionals. Under Pennsylvania law, however, professional negligence actions can be maintained only against defendants who are licensed professionals as defined in Pennsylvania Rule 1042.1. *See* Pa. R. Civ. P. 1042.1. Accordingly, AILIC and Oxford's Motions to Dismiss Count XV are granted.

### M. *Motion for a More Definite Statement*

AILIC and Oxford have asked the Court to dismiss the Amended Complaint for its failure to plead short, concise statements in accordance with Federal Rule of Civil Procedure 8(a)(2) or, in the alternative, that Plaintiffs be required to file a second amended complaint pursuant to Federal Rule of Civil Procedure 12(e). Plaintiffs argue that Defendants are attempting to impose inconsistent pleading standards on them, by seeking dismissal of the Amended Complaint for too much detail on the one hand, and lack of specificity on the other. However, it is well-established that it is not necessary to violate Rule 8 in order to comply with Rule 9(b). See *In re Wesinghouse Securities Litig*, 90 F.3d 696, 703 (3d Cir 1996) ("[i]t is well settled that the particularity demands of pleading fraud under Rule 9(b) in no way negate the commands of Rule 8 ") (citations omitted). Accordingly, the requirements of Rule 8 apply even where Rule 9(b) commands that circumstances be pled with particularity *Id* (citing to James W. Moore, *et al, Moore's Federal Practice* ¶ 8.13, at 8-58 (2d ed.1995)).

Courts should dismiss pleadings for failure to comply with Rule 8 only if the pleading is "so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised." *Martin v Warrington*. Civ. A. No. 01-1178, 2002 WL 341000, at *3 (E D.Pa. Mar 4, 2002) (citing *Simmons v Abruzzo*, 49 F.3d 83, 89 (2d Cir 1995)). While courts can strike pleadings that are "laden with unnecessary factual narrative," courts frequently decline to dismiss complaints despite plain violations of Rule 8(a)(2) *Martin*, 2002 WL 341000, at *3. Accordingly, the Court

denies AILIC's and Oxford's Motions to Dismiss the Amended Complaint for violations of Rule 8(a)(2). However, should Plaintiffs decide to file a Second Amended Complaint, they must comply with Rule 8(a)(2).

Under Rule 12(e), a party may move for a more definite statement if the pleading is so "vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith without prejudice to itself" *Sun Co*, 939 F.Supp. at 368 (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1376 (1990)) "The class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small ..." *Id* The Court finds that the Amended Complaint as a whole is not so vague, ambiguous, or unintelligible that Defendants cannot discern the essence of the claims made. Accordingly, AILIC's and Oxford's Motions for a More Definite Statement pursuant to Rule 12(e) are denied

### III CONCLUSION

**\*18** For the foregoing reasons, the Moving Defendants' Motions to Dismiss are granted in part and denied in part. AILIC and Oxford's Motions to Dismiss for failure to comply with Federal Rule of Civil Procedure 8(a)(2) are denied. AILIC and Oxford's Motions to Dismiss are granted as to Count I with respect to any claim for fraud based on their notification by a consumer agency that a larger living-trust scheme existed, and denied in all other respects. In addition, AILIC Motion to Dismiss is denied with respect to Counts II, IV, IX, X (except with respect to the claims that they aided and abetted in the unauthorized practice of the law) and XIII, and granted with respect Counts III, VIII, XI, XII, XIV and XV Oxford's Motion to Dismiss is denied with respect to Counts II, IV, IX, X (except with respect to the claims that they aided and abetted in the unauthorized practice of the law), XIII and XIV, and granted with respect Counts III, VIII, XI, XII and XV.

