**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RONNIE L. HATCHER, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| PFIZER, INC., PHARMACIA CORP., and G.D. SEARLE & CO., | ) ) ) ) |
| Defendants. | ) |

C.A. No. 05-208-SLR
<u>CLASS ACTION</u>

**PLAINTIFF'S ANSWERING BRIEF
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE
GRANTED AND FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY**

ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.
Jeffrey S. Goddess (Del. Bar No. 630)
919 Market Street, Suite 1401
PO Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
Attorneys for Plaintiff

OF COUNSEL:

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman
Douglas C. McDermott
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
(206) 623-7292

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
One Main Street, Fourth Floor
Cambridge, MA 02142
(617) 482-3700

July 15, 2005

# TABLE OF CONTENTS

**Page**

I.   NATURE AND STAGE OF THE PROCEEDINGS ..............................................1

II.  SUMMARY OF PLAINTIFF'S ARGUMENT......................................................1

III. STATEMENT OF THE FACTS ..........................................................................2

IV.  LEGAL AUTHORITY .......................................................................................5

    A.   The Applicable Standard for Dismissal ....................................................5

    B.   The Complaint Properly Pleads RICO Violations .....................................6

        1.   Plaintiff Has Standing to Sue Defendants for RICO
            Violations...................................................................................6

            a.   Plaintiff Has Suffered A Concrete Financial Loss..............7

            b.   Plaintiff's Injuries Were Proximately Caused by
                Defendants' Violation of 18 U.S.C. § 1962.......................12

        2.   Plaintiff Pleads Fraud with the Particularity Required by
            Rule 9(b) .................................................................................13

    C.   Plaintiff Has Stated Proper Claims Under Each State Consumer
        Protection Statute.....................................................................................17

        1.   Defendants Violated The Illinois Consumer Fraud and
            Deceptive Business Practices Act..................................................17

        2.   Defendants Violated New Jersey's Consumer Fraud Act.............19

        3.   Defendants Violated New York's Consumer Protection
            Statute .....................................................................................23

    D.   Plaintiff Has Stated a Proper Claim for Unjust Enrichment......................25

    E.   Plaintiff Has Stated a Proper Claim for Breach of Implied
        Warranty of Merchantability.....................................................................26

V.   CONCLUSION..................................................................................................27

# TABLE OF AUTHORITIES

## CASES

*Altman v. Bayer Corp.*,
    125 F. Supp. 2d 666 (S.D.N.Y. 2000)..................................................................24

*Bildstein v. MasterCard Int'l Inc.*,
    329 F. Supp. 2d 410 (2004) ...........................................................................24

*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA, Inc.*,
    818 N.E.2d 1140 (N.Y. App. Div. 2004)...............................................................24

*In re Bridgestone/Firestone, Inc. Tires Prod. Liability Litig.*,
    155 F. Supp. 2d 1069 (S.D. Ind. 2001)................................................................11

*Brown v. United States Stove Co.*,
    484 A.2d 1234 (N.J. Sup. Ct. 1994)....................................................................20

*Christidis v. First Pennsylvania Mortg. Trust*,
    717 F.2d 96 (3d Cir. 1983)..........................................................................13, 15

*Contey v. New Jersey Bell Tel. Co.*,
    643 A.2d 454 (N.J. Sup. Ct. 1994)......................................................................20

*Cox v. Sears Roebuck & Co.*,
    647 A.2d 454 (N.J. Sup. Ct. 1994)......................................................................19

*DeLima v. Exxon Corp.*,
    No. A-3536-99T3 (N.J. App. Div. Dec. 4, 2000) .................................................21, 22

*Elysian Fed. Sav. Bank v. First Interregional Equity Corp.*,
    713 F. Supp. 737 (D.N.J. 1989) .....................................................................13, 14

*Emcore Corp. v. PriceWaterhouseCoopers LLP*,
    102 F. Supp. 2d 237 (D.N.J. 2000) .......................................................................5

*Flood v. Makowski*,
    No. 3:CV- 03-1803, 2004 U.S. Dist. Lexis 16957
    (M.D. Pa. Aug. 24, 2004)..............................................................................6, 7

*Goshen v. Mutual Life Ins. Co.*,
    774 N.E.2d 1190 (N.Y. App. Div. 2002)...............................................................24

*Gray v. Seaboard Secs., Inc.*,
    241 F. Supp. 2d 213 (2003) ...........................................................................24

*Grider v. Keystone Health Plan Central, Inc.*,
    No. 2001-CV-05641, 2003 U.S. Dist. Lexis 16551
    (E.D. Pa. Sept. 18, 2003) .............................................................................6, 7

*Heindel v. Pfizer, Inc.,*
No. 02-3348 2004 U.S. Dist. Lexis 12232 (S.D.N.J. June 7, 2004) ......................11

*Heller v. Deutsche Bank AG,*
No. 04-CV-3571, 2005 U.S. Dist. Lexis 3445 (E.D. Pa. Mar. 3, 2005) .................5

*Insurance Consultants of Am. v. Southeastern Ins. Group, Inc.,*
746 F. Supp. 390 (D.N.J. 1990) ......................................................................13, 14

*In re K-Dur Antitrust Litig.,*
338 F. Supp. 2d 517 (D.N.J. 2004) ..........................................................................26

*Kaufman v. I-Stat Corp.,*
745 A.2d 1188 (N.J. Sup. Ct. 2000) ........................................................................22

*Kievit v. Rokeach,*
No. 86-2592, 1987 U.S. Dist. Lexis 16131 (D.N.J. Oct. 29, 1987) ...............15, 16

*Kimmel v. Peterson,*
565 F. Supp. 476 (E.D. Pa. 1983) .....................................................................14, 15

*Lacy v. G.D. Searle & Co.,*
567 A.2d 398 (Del. 1989) .................................................................................12, 26

*Lemelledo v. Beneficial Mgmt. Corp.,*
150 N.J. 255 (1997) ..................................................................................................23

*In re Lupron® Mktg. & Sales Practices Litig.,*
295 F. Supp. 2d 148 (D. Mass. 2003) ................................................................7, 11

*Maio v. Aetna, Inc.,*
221 F.3d 472 (3d Cir. 2000) .............................................................................7, 8, 9

*In re Managed Care Litig.,*
150 F. Supp. 2d 1330 (S.D. Fla. 2001) ....................................................................7

*Martin v. Group Health Inc.,*
2 A.D.3d 414 (N.Y. App. Div. 2003) ......................................................................24

*Mathews v. Kidder, Peabody & Co.,*
260 F.3d 239 (3d Cir. 2001) ............................................................................. *passim*

*McHale v. NuEnergy Group,*
No. 01-4111, 2002 U.S. Dist. Lexis 3307 (E.D. Pa. Feb. 27, 2002) ......................5

*Oliveira v. Amoco Oil Co.,*
776 N.E.2d 151 (Ill. 2002) ................................................................................17, 19

*Perez v. Wyeth Laboratories, Inc.,*
734 A.2d 1245 (N.J. Sup. Ct. 1999) .................................................................19, 20

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    307 F. Supp. 2d 196 (D. Mass. 2004) ...............................................................13

