# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.2d                                                                                                Page 1

Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: Not Reported in F.Supp.2d)**

C
Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004

United States District Court, E.D. Pennsylvania.
ALLEN NEUROSURGICAL ASSOCIATES, INC.,
v.
LEHIGH VALLEY HEALTH NETWORK, et al.
No. CIV. A. 99-4653.

Jan. 18, 2001.

*MEMORANDUM*

O'NEILL.

\*1 The Amended Complaint makes claims under RICO, the Lanham Act, and state law. Presently before me is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the motion will be GRANTED.

I. BACKGROUND

This case arises out of a staffing/credentialing dispute between the physicians that comprise plaintiff Allen Neurosurgical Associates, Inc. ("ANA") and defendant Lehigh Valley Health Network, including certain hospital subsidiaries, officers, and employees (collectively the "Network").

Over the years, ANA's neorosurgeons provided free trauma coverage in the Network's Lehigh Valley Hospital. Amended Complaint ¶¶ 103-04. On March 8, 1999, however, ANA notified the Network that it intended to cease coverage of the trauma service. *Id.* ¶ 103. ANA alleges that in covering both NeuroTrauma and Emergency Medicine it was "devoting 40% of its neurosurgeon resources without compensation." *Id.* On the other hand, the Network's "ability to offer neurosurgical services in the trauma center" generated at least $4 million in annual revenue. *Id.* ¶ 104. Defendants responded by threatening to terminate ANA's neurosurgeons' clinical privileges and medical staff memberships "for failing to perform according to the ByLaws [sic] of the Common Medical Staff." *Id.* ¶ 105. Defendants "falsely represented ... that the Bylaws [ ] required all neurosurgeons on staff to cover trauma for free." *Id.*

The parties attempted to negotiate a "mutually acceptable solution," but the attempt failed. *Id.* ¶ 109. Subsequently, defendants instituted a " campaign" to "conquer" ANA. *Id.* ¶ 110. This campaign consisted of: 1) publically characterizing ANA's withdraw of trauma coverage as being based on "compensation" issues; 2) spreading the rumor that ANA physicians were no longer on staff; 3) misleading new neurosurgery hires by falsely informing them that they were eligible for appointment to the faculty of Hershey Medical School; 4) informing the medical staff that it should not refer cases to ANA; 5) refusing to refer callers on the Network's physician referral line to ANA; 6) unlawfully intercepting, withholding and converting $70,000 originally sent to ANA as payment for research activities by an unrelated drug company; and 7) "co-opting" one of the ANA physicians, defendant Dr. Mark C. Lester, to breach his fiduciary duties. *Id.* ¶ 94-102, 111.

The Amended Complaint further alleges that defendants' actions against ANA were part of a larger "attempt to maximize power, resources and revenues and grow into one of the largest health care facilities in Pennsylvania." *Id.* ¶ 31. In pursuit of this goal, defendants pursued a number of "schemes," including: 1) an "exclusive credentialing " scheme that required physicians who had staff membership and/or were seeking staff membership to agree to admit patients exclusively or principally to the Network's hospitals (*id.* ¶¶ 39-53); 2) a " secret medical staff classification scheme" that placed physicians into categories based upon their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: Not Reported in F.Supp.2d)**

relationship with the Network and then gave preferential treatment to the physicians in some of the categories (*id.* ¶¶ 55-72); and 3) a "secret Staff Development Plan" that rewarded "loyal" physicians with "manpower slots," i.e., the ability to add new partners or associates to the physicians' practice at the hospital (*id.* ¶¶ 75-82).

The Amended Complaint makes claims under RICO (Counts I and II) the Lanham Act (Count VI), and state law (Counts III, IV, V, VII, VIII, IX, and X).

## II. DISCUSSION

### A. Standard of Review

\*2 A motion to dismiss under Fed.R.Civ.P. 12(b)(6) does not address the merits of a case but rather tests the legal sufficiency of the complaint. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ; *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). I may dismiss the complaint only if I determine that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishohn v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ; *Nami,* 82 F.3d at 65. I must accept all well-plead factual allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ; *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). However, I need not accept bald assertions, unwarranted inferences, or legal conclusions. *See Maio v. Aetna, Inc.,* 221 F.3d 472, 485 n. 12 (3d Cir.2000) ; *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). "[C]ourts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable. We do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner." *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir.1998).

