# EXHIBIT 5

Westlaw.

Slip Copy                                                                                                Page 1

Slip Copy, 2005 WL 711591, 2005-1 Trade Cases P 74,764, Comm. Fut. L. Rep. P 30,059
**(Cite as: Slip Copy)**

Slip Copy, 2005 WL 711591, 2005-1 Trade Cases
P 74,764, Comm. Fut. L. Rep. P 30,059
Briefs and Other Related Documents

United States District Court,N.D. Illinois, Eastern
Division.
PREMIUM PLUS PARTNERS, L.P., individually,
and on behalf of all others similarly situated,
Plaintiff,
v.
Peter J. DAVIS, Jr., John M. Youngdahl, Goldman
Sachs & Company, Inc., Steven E. Nothern,
Massachusetts Financial Services Company,
Defendants.
**No. 04 C 1851.**

March 28, 2005.

Marvin Alan Miller , Jennifer Winter Sprengel ,
Anthony F. Fata , Miller Faucher and Cafferty, LLP
, Chicago, IL, Harry Rothenberg , Law Offices of
Allen Rothenberg, New York, NY, for Plaintiff.
Mark T. Stancil , Baker Botts LLP , Washington,
DC, Thomas Day Decker , Thomas D. Decker &
Associates, Ltd. , Robert Y. Sperling , Joel Erik
Connolly , Marie A. Lona , Winston & Strawn LLP
, David E. Lieberman , Jack Samuel Tenenbaum ,
Sachnoff & Weaver, Ltd. , Thomas Michael Durkin
, Joshua Paul Kolar , Mayer, Brown, Rowe & Maw
LLP , Chicago, IL, Marisa L. Megur , Steven M.
Cohen , Kronish Lieb Weiner & Hellman LLP ,
Brian T. Frawley , Gandolfo V. DiBlasi , Matthew
S. Fitzwater , Sullivan & Cromwell , New York,
NY, Jessica V. Barnett , John A. Shop e, Nicholas
C. Theodorou , Foley Hoag LLP , William H. Paine
, Elizabeth Mone , Jonathan A. Shapiro , Wilmer
Cutler Pickering Hale and Dorr Ltd. Boston, MA,
for Defendants.

*MEMORANDUM OPINION AND ORDER*

FILIP, J.

*1 Plaintiff Premium Plus Partners, L.P. ("Plaintiff"
), on behalf of itself and others similarly situated,
brings this suit against Peter J. Davis, Jr. ("Davis"),
John M. Youngdahl ("Youngdahl"), Goldman
Sachs & Company ("Goldman Sachs"), Steven E.
Nothern ("Nothern"), and Massachusetts Financial
Services Company ("MFS") (collectively, "
Defendants"). Plaintiff alleges violations of the
Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et
seq.* (Counts I-III); the Illinois Consumer Fraud and
Deceptive Business Practices Act ("ICFA"), 815
ILCS 505/1 *et seq.* (Count IV); and Section 1 of the
Sherman Antitrust Act, 15 U.S.C. § 1 (Counts
VII-VIII). Plaintiff also alleges that Defendants
variously participated in two state law civil
conspiracies (Counts V-VI).

There are six pending motions to dismiss. As
explained below, Defendants' motions to dismiss
are denied in part and granted in part. Defendant
Youngdahl's motion to dismiss for lack of
jurisdiction and/or venue (D.E.50) is denied.
Defendant Nothern's motion to dismiss for lack of
jurisdiction and/or venue (D.E.35) is granted.
Defendants' various motions to dismiss under Rule
12(b)(6) (D.E.32, 36-37, 49) are granted in part and
denied in part. The motions to dismiss the CEA
claims are denied. The antitrust claims are
dismissed without prejudice. The state law claims
are dismissed.

*BACKGROUND*

This case arises from an approximately thirteen
minute window of time on October 31, 2001, during
which defendant Davis, an economic consultant, is
alleged to have made some nine cellular telephone
calls to various clients. Plaintiff alleges that during
these calls Davis disclosed material non-public
information regarding the United States Treasury
Department's impending suspension of sales of the
30-Year Treasury Bond. Plaintiff alleges that
certain Defendants traded on this information in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                        Page 2

Slip Copy, 2005 WL 711591, 2005-1 Trade Cases P 74,764, Comm. Fut. L. Rep. P 30,059
(Cite as: Slip Copy)

30-Year Treasury Bond and 30-Year Treasury Futures markets prior to it becoming public. Such trading, Plaintiff contends, also resulted in investors like Plaintiff, who were not privy to the inside information, incurring substantial losses covering " short positions" in another financial market-the market for 30-Year Treasury Options.