Bohmueller's Motion to Dismiss is granted with respect to Counts III, XI and XII, as well as with respect to the claim made in Count X that he aided

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 15

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

and abetted the unauthorized practice of law.
Bohmueller's Motion to Dismiss is denied in all
other respects. Strope and Patriot's Motions to
Dismiss Counts III, VIII, XI and XII are granted.
By agreement of the parties and by Order of the
Court, Counts V and VI of the Amended Complaint
are dismissed. [FN8]

> FN8. In sum, the following claims survive
> the Motions to Dismiss:
> 1. The fraudulent and negligent
> misrepresentation claims in Counts I and II
> against Strope as well as New Life, AILIC,
> Oxford, Bohmueller, and Patriot for false
> statements made by Strope acting as agent
> on their behalf.
> 2. The civil conspiracy claim against New
> Life, AILIC, Oxford, Bohmueller, Strope
> and Patriot.
> 3. The professional negligence claim in
> Count VII against Bohmueller.
> 4. The breach of fiduciary duty claim in
> Count IX against New Life, AILIC,
> Oxford, Bohmueller, Strope and Patriot.
> 5. The UTPCPL claim for fraudulent
> misrepresentations in Count X against New
> Life, AILIC, Oxford, Strope, Bohmueller
> and Patriot.
> 6. The unjust enrichment/*quantum meruit*
> claim in Count XIII against New Life,
> Oxford, Bohmueller, Strope and Patriot.
> 7. The claim for an accounting in Count
> XIV against New Life AILIC, Oxford,
> Bohmueller, Strope and Patriot.
> 8. The claim for professional negligence in
> Count XV against Bohmueller.

An appropriate Order follows.

### ORDER

AND NOW, this 27th day of January, 2005, upon
consideration of the Motions to Dismiss the
Amended Complaint filed by Defendants Barry O.
Bohmueller, Stephen A. Strope, The Patriot Group,
Inc., American Investors Life Insurance Company,
and Oxford Life Insurance Company (Doc. Nos. 25,
26, 29, 31, 33 and 37), all briefing in response
thereto, and the Hearing held on October 28, 2004,

IT IS HEREBY ORDERED that:

1. American Investors Life Insurance Company's
and Oxford Life Insurance Company's Motions to
Dismiss are DENIED as to Counts I and II of the
Amended Complaint;

2. American Investors Life Insurance Company's,
Oxford Life Insurance Company's, Barry O.
Bohmueller's, Stephen A. Strope's, and The
Patriot Group, Inc.'s Motions to Dismiss are
GRANTED as to Count III of the Amended
Complaint; Count III is hereby DISMISSED
without prejudice and with leave to file a Second
Amended Complaint which includes all factual
allegations required by a RICO Case Statement
(see attached) within thirty days of the date of this
Order;

3. American Investors Life Insurance Company's
and Oxford Life Insurance Company's Motions to
Dismiss are DENIED as to Count IV of the
Amended Complaint;

4. American Investors Life Insurance Company's,
Oxford Life Insurance Company's, Barry O.
Bohmueller's, Stephen A. Strope's, and The
Patriot Group, Inc.'s Motions to Dismiss are
GRANTED as to Counts V and VI of the
Amended Complaint by agreement of the parties;
those Counts are hereby DISMISSED with
prejudice;

*19 5. American Investors Life Insurance
Company's, Oxford Life Insurance Company's,
Stephen A. Strope's and The Patriot Group, Inc.'s
Motions to Dismiss are GRANTED as to Count
VIII of the Amended Complaint; Count VIII is
hereby DISMISSED without prejudice and with
leave to file a Second Amended within thirty days
of the date of this Order;

6. American Investors Life Insurance Company's
and Oxford Life Insurance Company's Motions to
Dismiss are DENIED as to Count IX of the
Amended Complaint;

7. American Investors Life Insurance Company's,
Oxford Life Insurance Company's, and Barry O.
Bohmueller's Motions to Dismiss is GRANTED
as to the claim made in Count X of the Amended
Complaint for claim for aiding and abetting the
unauthorized practice of law; this claim is hereby
DISMISSED with prejudice; American Investors
Life Insurance Company's, Oxford Life Insurance

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                          Page 16

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

Company's, and Barry O. Bohmueller' Motions to Dismiss are DENIED as to Count X of the Amended Complaint in all other respects;

8. American Investors Life Insurance Company's, Oxford Life Insurance Company's, Barry O. Bohmueller's, Stephen A. Strope's, and The Patriot Group, Inc.'s Motions to Dismiss are GRANTED as to Count XI of the Amended Complaint; Count XI is hereby DISMISSED with prejudice;

9. American Investors Life Insurance Company's, Oxford Life Insurance Company's, Barry O. Bohmueller's, Stephen A. Strope's, and The Patriot Group, Inc.'s Motions to Dismiss are GRANTED as to Count XII of the Amended Complaint; Count XII is hereby DISMISSED with prejudice;