*Polymer Dynamics, Inc. v. Bayer Corp.*,
    No. 99-4040, 2000 U.S. Dist. Lexis 11493 (E.D. Pa. Aug. 14, 2000)...................5

*Ramanadham v. New Jersey Mfrs. Ins. Co.*,
    455 A.2d 1134 (N.Y. Super. Ct. App. Div. 1982) .............................................19

*Robb v. Philadelphia*,
    733 F.2d 286 (3d Cir. 1984)..................................................................................5

*Schuylkill Skyport Inn, Inc. v. Rich*,
    No. 95-3128, 1996 U.S. Dist. Lexis 12655 (E.D. Pa. Aug. 21, 1996)..................14

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
    742 F.2d 786 (3d Cir. 1984).........................................................................14, 16

*Shannon v. Boise Cascade Corp.*,
    805 N.E.2d 213 (Ill. 2004)..................................................................................18

*Shreves v. Radiology Assocs., Inc.*,
    No. 92C-09-258, 1994 Del. Super. Lexis 497
    (Del. Super. Ct. Oct. 31, 1994) ...........................................................................12

*Sickles v. Cabot Corp.*,
    2005 N.J. Super. Lexis 217 (App. Div. July 7, 2005)..........................................23

*Stutman v. Chemical Bank*,
    731 N.E.2d 608 (N.Y. App. Div. 2004)...............................................................24

*Warden v. McLelland*,
    288 F.3d 105 (3d Cir. 2002)..................................................................................6

## STATUTES

18 U.S.C. § 1962..................................................................................................2, 6

18 U.S.C. § 1964(c) .................................................................................................6

18 U.S.C. §§ 1961-1968 ..........................................................................................6

Fed. R. Civ. P. 8(a) .................................................................................................6

N.J.S.A. 56:8-2......................................................................................................23

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Ronnie L. Hatcher, individually and on behalf of all others similarly situated (the "Class"), respectfully submits this answering brief in opposition to defendants' motion to dismiss plaintiff's class action complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), and for failure to plead fraud with particularity pursuant to Fed. R. Civ. P. 9(b). (D.I. 12.)

This action is currently subject to proceedings before the Judicial Panel on Multidistrict Litigation (the "Panel"). Presently pending before the Panel are multiple motions for transfer and consolidation pursuant to 28 U.S.C. § 1407. These motions encompass at least 33 lawsuits throughout the country, including the present case, and are scheduled to be heard on July 28, 2005. On May 13, 2005, the Panel advised that it might be "especially appropriate" for district courts to delay ruling on any pending motions "if the motion raises questions likely to arise in other actions in the transferee court and, in the interest of uniformity, might best be decided there if the Panel orders centralization." (D.I. 10.) Defendants have already filed a similar motion to dismiss in *Steamfitters' Indus. Welfare Fund v. Pfizer, et al.*, 05 Civ. 3814 (RJH) (S.D.N.Y.), raising the possibility of inconsistent rulings on virtually identical issues.

## II.    SUMMARY OF PLAINTIFF'S ARGUMENT

The allegations set forth in plaintiff's Class Action Complaint (the "Complaint") expose a widespread, fraudulent scheme whereby defendants falsely marketed and promoted the prescription drug Bextra in an effort to create demand for the drug as a wide-ranging pain-reliever, allowing defendants to sell it at a premium over comparable drugs. Although defendants were well-aware that Bextra had no proven superiority over competing drugs, and in fact had serious side effects, including gastrointestinal complications, blood clotting and clot-related cardiovascular events, and life-threatening

skin reactions, defendants nonetheless pushed Bextra to market on false claims of improved gastrointestinal safety while downplaying its other risks.

Defendants used the U.S. Mails and Interstate Wire Facilities on thousands, if not hundreds of thousands, of occasions to submit false and misleading marketing materials to governmental agencies, doctors, consumers, health care providers, and others throughout the country. These materials were designed to conceal Bextra's risks and falsely promote its safety and efficacy. This fraudulent pattern of marketing and promotion persisted for more than four years and, unfortunately, it worked. By the time it was withdrawn from the market, the Class had paid hundreds of millions of dollars for Bextra, despite the fact that it was no more effective, and in fact far more dangerous, than less expensive alternatives. Accordingly, plaintiff brings this action on behalf of himself and all others similarly situated who paid some or all of Bextra's inflated purchase price. Because the Complaint adequately pleads claims for violation of 18 U.S.C. § 1962(c), violation of various consumer fraud and consumer protection statutes, unjust enrichment, and breach of the implied warranty of merchantability, plaintiff respectfully asks the Court to deny defendants' motion to dismiss.

## III.     STATEMENT OF THE FACTS

Bextra belongs to a class of drugs known as non-steroidal anti-inflammatory drugs ("NSAIDs"). (Complaint, ¶ 20.) Aspirin, naproxen, and ibuprofen are examples of well-known NSAIDs. (Complaint, ¶ 20.) NSAIDs reduce pain by blocking the body's production of pain transmission enzymes called cyclo-oxygenase ("COX"). (Complaint, ¶ 21.) There are two forms of COX – COX-1 and COX-2. (Complaint, ¶ 21.)

In addition to transmitting pain sensations, COX-1 and COX-2 have beneficial functions. For instance, COX-1 is involved in maintaining and repairing gastrointestinal tissue, while COX-2 is involved in the prevention of blood clots. (Complaint, ¶¶ 22-23.) Accordingly, blocking COX-1 hampers the body's ability to repair gastric tissue and

causes harmful gastrointestinal side effects, including stomach ulceration and bleeding, while blocking COX-2 encourages the formation of blood clots and causes various clot-related cardiovascular events, including heart attacks, strokes, unstable angina, cardiac clotting, and hypertension. (Complaint, ¶¶ 24-25.) Traditional NSAIDs like aspirin block both COX-1 and COX-2 simultaneously, increasing the risk of ulcers in the stomach and intestines (because of a complex chemical balance in the human body, however, traditional NSAIDs do not cause blood clots, but actually reduce the risk of clots and help protect heart function). (Complaint, ¶ 26.) Selective COX-2 inhibitors were developed in an attempt to remedy this problem.

Bextra was a second-generation COX-2 inhibitor, following on the heels of Celebrex and Vioxx. (Complaint, ¶¶ 30-31.) Defendants launched Bextra in late 2001, more than two years after introducing Celebrex to the market in early 1999, and promoted it as an alternative to older NSAIDs. (Complaint, ¶¶ 30-34, 49-53.) As they did with Celebrex, defendants promoted Bextra as offering all of the benefits of less expensive NSAIDs with none of the drawbacks, thereby turning Bextra into a blockbuster drug with billions of dollars in yearly sales. (Complaint, ¶¶ 4, 9, 49-53.) Long before they began marketing the drug as being safer and more effective than other NSAIDs, however, defendants were well-aware that Bextra had no proven superiority over other NSAIDs, and in fact had serious side effects, including gastrointestinal complications, blood clotting and clot-related cardiovascular events, and life-threatening skin reactions. (Complaint, ¶¶ 25, 29-46, 49-53.) For example, by January 16, 2001, when defendants filed for approval of Bextra with the U.S. Food & Drug Administration ("FDA"), numerous studies had demonstrated that COX-2 inhibitors caused heart attacks, strokes, unstable angina, cardiac clotting, and hypertension. (Complaint, ¶¶ 25, 29, 36-46.) Although defendants submitted misleading documents to the FDA to conceal these and other risks and to falsely promote Bextra's safety and superiority, the FDA refused to

- 3 -

approve Bextra for the management of acute pain, finding it to be no better than other NSAIDs, and rejected defendants' application to market Bextra as being safer than other NSAIDs in protecting against clinically serious gastrointestinal side effects. (Complaint, ¶¶ 35, 84.) Instead, the FDA approved Bextra on November 16, 2001 for the limited purposes of treating primary dysmenorrhea and the signs and symptoms of osteoarthritis and rheumatoid arthritis. (Complaint, ¶ 34.)