### B. RICO Claims

The RICO statute, 18 U.S.C. § 1961 et seq., makes it unlawful to: 1) conduct or participate, directly or indirectly, in an enterprise that engages in a pattern of racketeering activity; or 2) conspire to conduct or participate in such an enterprise. *See* 18 U.S.C. § 1962(c) and (d). A RICO "enterprise" can be " virtually any de facto or de jure association." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 789 (3d Cir.1984). A "pattern of racketeering activity" is statutorily defined to " require[ ] at least two acts of racketeering activity." *See* 18 U.S.C. § 1961(5). Such activity includes mail fraud (18 U.S.C. § 1341) , wire fraud (18 U.S.C. § 1343), and a long list of other specifically enumerated "predicate acts." *See* 18 U.S.C. § 1961(1) ; *Annulli v. Panikkar,* 200 F.3d 189, 200 (3d Cir.1999) (noting that § 1961(1)'s "list of acts constituting predicate acts of racketeering is exhaustive."). RICO is primarily a criminal statute, but it provides treble damages for "any person injured in his business or property by reason of a violation of [the criminal provisions]." *See* 18 U.S.C. § 1964(d).

ANA alleges violations of §§ 1962(c) and (d). In order to state a claim for a violation of either provision, plaintiff must adequately plead a pattern of racketeering activity, i.e., at least two predicate acts of racketeering. *See* 18 U.S.C. § 1961(5). I conclude, however, that the Amended Complaint fails to adequately plead a single act of racketeering as defined in § 1961(1) and the RICO counts must therefore be dismissed.

#### 1. Allegations of Conduct that is Not Racketeering Activity

\*3 The Amended Complaint makes a host of allegations regarding conduct that, even if proven true, does not constitute racketeering activity. Plaintiff claims that defendants violated: 1) the " federal and state Medicare, Medicaid and insurance prohibitions against fraud and abuse known as the Anti Kickback laws, and the Anti Referral laws known as the Stark Laws" (Amended Complaint ¶ 30a); 2) the "freedom of choice provisions of both

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
(Cite as: Not Reported in F.Supp.2d)

federal and state Medicare and Medicaid law" (*id.* ¶ 30b); and 3) the "Antitrust laws of the United States" (*id.* ¶ 30c). None of these acts are included in the specific enumeration of predicate acts contained in § 1961(1), and the Court of Appeals has emphasized that that list is "exhaustive." *See Annulli,* 200 F.3d at 200. Therefore, these allegations do not support plaintiff's claim that defendants engaged in a pattern of racketeering activity.

2. Allegations of Mail and Wire Fraud that are not Plead with Particularity

Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." When the predicate acts in a RICO complaint sound in fraud, Rule 9(b) applies. *See Rose v. Bartle,* 871 F.2d 331, 356 n. 33 (3d Cir.1989). "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place defendants on notice of the precise misconduct with which they are charged, and to safeguard against spurious charges of immoral and fraudulent behavior." *Seville,* 742 F.2d at 791. This generally requires a plaintiff to plead the "who, what, when, and where details of the alleged fraud." *United States ex rel. Waris v. Staff Builders, Inc.,* No. 96-1969, 1999 WL 179745, at *4 (E.D.Pa. Mar.4, 1999). While a complaint need not set out "precise words," it should adequately describe the nature and subject of an alleged misrepresentation. *See Seville,* 742 F.2d at 791. Nonetheless, courts should not focus "too narrow[ly]" on the particularity language of Rule 9(b) and should take into account the "general simplicity and flexibility contemplated by the rules." *Id.*

With these principles in mind, it is clear that most of the potential predicate acts listed in the RICO Case Statement FN1 are not plead with the particularity required by Rule 9(b). FN2 Plaintiff does not plead the "date, place or time" of the alleged misrepresentations, which, though not an absolute requirement under Rule 9(b), would "inject precision and some measure of substantiation" into the allegations. *See Seville,* 742 F.2d at 791. Nor does plaintiff plead "who made the representations" at issue. *See Saporito v. Combustion Eng'g,* 843 F.2d 666, 675 (3d Cir.1988), *cert. granted and judgment vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989). Instead, plaintiff simply attributes the allegedly fraudulent communications to "the conspirators," which, given the number of corporate defendants, individual defendants, and John Doe defendants, could be any one of dozens of people. Similarly, plaintiff does not plead "who received the allegedly fraudulent information." *Id.; Smith v. Berg,* No. 99-2133, 1999 WL 1081065, at *4 (E.D.Pa. Dec.1, 1999). Given the breadth of the allegations, the universe of potential recipients is exponentially larger than the universe of potential speakers. Finally, plaintiff pleads nothing of the content of each alleged misrepresentation. *Saporito,* 843 F.2d at 675 (allegations should include "the general content of the representations"); *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998) (allegations of mail fraud should contain the "precise content of each particular mailing"); *Smith,* 1999 WL 1081065, at *5 (same).