Defendants' purchases in the 30-Year Bond and 30-Year Futures markets took place during an approximately eight minute window of time immediately prior to public release of the inside information. During the period leading up to the information becoming public, the market for 30-Year Bonds and 30-Year Futures is alleged to have moved upward by some fifteen to twenty-three basis points, or .15 to .23%. After the inside information became public, according to Plaintiff's own account of events, the information triggered the largest price rally in the 30-Year Bond market in some fifteen years, producing an approximately 6% price increase in the wake of the information's release on October 31, 2001. Plaintiff did not cover its positions in the Options market until after the information's public release. Plaintiff is not alleged to have traded in any market in which any of the Defendants traded; Plaintiff also is not alleged to have traded in any market when Defendants allegedly were engaging in prohibited securities transactions.

*2 The parties' views about the consequences of the alleged insider trading differ materially. Plaintiff contends that Defendants, by purchasing 30-Year Treasury Bonds or Futures (but not Options, the market in which Plaintiff exclusively participated), manipulated the price of all of those financial instruments in violation of the Commodity Exchange Act, the federal antitrust laws, and the Illinois Consumer Fraud and Deceptive Business Practices Act. Defendants, on the other hand, contend that Plaintiff, who concededly does not have standing to bring an orthodox insider trading case, is improperly attempting to shoehorn allegations of insider trading into legally defective claims.

I. The Parties

A. Plaintiff

Plaintiff is an Illinois limited partnership that held substantial short positions in 30-Year Treasury Options as of 9:25 a.m. eastern standard time on October 31, 2001. (Compl.¶ 10.) Plaintiff contends that it represents a class of plaintiffs comprised of " [a]ll individuals and entities who held short positions in 30-Year Treasury Futures or 30-Year Treasury Options" as of that time and date and " who covered such short positions at any time thereafter." (Id. ¶ 1.)

B. Defendants

Defendants are various individuals and entities involved in the securities industry. Defendant Davis, a resident of Washington, D.C., is an economist who runs a sole proprietorship, Davis Capital Investment Ideas. (Id. ¶ 13.) Through his business, Davis sells his analyses of political and financial events to broker-dealers, financial analysts, and investors. (Id.)

Defendant Youngdahl is a resident of New Jersey. ( Id. ¶ 15.) At times relevant to the case, Youngdahl was a Senior Economist in Defendant Goldman Sachs's New York-based Global Economics Group. (Id.) He also sat on the Goldman Sachs Treasury Desk in New York, advising traders on that desk regarding relevant economic developments. (Id.)

Defendant Nothern is a resident of Massachusetts. ( Id. ¶ 14.) At times relevant to the case, Nothern was a Senior Vice President at MFS whose duties included managing several fixed-income mutual funds, including a fund that invested in Treasury issues. (Id.)

Defendant MFS is a Boston, Massachusetts investment company. (Id. ¶ 12.) Defendant Goldman Sachs is a New York based investment company. (Id. ¶ 11.) Goldman Sachs and MFS were, at times relevant to Plaintiff's allegations, clients of Davis. (Id. ¶ 13.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3

Slip Copy, 2005 WL 711591, 2005-1 Trade Cases P 74,764, Comm. Fut. L. Rep. P 30,059
(Cite as: Slip Copy)

### C. Davis's Relationship with Goldman Sachs

Youngdahl, who was employed by Goldman Sachs, first met Davis in mid-February 2001. (*Id.* ¶ 31.) Davis explained that he knew people in Washington, D.C., and that he could provide Youngdahl with useful information about developments in the nation's capital. (*Id.*) Goldman Sachs later retained Davis in reliance on Youngdahl's recommendation. (*Id.* ¶ 32.) From Spring 2001 through at least October 2001, Youngdahl received daily e-mails from Davis and spoke with Davis by phone approximately once a week. (*Id.*) Davis knew that Youngdahl sat on a Goldman Sachs's Treasury desk. (*Id.*)

### D. Davis's Relationship with MFS

*3 Nothern, an employee of MFS, has known Davis since the mid-1990s. (*Id.* ¶ 36.) MFS first retained Davis sometime before 1997. (*Id.*) Nothern was Davis's primary contact at MFS. (*Id.*) Davis sent Nothern e-mails approximately three times a week, as well as periodic facsimiles that included copies of Treasury Department press releases. (*Id.* ¶ 37.)