10. Oxford Life Insurance Company's Motion to Dismiss is DENIED as to Count XIII of the Amended Complaint;

11. American Investors Life Insurance Company's Motion to Dismiss is GRANTED as to Count XIII of the Amended Complaint; Count XIII of the Amended Complaint against American Investors Life Insurance Company is hereby DISMISSED with prejudice;

12. American Investors Life Insurance Company's and Oxford Life Insurance Company's Motions to Dismiss are DENIED as to Count XIV of the Amended Complaint;

13. American Investors Life Insurance Company's and Oxford Life Insurance Company' Motions to Dismiss are GRANTED as to Count XV of the Amended Complaint; Count XV is hereby DISMISSED with prejudice against all Defendants except for Barry O. Bohmueller; and

14. American Investors Life Insurance Company's and Oxford Life Insurance Company's Motions to Dismiss the Amended Complaint for violating Federal Rule of Civil Procedure 8(a)(2) are DENIED;

15. American Investors Life Insurance Company's, Oxford Life Insurance Company's, Barry O. Bohmueller's, Stephen A. Strope's, and The Patriot Group, Inc.'s Motions for a More Definite Statement pursuant Federal Rule of Civil Procedure 12(e) are DENIED; and

16. IT IS FURTHER ORDERED that any Second Amended Complaint filed by Plaintiffs shall comply with Federal Rule of Civil Procedure 8(a)(2), which requires a short and plain statement of the claims showing that the pleader is entitled to relief.

### RICO CASE STATEMENT

**\*20** 1. State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b)(c), and/or (d);

2. List each defendant and state the alleged misconduct and basis of liability of each defendant;

3. List the alleged victims and state how each victim was allegedly injured:

4. Describe in detail the pattern of racketeering activity or collection of unlawful debts alleged for each RICO claim. A description of the pattern of racketeering activity shall include the following information:

a. List the alleged predicate acts and the specific statutes that were allegedly violated;

b. If the RICO claim is based on the predicate offenses of wire fraud, mail fraud or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity". Fed.R.Civ.P. 9(b).

c. Describe how the predicate acts form a "pattern of racketeering activity"; and

d. State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe.

5. Describe in detail the alleged enterprise for each RICO claim. A description of the enterprise shall include the following information:

a. State the names of the individuals, partnerships, corporation, associations or other legal entities that allegedly constitute the enterprise;

b. Describe the structure, purpose, function and course of conduct of the enterprise;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 17

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**(Cite as: 2005 WL 241181 (E.D.Pa.))**

c. State whether any defendants are employees, officers or directors of the alleged enterprise;

d. State whether any defendants are associated with the enterprise; and

e. State whether you are alleging that the defendants are individuals or entities separate from the alleged enterprise or that the defendants are the enterprise itself, or members of the enterprise.

6. Describe the alleged relationship between the activities of the enterprise and the alleged pattern of racketeering activity. Discuss how the racketeering activity differs from the usual and daily activities of the enterprise, if at all;

7. Describe the effect of the enterprise on interstate or foreign commerce;

8. If the complaint alleges a violation of 18 U.S.C. § 1962(a), provide the following information:

a. State who received the income derived from the pattern of racketeering activity or through the collection of an unlawful debt;

b. Describe the use of investment of such income;

9. If the complaint alleges a violation of 18 U.S.C. § 1962(b), describe the acquisition or maintenance of any interest in control of the alleged enterprise;

10. If the complaint alleges a violation of 18 U.S.C. § 1962(c), provide the following information:

a. State who is employed by or associated with the enterprise; and

b. State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c);

11. If the complaint alleges a violation of 18 U.S.C. § 1962(d), describe the alleged conspiracy;

12. Describe the alleged injury to business or property;

*21 13. Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.

14. Provide additional information that you feel would be helpful in processing your RICO claim

2005 WL 241181 (E.D.Pa.), RICO Bus.Disp.Guide 10,825

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2696766 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Defendants' Motions to Dismiss (Sep. 24, 2004)

• 2004 WL 2696758 (Trial Pleading) First Amended Complaint (Jul. 13, 2004)

• 2:04CV02535 (Docket)
                                                (Jun. 10, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.