Notwithstanding the FDA's limited approval, defendants made a business decision to push Bextra to market on false claims of gastrointestinal safety. (Complaint, ¶¶ 49-53.) Defendants initiated a massive marketing campaign in which they promoted Bextra as providing effective pain relief without the gastrointestinal side effects of traditional NSAIDs, while intentionally suppressing data exposing its other side effects, including blood clotting and clot-related cardiovascular events and life-threatening skin reactions. (Complaint, ¶¶ 49-53.) Defendants blitzed doctors' offices with literature and verbal presentations, and used the U.S. Mails and Interstate Wire Facilities on thousands, if not hundreds of thousands, of occasions to submit false and misleading materials to governmental agencies, doctors, consumers, health care providers, and others throughout the country. (Complaint, ¶¶ 49-53, 84-89.) These materials were designed to conceal Bextra's risks while falsely promoting its safety and efficacy. (Complaint, ¶ 84.)

Defendants maintained this marketing campaign in order to create demand for Bextra as a wide-ranging pain-reliever, which in turn allowed them to sell it at a premium over other NSAIDs. (Complaint, ¶¶ 6-7.) Unfortunately, the scheme worked. Defendants created significant demand for Bextra, allowing them to sell it for between $2.60 and $5.80 per pill depending upon the dosage. (Complaint, ¶ 9.) This continued for more than four years, until April 2005, when Bextra was withdrawn from the market. By that time, however, the Class had already paid hundreds of millions of dollars for the

drug, despite the fact that it was no more effective, and in fact far more dangerous, than a $0.10 aspirin.  (Complaint, ¶ 94.)

## IV.   LEGAL AUTHORITY

### A.   The Applicable Standard for Dismissal

"On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party." *Emcore Corp. v. PriceWaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 242 (D.N.J. 2000); *see also, Heller v. Deutsche Bank AG*, No. 04-CV-3571, 2005 U.S. Dist. Lexis 3445, at *4 (E.D. Pa. Mar. 3, 2005) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)). A complaint must not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Polymer Dynamics, Inc. v. Bayer Corp.*, No. 99-4040, 2000 U.S. Dist. Lexis 11493, at *2 (E.D. Pa. Aug. 14, 2000) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Robb v. Philadelphia*, 733 F.2d 286, 290 (3d Cir. 1984)); *see also, Heller*, 2005 U.S. Dist. Lexis 3445, at *5 (Dismissal is improper unless "it is certain that no relief can be granted under any set of facts which could be proved.") (internal quotations omitted); *McHale v. NuEnergy Group*, No. 01-4111, 2002 U.S. Dist. Lexis 3307, at *6 (E.D. Pa. Feb. 27, 2002) (same).  Thus, a motion to dismiss is subject to a limited inquiry, focusing not on whether plaintiff will ultimately prevail in a trial on the merits, "but whether [he] should be afforded an opportunity to offer evidence in support of [his] claims." *Heller*, 2005 U.S. Dist. Lexis 3445, at *5; *see also, Emcore Corp.*, 102 F. Supp. 2d at 242 ("The question is whether the plaintiff can prove any set of facts consistent with [his] allegations that will entitle [him] to relief, not whether [he] will ultimately prevail.").

**B.     The Complaint Properly Pleads RICO Violations**

The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), authorizes a private right of action by "[a]ny person injured in his business or property by reason of a violation of section 1962 of [Title 18]." 18 U.S.C. § 1964(c). 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Accordingly, plaintiff is authorized to maintain the present lawsuit if he was injured in his business or property by defendants' "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Warden v. McLelland*, 288 F.3d 105, 114 (3d Cir. 2002) (internal quotations omitted). As set forth herein, the complaint properly alleges each of these elements, and all other matters required to maintain an action for defendants' violation of 18 U.S.C. § 1962(c), with the specificity required by Third Circuit precedent, Fed. R. Civ. P. 8(a), and, where applicable, Fed. R. Civ. P. 9(b).

**1.     Plaintiff Has Standing to Sue Defendants for RICO Violations**

Defendants concede the sufficiency of the allegations concerning their conduct of an enterprise through a pattern of racketeering activity. Defendants also concede that plaintiff has been injured in his business or property. Notwithstanding these concessions, defendants challenge plaintiff's standing to bring this action, arguing that his damages are too intangible and too remote to be cognizable under RICO. In cases such as this, however, where plaintiff has suffered (1) a concrete financial loss (2) which was proximately caused by defendants' violation of 18 U.S.C. § 1962, there is no question that he has standing to maintain an action under RICO. *Flood v. Makowski*, No. 3:CV-03-1803, 2004 U.S. Dist. Lexis 16957, at *26 (M.D. Pa. Aug. 24, 2004); *Grider v. Keystone Health Plan Central, Inc.*, No. 2001-CV-05641, 2003 U.S. Dist. Lexis 16551,

at *63 (E.D. Pa. Sept. 18, 2003). Defendants' arguments to the contrary, and in particular their heavy reliance on *Maio v. Aetna, Inc.*, 221 F.3d 472 (3d Cir. 2000) and its progeny, are fatally flawed because they fail to recognize a critical distinction between the injured property interests at issue in those cases and the injured property interest at issue herein. *See, e.g., In re Lupron® Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 175 (D. Mass. 2003) ("Defendants' challenge to this element of plaintiffs' RICO claims borders on the frivolous.... Plaintiffs' allegations that as a result of the Lupron® marketing scheme they were induced to make many millions of dollars in overpayments for the drug is more than sufficient to satisfy RICO's causation requirement at the pleading stage.")