> FN1. The RICO Case Statement is a pleading that may be considered part of the operative complaint for the purposes of a motion to dismiss. *See Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413 (3d Cir.1993) ; *Smith v. Berg,* No. 99-2133, 1999 WL 1081065, at *3-*5 (E.D.Pa. Dec.1, 1999).
>
> FN2. The relevant portions of the RICO Case Statement read:
> a. List the alleged predicate acts and the specific statutes that were allegedly violated ...
> Correspondence, interstate telephone communications, facsimile and/or email communication concerning:
> -The conspirators [sic] false characterizations of ANA's actions in withdrawing from NeuroTrauma as being based on "compensation" issues. Despite being warned by ANA's counsel that these statements were false and defamatory, the conspirators continued those false

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                               Page 4

Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
(Cite as: Not Reported in F.Supp.2d)

representations through interstate wire.

-The conspirators [sic] false rumors that ANA physicians were no longer on staff. At least two of ANA [sic] patients were treated by Lester in his new capacity because those patients had been told that their ANA physicians were no longer on staff, and interstate mail and wire communications were generated as a result.

-The conspirators [sic] misleading of new neurosurgery hires by falsely informing them, through the interstate mails and wires, that they are eligible for appointment to the faculty of Hershey Medical School.

-The conspirators [sic] directing callers to the enterprise's physician referral line-an interstate wire-away from ANA.

-The conspirators [sic] directing the approximately one hundred fifty physicians, including transmissions through the mail and wires, in the enterprise [sic] practice group subsidiary, LVPG, to not refer patients to ANA, no matter what the patient's need for expertise might be.

-The conspirator's [sic] unlawful interception, withholding and conversion of seventy thousand dollars ($70,000) originally sent to ANA as payment for research activities by unrelated drug companies, including the mail and wire communications attendant thereto.

In addition to the acts of wire and mail fraud recited above, the mail and interstate wire fraud has occurred through mailings of correspondence, bills and payments between and among various lawyers representing defendants, receipt of correspondence to and from defendants, the transmission of the ByLaws [sic] of The Common Medical Staff and correspondence regarding the ByLaws [sic], applications for manpower slots, grants and/or denials of manpower slots, and correspondence regarding the manpower slots, telephone calls and correspondence regarding the payment of Medical Staff dues, transmission of correspondence regarding the internal " termination" procedure, transmissions of Insurance [sic], Medicare and Medcaid payments, transmission of benefits and reimbursements to the secret classifications of physicians and other documents regarding the benefits those secret classifications physicians have received, the transmission of the staff development plan, correspondence regarding the staff development plan and/or drafts of the named documents thereof through the United States Mails and courier by defendants, or at their instruction, and interstate telephone communications, facsimile and/or email communication between and among the defendants, and members of the Medical Staff and those who attempted to become members of the Medical Staff.
*See* RICO Case Statement at 5-6.

In short, plaintiff is not pleading "acts" of mail and wire fraud. Rather, the Amended Complaint and RICO Case Statement allege a set of facts which, drawing all inferences in plaintiff's favor, support the conclusion that defendants acted with some animus towards plaintiff. Plaintiff assumes that at some point defendants used the mail and interstate wires in acting upon that animus in a manner that constituted fraud. The RICO Case Statement then lists every conceivable scenario under which this may have happened. Where the Rule 9(b) standard applies, plaintiff is not entitled to the inference that the essential elements of mail and wire fraud occurred; plaintiff must plead those essential elements with particularity.