## II. Treasury Bonds, Futures, and Options

### A. The 30-Year Treasury Bond

Among the debt obligations that the United States Treasury Department issues are bonds that mature at a term of 30 years (the "30-Year Treasury Bond" or "30-Year Bond"). (*Id.* ¶ 16.) The 30-Year Treasury Bond, according to Plaintiff, plays an important role in trading for a wide variety of other financial instruments, and it is the financial instrument underlying the 30-Year Treasury Future and 30-Year Treasury Option. (*Id.* ¶ 17.) Plaintiff alleges that the 30-Year Treasury Bond has historically served as an important benchmark for other United States government bonds and for the bond market generally. (*Id.*)

Plaintiff alleges that a public announcement that the Treasury Department will suspend issuance of the 30-year Treasury Bond will drive up the price of previously issued 30-Year Treasury Bonds because traders anticipate a shortage of those bonds. (*Id.*) Plaintiff further alleges that traders with advance knowledge that the Treasury Department will suspend a bond can realize profit by purchasing bonds before the announcement and selling the bonds at a price greater than the purchase price immediately afterwards. (*Id.*)

### B. The 30-Year Treasury Bond Future

Individuals and entities trade, among other things, 30-Year United States Treasury Bond Futures (" 30-Year Treasury Future") on the Chicago Board of Trade ("CBOT"). (*Id.* ¶ 18.) A seller of a 30-Year Treasury Future assumes a "short" position and agrees to deliver $100,000 in 30-Year Treasury Bonds to a buyer for an agreed price at an agreed date. (*Id.*) A buyer of a 30-Year Treasury Future assumes a "long" position and agrees to take delivery of $100,000 in 30-Year Treasury Bonds for an agreed price in a specified contract month. (*Id.*)

Plaintiff contends that the public announcement that the Treasury Department will suspend issuance of the 30-Year Bond disfavors the seller (the holder of the "short position") of a 30-Year Treasury Future, who must procure 30-Year Treasury Bonds at a greater cost. (*Id.*) Plaintiff contends that such news, however, benefits the buyer of a 30-Year Treasury Future (who holds the "long position"), because the buyer can potentially realize the difference between the agreed-upon price set forth in the futures contract and the price at which the 30-year Treasury Bond trades. (*Id.*)

### C. The 30-Year Treasury Bond Option

Individuals and entities also trade options on 30-Year Treasury Bonds ("30-Year Treasury Options") on the CBOT. (*Id.* ¶ 19.) Plaintiff alleges that the financial instruments underlying the 30-Year Treasury Options are the 30-Year Treasury Bond and the 30-Year Treasury Future. (*Id.*) The 30-Year Treasury Options come in two forms: "put"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4

Slip Copy, 2005 WL 711591, 2005-1 Trade Cases P 74,764, Comm. Fut. L. Rep. P 30,059
**(Cite as: Slip Copy)**

options and "call" options. (*Id.*)

*4 The buyer of a 30-Year Treasury Put Option purchases the right to assume a "short" position in one 30-Year Treasury Bond Futures contract of a specified contract month at a striking price set at the time the option was purchased. (*Id.* ¶ 20.) The seller of a 30-Year Treasury Put Option agrees to assume a "long" position in a 30-Year Treasury Futures contract of a specified contract month at a striking price set at the time the option was sold. (*Id.*)

The buyer of a 30-Year Treasury Call Option purchases the right to assume a "long" position in one 30-Year Treasury Futures contract of a specified contract month at a striking price set at the time the option was purchased. (*Id.* ¶ 21.) The seller of a 30-Year Treasury Call Option agrees to assume a short position in a 30-Year Treasury Futures contract of a specified contract month at a striking price set at the time the option was sold. (*Id.*)

### III. Treasury Department Confidential Press Conferences

The Treasury Department discloses news concerning the federal government's financing requirements at quarterly press conferences. (*Id.* ¶ 22.) These announcements sometimes include details about the Treasury Department's plans to issue, suspend, or buy back its bonds in the coming quarter. (*Id.*) Attendees at these conferences are obligated to maintain strict confidentiality of any disclosed information during an "embargo" period, the length of which is announced at the conferences. (*Id.*)

Defendant Davis had been attending the Treasury Department's quarterly refunding press conferences since 1994. (*Id.* ¶ 25.) Davis agreed to preserve the confidentiality of any embargoed information that he learned by attending any refunding press conference. (*Id.* ¶ 26.)