### a.    Plaintiff Has Suffered A Concrete Financial Loss

A concrete financial loss is an ascertainable, out-of-pocket monetary loss. *Flood*, 2004 U.S. Dist. Lexis 16957, at *26; *Grider*, 2003 U.S. Dist. Lexis 16551, at *63; *Maio*, at 483. Where a plaintiff has suffered injury to his property, courts evaluate his financial loss, and therefore his standing, by looking at the nature of the property interest at issue. *Grider*, 2003 U.S. Dist. Lexis 16551, at *63-66; *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 246-249 (3d Cir. 2001); *Maio*, 221 F.3d at 485-92; *In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1338 (S.D. Fla. 2001). In doing so, courts draw a critical distinction between interests involving tangible property and interests in the nature of contract rights. *Grider*, 2003 U.S. Dist. Lexis 16551, at *63-66; *Mathews*, 260 F.3d at 246-49; *Maio*, 221 F.3d at 485-92; *In re Managed Care Litig.*, 150 F. Supp. 2d at 1338. Where, as here, the property at issue is tangible personal property, the Third Circuit has expressly adopted the "diminution in value" theory, recognizing that plaintiff's RICO damages are the difference between what he paid and the true market value of what he received. *Mathews*, 260 F.3d at 246-49 ("We believe that the most accurate way to measure that loss, like for any other tangible property interest, would be to calculate the difference between what the Appellants paid and the true market value of what they

received."); *Maio*, 221 F.3d at 485-92 ("[W]here property at issue is in the nature of real or personal property, a reduction in property value is the harm suffered."). In such cases, an injury occurs at the time of investment. *Mathews*, 260 F.3d at 249. By contrast, where the interest is in the nature of a contract right, such as a contract to provide health benefits, a plaintiff's RICO injury does not occur until the defendant has breached its contractual obligations. *Mathews*, 260 F.3d at 246-49; *Maio*, 221 F.3d at 485-92. Accordingly, since the financial losses occasioned by a defendant's breach would constitute the economic harm suffered (as opposed to the difference between the contract negotiated and the contract actually received), a plaintiff's injury cannot be characterized in terms of a "diminution in value" of the contract. *Mathews*, 260 F.3d at 246-49; *Maio*, 221 F.3d at 485-92. Defendants' failure to recognize this important distinction, which was analyzed at length in *Maio*, is fatal to their analysis.

In *Maio*, the plaintiffs sued their HMO provider claiming that it fraudulently induced them to enroll in its HMO plan by making certain representations regarding its high quality of healthcare services, and then failed to provide the level of service that the plaintiffs had been led to expect. 221 F.3d at 474-79. Plaintiffs claimed that they received an "'inferior' health care product," but alleged neither a denial of medical benefits nor inferior treatment. *Id.* at 484-85. Instead, plaintiffs asserted that the difference between what they had paid and the actual value of the services constituted their financial loss for RICO purposes. *Id.* at 486-87. On these facts, the *Maio* court refused to apply the "diminution in value" rule because plaintiffs' interest was not a tangible property interest, but a contract right which could not be diminished in value absent a breach of the contractual terms. *Id.* at 488-92. In such a context, the court found that an injury could be shown by receipt of "inadequate, inferior or delayed care, personal injuries resulting therefrom, or [the HMO's] denial of benefits due under the insurance arrangement." *Id.* at 490. In so holding, the *Maio* court drew a critical distinction

between tangible property interests and contracts interests, and the application of the
"diminution in value" rule with respect thereto:

> Notwithstanding appellants' description of the
> property interests they acquired through their enrollment in
> Aetna's HMO plan, Aetna's HMO is not a tangible
> property interest, like a plot of land or a diamond necklace,
> as appellants' argument necessarily implies. … In the
> context of a case in which the property interest at stake is of
> a tangible nature, it seems logical that an injury to that
> property, and consequently the fact of damage under RICO,
> may be demonstrated by reference to external conditions or
> the occurrence of events which cause the value of the real
> or personal property to be reduced. …
>
> Here, however, the property at issue is not real or
> personal property; rather, it is a contract for health
> insurance. Thus, the nature of appellants' property interests
> at stake is their contractual right to receive benefits in the
> form of covered medical services.

*Id.* at 488-89. Since plaintiff herein does not claim injury to any contractual right, the

Third Circuit has not, as defendants contend, squarely rejected plaintiff's overpayment

theory. To the contrary, the Third Circuit has expressly adopted this theory insofar as

tangible property interests are concerned.

This point was clarified even more recently in *Mathews*, 260 F.3d at 246-49.

There, plaintiffs claimed that defendants fraudulently misrepresented certain investment

funds involving real estate as "low-risk, conservative investments suitable for low net-

worth individuals," thereby inducing plaintiffs to invest in, and overpay for, the funds.

*Id.* at 241-42. Referring to its decision in *Maio*, the Third Circuit noted unequivocally

that "we recognized that the diminution in value of tangible property, 'like a plot of land

or diamond necklace,' can constitute a RICO injury." *Id.* at 246 n.9 (quoting *Maio*, 221

F.3d at 488-89). The court further distinguished *Mathews* from *Maio* as follows:

> We held [in *Maio*], however, that a RICO injury did not
> occur until Aetna failed to perform its contractual
> obligations – i.e., until it failed to provide health benefits or
> treatment that it had promised. In essence, we
> characterized the plaintiffs' property interest as a
> contractual right to receive certain benefits, and

distinguished it from an ownership interest in tangible property.

In contrast, the Appellants' interest in this case was an ownership stake in real property, fundamentally no different than a plot of land or a diamond necklace. Although Kidder may have been overly optimistic in describing its investment funds, it never promised a set return. Therefore, the Appellants have no contractual remedy for the losses they incurred. Instead, Kidder offered an equity investment, contingent upon the appreciation, or lack thereof, of the underlying Sunbelt properties. **The crux of the Appellants' claim is that they overpaid for that interest. We believe that the most accurate way to measure that loss, like for any other tangible property interest, would be to calculate the difference between what the Appellants paid and the true market value of what they received.** Therefore, we agree with the Second Circuit Court of Appeals that this case is distinguishable from those involving contractual agreements, such as debt contracts. When a defendant fraudulently misleads individuals into purchasing equity interests in real property, an injury occurs at the time of investment.

*Id.* at 248-49 (emphasis added) (citations and internal quotations omitted).

The present case is remarkably similar to *Mathews.* As in *Mathews*, defendants herein misrepresented the nature and quality of tangible property, causing plaintiff and the Class to overpay. The Complaint plainly alleges that defendants falsely marketed and promoted Bextra in an effort to create demand for the drug as a wide-ranging pain reliever, allowing defendants to sell it at a premium over other NSAIDs. (Complaint, ¶¶ 6-7.) Although defendants were well-aware that Bextra had no proven superiority over other NSAIDs, and that the FDA had refused to approve Bextra for the management of acute pain, defendants nonetheless promoted it as a superior pain reliever. (Complaint, ¶¶ 8, 35, 49-53.) Plaintiff and the Class were deceived by these misrepresentations, causing them to overpay for Bextra, just as plaintiffs in *Mathews* overpaid for their interest in the investment funds. (Complaint, ¶¶ 7-9, 103.) These similarities compel the same conclusion – that plaintiff adequately alleges a concrete financial loss by virtue of

the diminution in value of his tangible property interest. *See also, In re Lupron® Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d at 175.