3. Allegations of Mail Fraud that are Plead with Particularity

*4 Plaintiff does plead three potential acts of mail fraud with sufficient particularity to pass the Rule 9(b) test: 1) the April 2, 1999 letter from defendant Dr. David M. Caccese to plaintiff; 2) the April 14, 1999 letter from defendant Dr. Robert J. Laskowski to Drs. Chovanes, Morrow, Salotta, and Elias of ANA; and 3) the letter of June 30, 1999 from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendant John W. Hart to Drs. Chovanes and Morrow. *See* Amended Complaint ¶¶ 98 and 105; RICO Case Statement at 5. I nonetheless conclude that these mailings were not part of a scheme or artifice to defraud within the meaning of the mail fraud statute and/or did not induce reliance, which is required when mail fraud serves as a predicate act under the RICO statute.

The mail fraud statute provides in relevant part:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purposes of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined under this title or imprisoned not more than five years, or both.

*See* 18 U.S.C. § 1341.

In interpreting § 1341, the Court of Appeals has held that: "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir.1991). "The scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies the deprivation of something of value by trick, deceit, chicane or overreaching." *Id.* (internal quotes and citations omitted). Moreover, a person who knows that a representation is untrue cannot claim that the misrepresentation defrauded him. *See Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 746-47 (3d Cir.1996) ; *Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1253 (7th Cir.1989).

Unlike common law fraud, reliance is not an element of mail fraud. *See United States v. Sanders*, 893 F.2d 133, 138 (7th Cir.1990). However, most courts now agree that reliance must be shown when mail fraud is a predicate act in a civil RICO case. *See Summit Properties, Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 559 (5th Cir.2000) ; *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir.1996) ; *Appletree Square I v. W.R. Grace & Co.*, 29 F.3d 1283, 1286 (8th Cir.1994) ; *Central Distribs. of Beer, Inc. v. Conn.*, 5 F.3d 181, 184 (6th Cir.1993) ; *Pelletier v. Zweifel*, 921 F.2d 1465, 1499-1500 (11th Cir.1991) ; *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2d Cir.1990). FN3 This additional requirement derives from the proximate cause requirement of civil RICO, which limits recovery in civil RICO cases to "[a]ny person injured in his business or property *by reason of* a violation of [the criminal provisions]." *See* 18 U.S.C. § 1964(c) (emphasis added). As the *Summit Properties* Court put it: "[T]he government can punish unsuccessful schemes to defraud because the underlying mail fraud violation does not require reliance, but a civil plaintiff 'faces an additional hurdle' and must show an injury caused ' by reason of' the violation ... reliance is necessary to establish proximate cause under RICO." *Summit Properties*, 214 F.3d at 559. *See also Chisolm*, 95 F.3d at 337 ("[O]ur rule that reliance be shown in civil RICO fraud actions does not also dictate that the fraud be the sole legal cause of the plaintiff's injury, so long as it is a legal cause. The only caveat is that, where fraud is alleged as a proximate cause of the injury, the fraud must be a 'classic' one. In other words, the plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation.").

> FN3. I note that *Summit Properties*, 214 F.3d at 560 n. 16, claims that the Third Circuit in *Ideal Dairy* and the Seventh Circuit in *Reynolds* also adopted the reliance requirement in civil RICO cases. I disagree. In my view, those cases are better read as standing for the proposition that a person cannot be defrauded by a representations that he knows to be untrue. *See Ideal Dairy*, 90 F.3d at 746-47 (holding that "no fraudulent act occurred" where plaintiff knew "early in the relationship" that defendant was overcharging on contract price for dairy products); *Reynolds*, 882 F.2d at 1254 (holding that no mail or wire fraud occurred where defendant failed to

Not Reported in F.Supp.2d                                                                                                              Page 6
Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: Not Reported in F.Supp.2d)**

disclose a soil problem on property purchased by plaintiffs but plaintiffs already knew of the problem). There is a distinction between *Ideal Dairy* and *Reynolds* on the one hand and the *Summit Properties* line of cases on the other, although it admittedly is a fine one. *Ideal Dairy* and *Reynolds* are based on the nature of fraud and ask whether there was a misrepresentation. The *Summit Properties* line of cases are based on the proximate causation requirement in RICO and, conceding that there was a misrepresentation, ask whether plaintiffs' injuries were proximately caused by the misrepresentation. This distinction is important because *Ideal Diary* and *Reynolds* arguably could be applied generally to the mail and wire fraud statutes, but the *Summit Properties* line of cases are limited to the civil RICO context.