On October 31, 2001, Davis attended a confidential Treasury Department quarterly refunding

conference. (*Id.* ¶ 40.) Davis was in attendance with 30 to 50 other individuals. (*Id.*) Davis attended the press conference from 9:00 a.m. until approximately 9:25 a.m. (*Id.*)

At the conference, a Treasury Department spokesperson informed attendees that the Department would announce its intention to suspend the issuance of the 30-Year Treasury Bond later that morning and that such information was embargoed until 10:00 a.m. (*Id.* ¶ 42.)

### IV. Davis Discloses Confidential Information to Goldman Sachs and MFS

Davis failed to observe the embargo. Between the time Davis left the October 31, 2001, conference, at approximately 9:25 a.m., and 9:43 a.m., Davis made nine cellular phone calls to eight of his clients, including Youngdahl at Goldman Sachs and Nothern at MFS. (*Id.* ¶ 44.) Specifically, at 9:35 a.m., Davis called Youngdahl at the Goldman Sachs Treasury Desk. (*Id.* ¶ 45.) Davis informed Youngdahl that the Treasury Department would suspend sales of the 30-Year Treasury Bond. (*Id.*) Davis also informed Youngdahl that the Treasury Department would change its buyback program. (*Id.*) Plaintiff alleges that Davis knew or should have known that Youngdahl would tip others to trade in the 30-Year Bond market and related markets. (*Id.*)

*5 At approximately 9:38 a.m., Davis phoned Nothern and left a voicemail message stating that the Treasury Department would cancel the 30-Year Treasury Bond. (*Id.* ¶ 51.) Davis also indicated in the voicemail message that the information was embargoed until the Treasury Department released a press announcement of the cancellation at 10:00 a.m. (*Id.* ¶ 51.) Nothern retrieved this voicemail message almost immediately. (*Id.* ¶ 52.) Plaintiff alleges that Davis also knew or should have known that Nothern would trade on the nonpublic information or would tip others to trade 30-Year Treasury Bonds. (*Id.* ¶ 51.)

### V. Defendants Trade on Confidential Information

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 5

Slip Copy, 2005 WL 711591, 2005-1 Trade Cases P 74,764, Comm. Fut. L. Rep. P 30,059
(Cite as: Slip Copy)

A limited number of employees of Defendant Goldman Sachs allegedly traded on the confidential information that Davis disclosed regarding 30-Year Treasury Bonds. Before the information became public at 9:43 a.m., employees at Goldman Sachs's Treasury Desk purchased $84 million in par value of 30-Year Treasury Bonds. (*Id.* ¶ 48.) Goldman Sachs's Treasury Desk subsequently sold the $84 million in bonds after the news became public, realizing profits of $4.3 million dollars. (*Id.* ¶ 50.)

A limited number of employees of Defendant MFS also allegedly traded on the confidential information concerning the 30-Year Treasury Bond. Before the information became public, Nothern purchased $25 million in par value of 30-year Bonds. (*Id.* ¶ 54.) Three MFS portfolio managers also purchased a total of $40 million in par value of 30-Year Treasury Bonds. (*Id.*) After the information became public, MFS sold substantial holdings in 30-Year Treasury Bonds, realizing $3.1 million in profits for MFS portfolios. (*Id.* ¶ 55.)

At approximately 9:43 a.m., the information from the refunding press conference was posted on the Treasury Department's internet web site. (*Id.* ¶ 61.) Plaintiff alleges that when news of the suspension of the 30-Year Treasury Bond became public, it materially affected the price of outstanding 30-Year Treasury Bonds. (*Id.*) In this regard, the ask price for 30-Year Treasury Bonds increased, triggering the largest one-day rally in the price of 30-Year Treasury Bonds since 1987. (*Id.*) In the wake of the public release of the information on October 31, 2001, the price of 30-Year Bonds increased by some 6%. (*Id.*) The Treasury Department's public disclosure also prompted substantial activity in the markets for 30-Year Treasury Futures and 30-Year Treasury Options. (*Id.*)

Plaintiff alleges that it suffered trading losses when it was forced to cover short positions in 30-year Treasury Options at prices that were inflated as a result of Defendants' conduct. (*Id.* ¶ 71.) In this regard, Plaintiff alleges that it suffered $248,796.30 in losses on October 31, 2001, as a consequence of being "forced" to cover certain short positions at that time. (*Id.* ¶ 72.)