Defendants' reliance on *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F. Supp. 2d 1069 (S.D. Ind. 2001) and *Heindel v. Pfizer, Inc.*, No. 02-3348(SRC), 2004 U.S. Dist. Lexis 12232 (S.D.N.J. June 7, 2004) is similarly unavailing. Putting aside the fact that neither decision is binding on this Court, particularly in light of the *Mathews* decision, both cases are factually inapposite. For example, plaintiffs' assertion of financial loss in *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.* was "grounded in the possibility of future events that may cause them to suffer the loss associated with the products they claim are defective or diminished in value: the tires ... may suffer tread separation; they may receive on trade-in or resale of their Explorers ... less than they would have received absent the alleged defects." 155 F. Supp. 2d at 1091. By contrast, plaintiff herein alleges, among other things, that defendants promoted Bextra as a superior pain reliever when in fact it was not, nor was it even approved by the FDA for the management or prevention of acute pain. Thus, plaintiff's claims are not grounded in the possibility of future events – plaintiff suffered an injury when he purchased a drug that could not perform as defendants promised. On this point, the *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.* court specifically noted that RICO affords a monetary remedy to plaintiffs who have actually realized the diminished value of a product. *Id.*

*Heindel* is also distinguishable. First, as defendants point out, it involved claims for violation of the New Jersey Consumer Fraud Act and for breach of the implied warranty of merchantability arising out of the purchase and use of Celebrex. 2004 U.S. Dist. Lexis 12232, at *41-47. Second, and more importantly, there was no evidence in the record therein that Celebrex had been ineffective. *Id.* at *42. Again, the allegations

in the Complaint are quite the opposite, demonstrating that Bextra was not, as defendants promised, a superior pain reliever, among other things.

Because the Complaint adequately alleges that plaintiff and the Class suffered a concrete financial loss when they purchased Bextra, defendants' motion to dismiss should be denied.

**b.    Plaintiff's Injuries Were Proximately Caused by Defendants' Violation of 18 U.S.C. § 1962**

Defendants' perfunctory reference to the learned intermediary doctrine is entirely misplaced. The learned intermediary doctrine has no bearing on a plaintiff's standing to maintain an action under RICO. Indeed, after extensive review of federal and state court decisions throughout the country, plaintiff was unable to locate a single case where the learned intermediary doctrine operated to bar a RICO claim. In fact, plaintiff was unable to locate a single decision that even analyzed the learned intermediary doctrine in the context of a RICO claim. In *Shreves v. Radiology Assocs., Inc.*, No. 92C-09-258, 1994 Del. Super. Lexis 497, at *9-10 (Del. Super. Ct. Oct. 31, 1994), the court noted that it was unaware of "any authority applying the learned intermediary doctrine in any context other than a products liability action against the manufacturer of a prescription drug or device." Thus, there is no support for defendants' proposition that the learned intermediary doctrine applies to plaintiff's RICO claim. Even if it did apply, however, defendants' argument is nevertheless devoid of merit.

The learned intermediary doctrine provides an exception to the rule that a drug manufacturer has a duty to directly warn consumers about the risks associated with its drugs. *Lacy v. G.D. Searle & Co.*, 567 A.2d 398, 399-400 (Del. 1989). In order to fall within this exception, a manufacturer must "provide an appropriate warning about the drug when it gives the patient's physician the necessary information to be disseminated to the patient." *Id.* at 399. Defendants herein did precisely the opposite. Rather than

provide physicians with the necessary information, defendants blitzed doctors' offices with false and misleading literature and verbal presentations, and used the U.S. Mails and Interstate Wire Facilities on thousands, if not hundreds of thousands, of occasions to submit false and misleading materials to doctors, among others. (Complaint, ¶¶ 49-53, 80-89.) Under these circumstances, there can be no serious question that the learned intermediary doctrine is inapplicable to the facts of this case, and defendants' motion to dismiss in this regard should be denied. *In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 207 (D. Mass. 2004) ("In the private, end-payor context, the harm alleged by Defendants' alleged actions is visited directly upon the end-payor Plaintiffs, as they have paid directly for the named drugs based on the [average wholesale prices]. Similar arguments about intervening causes between the setting of an [average wholesale price] by a defendant and injuries to plans and individual co-payors were recently rejected as bordering on the frivolous.") (internal quotations omitted).

### 2.    Plaintiff Pleads Fraud with the Particularity Required by Rule 9(b)

"The requirements of Rule 9(b) for a RICO claim are construed liberally in the Third Circuit." *Insurance Consultants of Am. v. Southeastern Ins. Group, Inc.*, 746 F. Supp. 390, 416 (D.N.J. 1990) (citing *Christidis v. First Pennsylvania Mortg. Trust*, 717 F.2d 96, 100 (3d Cir. 1983)); *see also, Elysian Fed. Sav. Bank v. First Interregional Equity Corp.*, 713 F. Supp. 737, 756 (D.N.J. 1989). Although allegations of mail fraud and wire fraud are analyzed under Fed. R. Civ. P. 9(b), "Rule 9(b) must be harmonized with the flexibility permitted under Rule 8 of the Federal Rules of Civil Procedure. That Rule requires a short and plain statement with each pleading being simple, concise and direct." *Insurance Consultants of Am.*, 746 F. Supp. at 416 (citations and internal quotations omitted); *see also, Elysian Fed. Sav. Bank*, 713 F. Supp. at 756. Focusing exclusively on the "particularity" language in Fed. R. Civ. P. 9(b) is "too narrow an approach and fails to take account of the general simplicity and flexibility contemplated

by the rules." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791

(3d Cir. 1984). "[W]ith these principles in mind, the purpose of Rule 9 becomes clear.

Rule 9 lists the actions in which *slightly* more is needed for notice." *Kimmel v. Peterson,*

565 F. Supp. 476, 481 (E.D. Pa. 1983) (emphasis in original) (internal quotations

omitted).

Contrary to what defendants have argued, plaintiff need not specifically identify

the fraudulent statements at issue, the individuals who made each statement, the

recipients of each statement, and the time, place, and content of the communications. "A

complaint need not read like a laundry list of dates, times and persons involved in the

underlying transaction." *Insurance Consultants of Am.*, 746 F. Supp. at 416; *see also*

*Elysian Fed. Sav. Bank*, 713 F. Supp. at 756. Instead, the Third Circuit has articulated

the following standard:

> Rule 9(b) requires plaintiffs to plead with particularity the
> "circumstances" of the alleged fraud in order to place the
> defendants on notice of the precise misconduct with which
> they are charged, and to safeguard defendants against
> spurious charges of immoral and fraudulent behavior. It is
> certainly true that allegations of "date, place or time" fulfill
> these functions, but nothing in the rule requires them.
> Plaintiffs are free to use alternative means of injecting
> precision and some measure of substantiation into their
> allegations of fraud.

*Seville Indus. Mach. Corp.*, 742 F.2d at 791; *see also, Schuylkill Skyport Inn, Inc. v. Rich*,

No. 95-3128, 1996 U.S. Dist. Lexis 12655, at *118 (E.D. Pa. Aug. 21, 1996); *Kimmel*,

565 F. Supp. at 481; *Insurance Consultants of Am.*, 746 F. Supp. at 416; *Elysian Fed.*

*Sav. Bank*, 713 F. Supp. at 756-57. If the Complaint sets forth enough information to

provide factual support for plaintiff's allegations, it meets the standard set forth in *Seville*.

*Insurance Consultants of Am.*, 746 F. Supp. at 416; *Elysian Fed. Sav. Bank*, 713 F. Supp.

at 757. Plaintiff may even allege fraud on information and belief "if the allegations are

accompanied by a statement of the facts upon which the belief is founded." *Kimmel*, 565

F. Supp. at 482. Courts in this Circuit are particularly lenient in their application of Fed. R. Civ. P. 9(b) where, as here, plaintiff has not had an opportunity to conduct discovery. *Christidis*, 717 F.2d at 99-100; *Kievit v. Rokeach*, No. 86-2592, 1987 U.S. Dist. Lexis 16131, at *47 (D.N.J. Oct. 29, 1987).