*5 Applying these standards to the predicate acts that were plead with particularity, it is clear that there was no scheme or artifice to defraud and/or there was no reliance. The April 2nd and June 30th letters allegedly "falsely represented ... that the Bylaws of the Common Medical Staff required all neurosurgeons on staff to cover trauma for free." Amended Complaint ¶ 50. In other words, plaintiff alleges that defendants asserted an incorrect legal interpretation of a public document. That interpretation, even if obviously wrong, was not a misrepresentation of fact and could not have been reasonably calculated to deceive the physicians at ANA. A person of ordinary prudence would be expected to seek independent legal counsel before relying on such an interpretation. Moreover, plaintiff obviously did receive such independent counsel and as a result never accepted or relied upon that interpretation. ANA disputed that interpretation of the bylaws at the time and implicitly continues to dispute it in these proceedings.

The April 14th letter was equally benign. The contents of the letter requested that ANA agree to continue trauma coverage for at least one year (*id.* ¶ 98), but ANA does not claim that the contents constituted fraud. Rather, plaintiff argues that the letter was fraudulent because a "blind copy" was sent to defendant Dr. Lester, who was both a partner at ANA and Divisional Chief of Neurological Surgery at one of the Network's hospitals at the time. I will assume without deciding that a blind copy of a letter might constitute fraud in some circumstances, particularly where the letter purports to be a confidential communication. In this instance, however, ANA should have anticipated that Dr. Lester, as Divisional Chief, would have either received a copy of the letter or would have been appraised of its contents. At most, the blind copy of the letter was part of defendants' alleged attempts to "co-opt" Dr. Lester into breaching his fiduciary duties. However, a breach of fiduciary duties does not constitute a scheme to defraud within the meaning of the mail fraud statute. *See Manion v. Freund*, 967 F.2d 1183, 1186 (8th Cir.1992) ; *Bonton v. Archer Chrysler Plymouth, Inc.*, 889 F.Supp. 995, 1002-03 (S.D.Tex.1995).

*6 Therefore, the allegations regarding the April 2nd, April 14th, and June 30th letters fail to state a claim for violations of the mail fraud statute and do not support plaintiff's claim that defendants engaged in a pattern of racketeering activity.

4. Commercial Bribery

The final potential predicate act that plaintiff alleges is the state law crime of commercial bribery. I conclude, however, that plaintiff has not alleged any conduct that could be construed to be commercial bribery.

Section 1961(1) of the RICO statute defines " racketeering activity" to include "any act or threat involving ... bribery ... which is chargeable under State law and punishable by imprisonment for more than one year. *See* 18 U.S.C. § 1961(1)(A). Under Pennsylvania law, commercial bribery is a second degree misdemeanor. *See* 18 Pa.C.S.A. § 4108. As such, it is punishable by up to two years of imprisonment. *See* 18 Pa.C.S.A. § 106(b)(7). Therefore, the Pennsylvania crime of commercial bribery qualifies as a predicate act of racketeering under RICO. *See Westlake Plastic Co. v. O'Donnell*,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d																					Page 7

Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: Not Reported in F.Supp.2d)**

182 F.R.D. 165, 170 (E.D.Pa.1998).

Plaintiff specifically alleges that defendants violated 18 Pa.C.S.A. § 4108(b), which provides:
> A person who holds himself out to the public as being engaged in the business of making disinterested selection, appraisal, or criticism of commodities or services commits a misdemeanor of the second degree if he solicits, accepts or agrees to accept any benefit to influence his selection, appraisal or criticism.

Plaintiff alleges that defendants' exclusive credentialing "scheme," which required physicians with staff membership to agree to admit patients exclusively or principally to the Network's hospitals, violated § 4108(b):
> The individual defendants have engaged in commercial bribery by accepting benefits that affect their purportedly disinterested selection or appraisals of various physicians services. The individual defendants and the enterprise hold themselves out to the public as disinterested in their selection of physicians for admittance to the Medical Staff. Yet the individual defendants have, at the same time, implemented their exclusive credentialing "pay to play" scheme, which provides them and the enterprise with all or most of the referrals generated by the Medical Staff, as well as the generation of all or most of the revenues used by the referring and referred physicians.

*7 *See* Amended Complaint ¶ 51.

Plaintiff's argument is similar to the argument rejected by the Court of Appeals in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 527-28 (3d Cir.1998). *Brokerage Concepts* was a RICO case brought by a Third Party Administrator ("TPA") against an HMO. The HMO had conditioned a pharmacy's membership in its provider network on the pharmacy's agreement to stop using an independent TPA and begin using the HMO's TPA services. *Id.* at 501. The independent TPA then brought antitrust, civil RICO, and intentional interference claims against the HMO. *Id.* A jury found the HMO liable on the RICO claims, but the Court of Appeals overturned the verdict because there was insufficient evidence that the HMO had committed any predicate acts of racketeering. *Id.* at 529.