*ANALYSIS*

VI. Personal Jurisdiction

*6 Defendants Nothern and Youngdahl have each moved to dismiss Plaintiff's complaint on the ground that this Court does not have personal jurisdiction over them and/or the Northern District of Illinois is an improper venue as to them. (D.E. 35; D.E. 50.) For the following reasons, Nothern's motion is granted and Youngdahl's is denied.

A. Standard for a Federal Rule 12(b)(2) Motion

Federal Rule of Civil Procedure 12(b)(2) provides a defendant a procedural mechanism to challenge a federal district court's exercise of personal jurisdiction. *See* Fed.R.Civ.P. 12(b)(2). Once a defendant moves to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Jennings v. AC Hydraulic A/S,* 383 F.3d 546, 548 (7th Cir.2004) (citing *Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir.2003)). The Court draws all reasonable inferences consistent with the complaint in favor of the plaintiff. *See Quantum Color Graphics, LLC v. Fan Ass'n Event Photo GmbH,* 185 F.Supp.2d 897, 904 (N.D.Ill.2002) (citing *Sapperstein v. Hager,* 188 F.3d 852, 855 (7th Cir.1999)).

If a district court rules on a defendant's motion to dismiss for lack of personal jurisdiction based on the submission of written materials, "the plaintiff need only make out a *prima facie* case of personal jurisdiction." *Purdue Research,* 338 F.3d at 782 (collecting cases; internal quotations omitted). The Seventh Circuit instructs that "[i]n evaluating whether the *prima facie* standard has been satisfied, the plaintiff 'is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record.' " *Id.* (quoting *Nelson v. Park Indus., Inc.,* 717 F.2d 1120, 1123 (7th Cir.1983)). However, if the defendant submits affidavits or other evidence in opposition, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2005 WL 711591, 2005-1 Trade Cases P 74,764, Comm. Fut. L. Rep. P 30,059
**(Cite as: Slip Copy)**

at 783.

B. Plaintiff Has Not Made a *Prima Facie* Showing
That This Court Has Personal Jurisdiction Over
Nothern

Plaintiff must make a *prima facie* showing that the
Court has personal jurisdiction over Nothern. The
Seventh Circuit has held that in federal question
cases (as this case is, at least in part), a plaintiff
must establish two things to demonstrate personal
jurisdiction over a defendant. The plaintiff, at least
in cases involving statutes that provide for
nationwide service of process, as Nothern concedes
is the case here (D.E. 35 at 5), must demonstrate
that: (1) haling the defendant into court accords
with the Due Process Clause of the Fifth
Amendment; and (2) the defendant is amendable to
service of process from the court. *See, e.g., United
States v. De Ortiz,* 910 F.2d 376, 381-382 (7th
Cir.1990); *see also Perry v. Delaney,* 5 F.Supp.2d
617, 619 (C.D.Ill.1998) ; *Lifeway Foods, Inc. v.
Fresh Made, Inc.,* 940 F.Supp. 1316, 1318
(N.D.Ill.1996). As discussed below, Plaintiff has
not met its burden with respect to Nothern.

*7 Nothern argues that this Court does not have
personal jurisdiction over him, pointing out, among
other things, that he does not live in Illinois, does
not own any real estate or any other valuable asset
in Illinois, is not an officer or director of an Illinois
corporation, and is not a party to an Illinois
contract. (*See* D.E. 35 at 4-10; Nothern Aff. ¶¶ 2,
12-13.) In response, Plaintiff argues that its claim "
against Nothern is for manipulation of [Treasury
Bonds,] the commodity underlying the Treasury
Options[,] which Plaintiff purchased on the Chicago
Board of Trade." (D.E. 46 at 3.) Plaintiff notes that
the CBOT is located in this district. (*Id.*) Plaintiff
further contends that "the Court has jurisdiction
over Nothern for his conduct which severely
impacted Plaintiff ... in the Northern District of
Illinois under 7 U.S.C. § 25(c)." (*Id.*) In support of
this contention, Plaintiff states that under 7 U.S.C. §
25(c), "CEA claims [are] appropriately brought in
any judicial district wherein any act or transaction
constituting the violation occurs." (*Id.*)    &nb