"In applying the first sentence of Rule 9(b) courts must be sensitive to the fact that its application, prior to discovery, may permit sophisticated defrauders to successfully conceal the details of their fraud." *Christidis*, 717 F.2d at 99-100; *see also, Kievit*, 1987 U.S. Dist. Lexis 16131, at *47; *Kimmel*, 565 F. Supp. at 482 ("Only through discovery will both sides gain the information required to assert their respective claims and defenses."). In *Kimmel*, the court found that requiring greater detail in the absence of discovery "would totally undermine the letter and spirit of Rule 8(a) and the liberalized pleading envisaged under the Federal Rules of Civil Procedures." 565 F. Supp. at 482. Courts also relax their application of Fed. R. Civ. P. 9(b) as to matters within the adverse party's knowledge. *Kimmel*, 565 F. Supp. at 482.

Applying these principles to the present case, the Complaint must be sustained as it alleges the nature and mechanics of defendants' scheme in great detail, and undoubtedly puts defendants on notice of the precise misconduct with which they are charged. Specifically, the Complaint alleges that defendants falsely marketed and promoted Bextra in an effort to create demand for the drug as a wide-ranging pain reliever, allowing defendants to sell it at a premium over other NSAIDs. (Complaint, ¶¶ 6-7.) Although defendants were well-aware that Bextra had no proven superiority over other NSAIDs, that the FDA had refused to approve Bextra for the management of acute pain, and that Bextra had serious gastrointestinal, cardiovascular, and skin reaction side-effects, defendants nonetheless promoted it as a superior pain reliever, falsely advertising its safety and efficacy while concealing its life-threatening side effects. (Complaint, ¶¶ 25, 29-46, 49-53.) Defendants blitzed doctors' offices with fraudulent literature and

verbal presentations, and they each used the U.S. Mails and Interstate Wire Facilities on thousands, if not hundreds of thousands, of occasions to direct false and misleading materials to governmental agencies, doctors, consumers, health care providers, and others throughout the country. (Complaint, ¶¶ 49-53, 84-89.) Although plaintiff is unable to allege the precise dates of each communication, such matters are peculiarly within defendants' knowledge. "Indeed, an essential part of the successful operation of the Bextra Enterprise alleged herein depended upon secrecy, and as alleged above, Defendants took deliberate steps to conceal their wrongdoing." (Complaint, ¶ 83.)

The argument that plaintiff may not lump defendants together for purposes of alleging their commission of predicate mail fraud and wire fraud acts is also incorrect. In response to the very same argument, the *Kievit* court refused to grant defendants' motion to dismiss, citing the Third Circuit's lenient approach to the application of Fed. R. Civ. P. 9(b) and the *Seville* court's approval of a complaint with allegations attributing fraud to the defendants as a group. *Kievit*, 1987 U.S. Dist. Lexis 16131, at *46-50. The *Kievit* court further noted that the purposes behind Fed. R. Civ. P. 9(b) are met where the circumstances of fraud are particularized sufficiently enough for defendants to file responsive pleadings. *Id.* at *49-50.

Under the circumstances herein, where plaintiff has not had an opportunity to conduct discovery, and the details of the fraud are known only by defendants, courts in this Circuit do not require greater specificity lest they permit sophisticated defrauders to successfully conceal the details of their fraud and avoid liability. Defendants cannot, and do not, contest the fact that they are on notice of the precise misconduct with which they are charged. Therefore, the standard set forth in *Seville* has been met, and the Complaint must be sustained.

**C.     Plaintiff Has Stated Proper Claims Under Each State Consumer Protection Statute**

Plaintiff successfully alleges claims under the consumer fraud statues of Illinois, New Jersey, and New York.  As set forth below, plaintiff has sufficiently plead violations of each states' consumer fraud statutes.

**1.     Defendants Violated The Illinois Consumer Fraud and Deceptive Business Practices Act**

Defendants allege that plaintiff has not successfully plead a cause of action under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").  Defs. Br. at 16.  To adequately plead a private cause of action under the ICFA, a claimant must allege: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception.  *Oliveira v. Amoco Oil Co.,* 776 N.E.2d 151, 160 (Ill. 2002).  Defendants argue that plaintiff has not satisfied the proximate causation requirement under the ICFA.

The cause and effect relationship must exist between the defendants' conduct in violation of the ICFA and the inflated prices plaintiff paid when purchasing Bextra.  That causal connection is demonstrated by the allegations in the Complaint.  Plaintiff affirmatively state that he "and the Class members were deceived by defendants' omission and misrepresentation" and "[a]s a proximate result of the Defendants' misrepresentation, [they] have suffered ascertainable losses in an amount to be determined at trial." (Complaint, ¶ 103-04.)  This statement alone is sufficient to state a claim under the ICFA.  Plaintiff further alleges that the defendants' marketing and promotion of Bextra was a scheme to create the impression of, and demand for, Bextra as a wide-ranging pain reliever. (Complaint, ¶ 6.)  Additionally, plaintiff alleges that the

scheme was accomplished by unlawful means which included the suppression of data showing cardiovascular risks associated with the use of the drug, suppression of data showing serious risks of potentially life-threatening adverse reactions to the drug, manipulation of data, false promotional materials, and use of reprinted articles that falsely claimed Bextra was proven to be safer than other drugs. (Complaint, ¶ 6.) Defendants' scheme caused increased consumer demand for Bextra. The increased demand allowed defendants to sell Bextra at a premium over other NSAIDs – a premium paid by the plaintiff and the Class. (Complaint, ¶ 7.)

Whether defendants' misrepresentation *actually* deceived the plaintiff and the Class is an issue that is best determined at trial. In essence, defendants ask this Court to make a wholly factual determination based on nothing more than their bald assertions as to the subjective understanding and motivation of Bextra consumers.

Defendants rely on *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213 (Ill. 2004) to support the proposition that deceptive advertising can only be the proximate cause of damages if it actually deceives plaintiffs. In *Shannon*, the Supreme Court of Illinois dealt with an appeal stemming from the trial court's entry of summary judgment for the defendant. Of course, the burdens and presumptions on a motion for summary judgment are materially different from that on a motion to dismiss. For summary judgment, there is an extensive factual record to which the court may look in resolving the motion, and the plaintiff bears the burden of coming forward with evidence that would be admissible at trial to demonstrate there are genuine issues of material fact. *See Shannon*, 805 N.E.2d at 217 ("Summary judgment is proper where the pleadings, depositions, and admissions on file, when viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.") ("Since there is no genuine issue of material fact as to whether the plaintiffs were damaged as a result of [defendant's] alleged deceptive advertising, the circuit court properly entered summary judgment for defendant on the consumer fraud count."). Those presumptions are fundamentally inconsistent with the presumptions that control resolution of a motion to dismiss.