One of the predicate acts found to have been committed by the jury but rejected by the Court of Appeals was commercial bribery under § 4108(b). The TRA argued that the HMO held itself out "as selecting providers disinterestedly, based solely on the quality of the provider." *Id.* at 528. The Court of Appeals disagreed:
> The "bottom line" is that U.S. Healthcare is not a disinterested appraiser of healthcare providers; it is an HMO. An HMO is designed to provide access to low-cost, good quality health care, at a profit for the HMO. Thus, while U.S. Healthcare is required by law to allow only qualified providers into its network, and chooses its providers from the set of qualified providers, it alone decides whom within that set to admit largely on the basis of a provider's willingness to furnish care at managed care rates. There is nothing disinterested about this process, and we find no evidence to support a finding that U.S. Healthcare represented to the public that the process was, in fact, disinterested.

*Id.*

I conclude that this analysis is dispositive of plaintiff's commercial bribery claim in this case. The Network is not a disinterested appraiser of its hospitals' staff members. It has a legal and ethical duty to appoint qualified physicians, but it does so with other needs in mind, which, even for a non-profit corporation, includes revenue needs. Moreover, plaintiff does not allege, other than in the bald assertions quoted above (*see* Amended Complaint ¶ 51), that defendants held themselves out as being disinterested in their medical staff.

In addition, I think that there is another basis for holding § 4108(b) inapplicable in this case. By its explicit terms, § 4108(b) applies to a person who holds himself out as "being *engaged in the business* of making disinterested selection, appraisal, or criticism." *See* 18 Pa.C.S.A. § 4108(b) (emphasis added). This clause limits the application of § 4108(b) to persons whose primary business is making critical judgments, not persons who make critical judgments incident to some other business

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 8
Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: Not Reported in F.Supp.2d)**

activity. The former category is relatively narrow. It might include, for example, food critics, art appraisers, and, possibly, certified public accountants. The latter category is as broad as the realm of economic activity. Defendants in this case clearly fall into the latter category. The Network is " engaged in the business" of providing healthcare. It is not "engaged in the business" of selecting staff members. Therefore, § 4108(b) simply does not apply to its activities.

*8 This reading of § 4108(b) is justified for two reasons. First, it is true to the plain language of the statute. The key word in § 4108(b) is "disinterested, " which is not synonymous with "objective." A person "engaged in business" could never be " disinterested" in evaluating or selecting things that affect his business, but he could be objective. In this case, for example, the Network could never be disinterested in selecting physician staff members, though it could potentially make such selections based solely upon objective criteria. Second, this reading is consistent with the rule of lenity, which provides that criminal statutes should be strictly construed so as to give individuals fair warning of the criminal law and avoid due process problems. FN4 *See generally United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

> FN4. The rule of lenity applies in this civil case because § 4108(b) is a criminal statute that is a predicate act of civil RICO by virtue of 18 U.S.C. § 1961(1).

Plaintiff has failed to allege a set of facts that could be construed as constituting commercial bribery. Therefore, plaintiff has failed to allege any predicate acts of racketeering and the RICO claims must be dismissed.

### C. Lanham Act Claim

Count VI of the complaint asserts a claim under Section 43(a) of the Lanham Act, which provides in relevant part:
  Any person who, or in connection with any goods or services, or any container for goods, uses in commerce any word, term name, symbol, or device, or any combination thereof, or any false destination of origin, false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
*See* 15 U.S.C. § 1125(a).