On a motion to dismiss, "[i]n determining whether a complaint states a cause of action, the allegations contained within the complaint are construed in the light most favorable to the plaintiff and all well-pleaded facts and reasonable inferences drawn from those facts are accepted as true." *Oliveira*, 776 N.E.2d at 159 (citing *Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A.*, 186 Ill. 2d 472, 491, 713 N.E.2d 543 (1999)). Plaintiff has sufficiently plead proximate causation and his claim under ICFA survives a motion to dismiss inquiry.

### 2.    Defendants Violated New Jersey's Consumer Fraud Act

Defendants allege that plaintiff fails to state a claim under the New Jersey Consumer Fraud Act because he does not allege "a causal relationship between defendants' unlawful conduct and the plaintiff's ascertainable loss." Defs. Br. at 17. Defendants' arguments must fail because plaintiff has alleged a causal link between Defendants' misleading advertisements and plaintiff's ascertainable loss.

"The 'causation' provision of [the CFA] requires plaintiff to prove that the unlawful consumer fraud caused his loss." *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 464 (N.J. Sup. Ct. 1994). New Jersey courts view causation as a question of proximate cause. *See Ramanadham v. New Jersey Mfrs. Ins. Co.*, 544 A.2d 1134, 1136 (N.J. Super. Ct. App. Div. 1982); *Perez v. Wyeth Labs., Inc.*, 734 A.2d 1245, 1252 (N.J. Sup. Ct.

1999). Proximate cause is a flexible concept that may change to fit the circumstances of each case. It is "that combination of logic, common sense, justice, policy and precedent that fixes a point in a chain of events, some foreseeable and some unforeseeable, beyond which the law will bar recovery." *Perez*, 734 A.2d at 1252. A proximate cause need not be the sole cause of harm, if it is a substantial contributing factor to the harm suffered. *Id.* Moreover, issues of proximate cause are ordinarily the province of the jury. *Id.*

An analysis of causation requires the Court to determine "whether conduct can be considered sufficiently causally connected . . . so as to justify the imposition of liability[, it] also implicates concerns for overall fairness and sound public policy." *Brown v. United States Stove Co.*, 484 A.2d 1234, 1243 (N.J. Sup. Ct. 1984); *see also, e.g., Contey v. New Jersey Bell Tel. Co.*, 643 A.2d 1005, 1008 (N.J. Sup. Ct. 1994) ("We have . . . defined the limits of proximate cause 'as an instrument of fairness and policy'"). Causation analysis is not a question of tracing the links in a chain of events. Rather, it is a determination, grounded upon policy, justice and fairness, of whether the cause and its effect are sufficiently "proximate" to one another that the courts will afford redress for the harm.

The cause and effect relationship must exist between the defendants' conduct in violation of the CFA and the inflated prices plaintiff paid when purchasing Bextra. That causal connection is demonstrated by the allegations in the Complaint. Plaintiff alleges that the defendants' marketing and promotion of Bextra was a scheme to create the impression of, and demand for, Bextra as a wide-ranging pain reliever. (Complaint, ¶ 6.) Plaintiff further alleges that the scheme was accomplished by unlawful means which

included the suppression of data showing cardiovascular risks associated with the use of the drug, suppression of data showing serious risks of potentially life-threatening adverse reactions to the drug, manipulation of data, false promotional materials, and use of reprinted articles that falsely claimed Bextra was proven to be safer than other drugs. (Complaint, ¶ 6.) Defendants' scheme caused an increased consumer demand for Bextra. The increased demand allowed defendants to sell Bextra at a premium over other NSAIDs – a premium paid by the plaintiff and the Class. (Complaint, ¶ 7.)

The defendants' argument that there is not a sufficient causal link between demand and price is wrong. Indeed, the "price inflation theory" has been addressed by New Jersey courts and found to establish a causal relationship. In *DeLima v. Exxon Corp.*, the Appellate Division upheld a trial court decision holding that the price inflation theory demonstrated causation and ascertainable loss under the CFA. *DeLima v. Exxon Corp.*, slip op., No. A-3536-99T3 (N.J. Super. Ct. App. Div. Dec. 4, 2000) (a copy is attached hereto as Exhibit A). In *DeLima*, the plaintiffs alleged that Exxon had engaged in a misleading advertising campaign which falsely touted its high-octane gasoline, 93 Supreme, as keeping car engines cleaner than competing or less expensive gasolines. *Id.* at 3-4. The false and misleading advertising campaign was alleged to have driven up the price of Exxon's high-octane gasoline, thereby damaging the class comprised of New Jersey consumers that purchased the gasoline during the period of the advertising campaign and thereby paid an inflated price. Not surprisingly, there was a broad range of exposure to the allegedly false advertising among class members, from plaintiffs that had

- 21 -

not seen the advertising, to those that saw the ads but had not changed their preexisting

purchasing behavior as a result. *Id.* at 4-5.

Predictably, defendants attacked the plaintiffs' theory as failing to allege

sufficient causation between the allegedly false advertising and the ascertainable loss

plaintiffs claimed to have suffered. The Trial Court and the Appellate Division rejected

defendants' attack on the price inflation theory, accepting it as providing the link between

the misleading advertising and ascertainable loss required by the Consumer Fraud Act.

> If [plaintiff's expert] Latham is correct, the [plaintiff] paid
> more for 93 Supreme than he would have if defendant had
> not engaged in false advertising. [Plaintiff's] loss would be
> the difference between the price he paid for the gasoline
> and what the gasoline would have cost without the
> advertising.

*Id.*

In *DeLima*, the Appellate Division distinguished, *Kaufman v. I-Stat Corp.*, 745

A.2d 1188 (N.J. Sup. Ct. 2000), from a false advertising case under the CFA. It noted

that in *Kaufman*, the Supreme Court rejected the "fraud on the market" theory where the

plaintiffs had attempted to use it to establish reliance in a common law fraud action. *Id.*

at 1200-01. The *DeLima* court identified the clear distinction between common law fraud

(requiring reliance) and statutory fraud under the CFA (requiring causation, but not

reliance). Because the significance of the *Kaufman* decision lay in its rejection of the

"fraud on the market" theory in lieu of proof of reliance on a common law fraud claim,

the Appellate Division held that *Kaufman* was irrelevant to its analysis of the statutory

fraud claims set forth by the *DeLima* plaintiffs. Thus, *Kaufman* has no bearing on the

statutory fraud claim under the CFA and does not require dismissal of a claim not dependent upon reliance.

Finally, it must be noted that the legislature intended for the CFA to have liberal standards of proof. The clearest statement of what constitutes a claim under the CFA is in the statute itself. The CFA states, in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful act.

N.J.S.A. 56:8-2.

The CFA was enacted in 1960 "in response to widespread complaints about selling practices which victimized consumers." *Sickles v. Cabot Corp.*, 2005 N.J. Super. Lexis 217, at *24 (App. Div. July 7, 2005) (quoting *Fenwick v. Kay America Jeep, Inc.,* 371 A.2d 13, 15 (N.J. Sup. Ct. 1997)). "The language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud." *Lemelledo v. Beneficial Mgmt. Corp.*, 696 A.2d 546, 551 (N.J. Sup. Ct. 1997); *Sickles*, 2005 N.J. Super. Lexis 217, at *18. The principles promulgated by the CFA, as well as New Jersey law, support the conclusion that plaintiff has stated a valid claim under the New Jersey Consumer Fraud Act.