I conclude that plaintiff fails to state a claim for a violation of the Lanham Act because the statements complained of are not "commercial advertising or promotion" within the meaning of § 1125(a). The test of what constitutes commercial advertising or promotion was first enunciated by the Court of Appeals for the Fifth Circuit in *Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1384 (5th Cir.1996). Under the *Seven-Up* test, commercial advertising or promotion consists of: 1) commercial speech; 2) by a defendant who is in commercial competition with the plaintiff; 3) for the purpose of influencing consumers to buy the defendant's goods or services; and 4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry. *Id.* at 1384. The *Seven-Up* test has since been adopted by other circuit courts and by the courts of this District. *See Proctor & Gamble, Co. v. Haugen,* 222 F.3d 1262, 1273-74 (10th Cir.2000) ; *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 735 (9th Cir.1999) ; *Peerless Heater Co. v. Mestek, Inc.,* No. 98-6532, 2000 WL 637082, at *10 (E.D.Pa. May 11, 2000) ; *Synygy, Inc. v. Scott-Levin, Inc.,* 51 F.Supp.2d 570, 576 (E.D.Pa.1999) ; *J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc.,* No. 96-5819 & 95-2179, 1997 WL 83766, at *16 (E.D.Pa. Feb.24, 1997) ; *Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co.,* No. 95-3997, 1995 WL 723186, at *3 (E.D.Pa. Nov.14, 1995).

The statements at issue in this case fail the second, third, and fourth prongs of the *Seven-Up* test: 1) they were not disseminated by plaintiff's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00208-SLR    Document 19-3    Filed 08/08/2005    Page 10 of 11

Not Reported in F.Supp.2d                                                                                                      Page 9
Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
(Cite as: Not Reported in F.Supp.2d)

commercial competitors; 2) they were not intended to influence consumers to use defendants' services; and 3) they were not sufficiently disseminated to the relevant purchasing public. None of the defendants, with the possible exception of Dr. Lester, are alleged to have been commercial competitors of the physicians at ANA. FN5 Rather, the Network and the ANA physicians were in contractual privity. Similarly, the statements at issue may have been designed to harm ANA, but they were not designed to attract patients to the Network. Since the services offered by ANA and the Network are not fungible, harming the reputation of one does not automatically help the other. Finally, none of the statements at issue are alleged to have been sufficiently disseminated to the relevant purchasing public. At worst, plaintiff alleges that two patients were told that the ANA physicians were no longer on staff. *See* Amended Complaint ¶ 111b. Two patients does not constitute "sufficient dissemination " under the *Seven-Up* test. The only alleged conduct that could potentially constitute sufficient dissemination involves the physician referral line. However, plaintiff alleges that the Network stopped referring callers on the referral line to ANA. *See* Amended Complaint ¶ 111e. This is not a misrepresentation; it is a lack of endorsement that clearly is not commercial advertising or promotion.

> FN5. Dr. Lester was a neurosurgeon, but the actions plaintiff complains of were not taken in his capacity as a neurosurgeon. In fact, the gravamen of plaintiff's complaint against Dr. Lester is that he breached his fiduciary duty by acting in the best interests of the Network instead of acting as an ANA neurosurgeon.

*9 For these reasons, I conclude that the statements complained of were not commercial advertising or promotion and plaintiff has failed to state a claim for violation of the Lanham Act.

### D. State Law Claims

Because the federal claims will be dismissed, I will not exercise jurisdiction over the state law claims in Counts III, IV, V, VII, VIII, IX, and X. *See* 28 U.S.C. § 1367(c)(3).

### E. Leave to Amend

Fed.R.Civ.P. 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Plaintiff has not sought leave to amend the complaint. In previous cases, however, I have granted leave to amend *sua sponte* in RICO cases where I felt it was appropriate. *See, e.g., Smith v. Berg,* No. 99-2133, 1999 WL 1081065, at *6 (E.D.Pa. Dec.1, 1999).

This case does not warrant leave to amend for two reasons. First, plaintiff had an opportunity to refine his complaint by filing a RICO Case Statement, which I considered in ruling on this motion. Second, leave to amend can be denied on the basis of undue delay, bad faith, dilatory motive, prejudice, and futility. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). Granting leave to amend would be futile because plaintiff's claims are essentially state claims that are not predicate acts of racketeering under RICO. Therefore, leave to amend will be denied.

### III. CONCLUSION

*10 At most, plaintiff complains of breach of contract, breach of fiduciary duties, and intentional interference with contract, state law claims that have no place in a federal forum absent some other basis for jurisdiction.

An appropriate Order follows.

### *ORDER*

AND NOW, this _____ day of January, 2001, after consideration of defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), and plaintiff's response thereto, and for the reasons contained in the accompanying memorandum, it is ORDERED that the motion is GRANTED and the complaint is DISMISSED.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: Not Reported in F.Supp.2d)**

E.D.Pa.,2001.
Allen Neurosurgical Associates, Inc. v. Lehigh Valley Health Network
Not Reported in F.Supp.2d, 2001 WL 41143, 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.