### 3.    Defendants Violated New York's Consumer Protection Statute

Defendants contend that plaintiff has not sufficiently stated a claim under New York's Consumer Protection statute. First, they argue that plaintiff failed to establish that

a consumer was deceived in New York. Def. Br. at 19. Defendants' arguments are unfounded because plaintiff has sufficiently plead the elements to state a claim under New York's consumer protection statute.

Under New York General Business Laws § 349, a plaintiff must prove that defendants conduct was consumer-oriented and that plaintiff was actually injured as a result thereof. *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA*, Inc., 818 N.E.2d 1140, 1143 (N.Y. App. Div. 2004); *Stutman v. Chemical Bank*, 731 N.E.2d 608 (N.Y. App. Div. 2000); *Altman v. Bayer Corp.*, 125 F. Supp. 2d 666 (S.D.N.Y. 2000); *Gray v. Seaboard Secs., Inc.*, 241 F. Supp. 2d 213 (2003); *Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410 (2004). Plaintiff affirmatively states that he "and the Class members were deceived by Defendants' omission and misrepresentation" and "[a]s a proximate result of the Defendants' misrepresentation, [they] have suffered ascertainable losses in an amount to be determined at trial." (Complaint, ¶ 103-04.) Plaintiff further alleges that "Defendants' promotional campaign targeted a broad spectrum of patients" and thus satisfies the requirement that defendant's scheme was consumer-oriented. *Martin v. Group Health Inc.*, 2 A.D.3d 414 (N.Y. App. Div. 2003) (Recovery under § 349 requires proof that a defendant's conduct had an impact on consumers at-large.) Defendants wrongfully sought to create, and actually created, an artificial consumer demand for Bextra and through their conduct harmed plaintiffs and the class.

Finally, to qualify as a prohibited act under § 349, the deception of a consumer must occur in New York. *Goshen v. Mutual Life Ins. Co.*, 774 N.E.2d 1190 (N.Y. App.

Div. 2002). Plaintiff, a resident of Kentucky, seeks certification of a nationwide class. There can be no doubt that many class members have been exposed to defendant's unlawful and false advertisements in the state of New York, were deceived by said advertisements, and actually purchased the drug in the state of New York.

Since defendants' arguments are contrary to well-established law and plaintiff sufficiently alleges the claims under Illinois, New Jersey, and New York's consumer protection statutes, defendants' motion to dismiss plaintiff's consumer protection claims must be denied.

## D.    Plaintiff Has Stated a Proper Claim for Unjust Enrichment

Defendants cite no authority for their novel proposition that plaintiff cannot maintain an action for unjust enrichment to recover funds he overpaid as a result of defendants' fraudulent marketing of Bextra and, after careful review, such authority does not appear to exist. As defendants themselves acknowledge, unjust enrichment is an equitable doctrine that prevents one party from unjustly retaining the money or property of another where equity and good conscience demand its return. (Defs. Br. at 21-22.) In the present case, defendants' false marketing and promotion of Bextra created demand for the drug, which in turn allowed them to sell it for a premium over other NSAIDs. When plaintiff purchased Bextra, however, he did not receive a superior drug as promised. Bextra was neither a superior pain reliever, nor was it safer or more effective than other NSAIDs. Instead, in exchange for his premium payment, plaintiff received the equivalent of a $0.10 aspirin. Overall, plaintiff and the Class paid, and defendants received, hundreds of millions of dollars as a result of defendants' fraudulent marketing scheme. Equity and good conscience demand the return of these funds.

In a similar situation, a district court recently allowed a group of plaintiffs to maintain an action for unjust enrichment for alleged "over payments" they made in

purchasing a pioneer potassium chloride supplement manufactured by defendants therein. *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544-46 (D.N.J. 2004). Specifically, plaintiffs sought to recover "the actual cost of [the drug] itself, not outlays made for medical coverage of health risks associated with [the drug]." *Id.* at 545. In denying defendants' motion to dismiss, the court rejected the argument that plaintiffs' receipt of valuable medicine for their payments negated their claim. *Id.* at 545. The court further clarified that the benefit conferred on defendants need not mirror plaintiff's loss. *Id.* at 544. "The critical inquiry is whether the plaintiff's detriment and the defendant's benefit are related to, and flow from, the challenged conduct." *Id.*

As discussed above, plaintiff's damages are directly related to defendants' conduct – *i.e.*, their false and misleading marketing of Bextra. Therefore, plaintiff has standing to maintain an action for unjust enrichment. In addition, as set forth in section B.1.b. herein, defendants' arguments based upon the learned intermediary doctrine are entirely misplaced. The learned intermediary doctrine provides drug manufacturers with a defense in a failure to warn case if, and only if, they provide plaintiff's physician with an appropriate warning about the drug. *Lacy*, 567 A.2d at 399-400. It does not apply where, as here, defendants provided doctors with false and misleading material regarding Bextra's safety and efficacy.

Since defendants' arguments are contrary to well-established law, they should be rejected, and defendants' motion to dismiss plaintiff's unjust enrichment claim should be denied.

**E.    Plaintiff Has Stated a Proper Claim for Breach of Implied Warranty of Merchantability**

Defendants once again argue that the learned intermediary doctrine operates as a defense to the allegations set forth in the Complaint, and, for the reasons set forth in section B.1.b. and section D. above, the Court should once again reject it as misplaced.

Taking the facts in the Complaint as true, defendants provided doctors with false and misleading material about Bextra. This, in and of itself, precludes the use of this doctrine as a defense to plaintiff's claim for breach of implied warranty of merchantability.

Defendants' only other argument – that plaintiff's injuries were not proximately caused by the defective nature of Bextra – must also fail. Indeed, the defective nature of Bextra is the very crux of plaintiff's claims. Bextra was neither as safe nor as effective as defendants promised it would be. Defendants promised that it was a superior pain reliever. As the FDA determined, however, it was not. Defendants' conclusory and unsupported argument to the contrary does not change that fact.

Ultimately, defendants again cite no authority for the proposition that plaintiff cannot maintain an action for breach of implied warranty of merchantability to recover funds he overpaid as a result of defendants' fraudulent marketing of Bextra and, after careful review, such authority does not appear to exist. Therefore, defendants' motion to dismiss plaintiff's claim for breach of implied warranty of merchantability must be denied.

## V.    CONCLUSION

For all of the foregoing reasons, defendants' motion to dismiss should be denied in its entirety.

ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
919 Market Street, Suite 1401
PO Box 1070
Wilmington, DE  19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
Attorneys for Plaintiff

- 27 -

OF COUNSEL:

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman
Douglas C. McDermott
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
(206) 623-7292

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
One Main Street, Fourth Floor
Cambridge, MA 02142
(617) 482-3700

July 15, 2005

## CERTIFICATE OF SERVICE

I, Jessica Zeldin, do hereby certify that on the 15th day of July, 2005, I electronically filed PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY with the Clerk of the Court using CM/ECF which will send notification of such filing to the following registered participant:

Richard L. Horwitz, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899

Jessica Zeldin (Del. Bar No. 3558)
ROSENTHAL, MONHAIT, GROSS
& GODDESS, P.A.
(302) 656-4433
jzeldin@rmgglaw.com